**JUDGE STEIN**

14 CV 1993

Safe Horizon Anti-Trafficking Program
50 Court Street, 8th Floor
Brooklyn, New York 11201
Telephone: (718) 943-8641
Facsimile: (718) 943-8653

*Attorneys for Plaintiff Mashud Parves Rana*



RECEIVED
MAR 2 1 2014
U.S.D.C. S.D. N.Y.
CASHIERS

### UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Mashud Parves Rana** | : |
| Plaintiff, | : |
| | : |
| v. | : *Civil Action No.* |
| | : |
| **Monirul Islam and Fahima Tahsina Prova,** | : **COMPLAINT FOR DAMAGES** |
| Defendants. | : |
| | : **Jury Trial Requested** |
| | : |
| | : |
| | : |

Plaintiff Mashud Parves Rana ("Plaintiff" or "Mr. Rana"), by and through his undersigned attorney, with personal knowledge as to himself and his actions and otherwise on information and belief, hereby alleges as follows:

### INTRODUCTION

1. Plaintiff worked in the household of Defendants Monirul Islam and Fahima Tahsina Prova (collectively, "Defendants") as a domestic worker for approximately eighteen months and twenty days.

2. Defendants knowingly and willfully lured Mr. Rana from Bangladesh with false promises of a wage of $3,000 per month and good working conditions. After making such promises and bringing Mr. Rana to the United States, Defendants maintained him here in forced

labor in slavery-like conditions, forbidding him from leaving their residence under his own volition, threatening to beat him or kill him, threatening that the police will arrest and kill him if he left their residence, physically assaulting him on at least two occasions, maintaining possession over Mr. Rana's passport and visa, and withholding all compensation from Mr. Rana for a period of over eighteen months.

3.    Defendants required that Mr. Rana work from approximately 6:30 a.m. to 11:00 p.m., and sometimes later, seven days per week, without a single day off. For this work, Defendants failed to pay Mr. Rana even a single dollar of his promised wage. This willful failure to pay wages violated both state and federal labor laws requiring the statutory minimum wage, overtime pay, and spread-of-hours pay.

4.    Mr. Rana seeks redress for these egregious violations of his most basic human and civil rights. Accordingly, Mr. Rana brings this action under the Trafficking Victims Protection Reauthorization Act ("TVPRA"), federal and state labor laws, breach of contract, and common law to recover his promised wages, lawful minimum and overtime wages, the fair and reasonable value of his work, other compensatory damages, punitive damages, and attorneys' fees and costs.

## JURISDICTION

5.    Jurisdiction of the subject matter of this action is established under 28 U.S.C. § 1331, 29 U.S.C. § 201 *et seq.*, and 18 U.S.C. § 1595(a).

6.    This Court has supplemental jurisdiction over Plaintiff's related state law claims asserted herein under the doctrine of pendent jurisdiction and pursuant to 28 U.S.C. § 1367(a) because these claims are so closely related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution and because they arise from the same common nucleus of operative facts from which the federal claims arise.

7.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendants reside in this district, and because a substantial part of the events and omissions giving rise to the claims occurred in this District.

2

## PARTIES

### Plaintiff

8.      Plaintiff Mashud Parves Rana is a citizen of Bangladesh.

9.      At the outset of the events that give rise to this Complaint, Mr. Rana was living in Bangladesh.  Thereafter, upon information and belief, Mr. Rana was admitted into the United States pursuant to an A-3 Visa, which is available for attendants, servants, personal employees, and members of the immediate families of consular officers.  *See* 8 U.S.C. § 1101(a)(15)(A)(iii). He has resided in the United States at all other times relevant to this action, and continues to reside in New York City.

10.     At all relevant times to this action, Mr. Rana worked for the Defendants at their two residences in New York County, New York.

11.     At all relevant times to this action, Mr. Rana was a domestic worker of Defendants as that term is defined by the Fair Labor Standards Act and New York Labor Law.

12.     At all relevant times to this action, Mr. Rana was a personal employee of Defendants, and was not employed as if he were an employee of any government agency or authority.

13.     Mr. Rana's ability to speak and understand English was extremely limited during the time he worked for Defendants.

### Defendants

14.     At all relevant times to this action, Defendant Monirul Islam served as the Consul General of Bangladesh at the Consulate General of Bangladesh in New York City and continues to serve as the Consul General of Bangladesh.

15.     At all relevant times to this action, Defendant Islam resided in New York County, New York, and continues to reside in New York County, New York.

16.     Defendant Fahima Tahsina Prova is the wife of Defendant Monirul Islam, and at all relevant times to this action, she accompanied Defendant Islam during his posting in the

3

United States, resided with Defendant Islam in New York County, New York, and continues to reside in New York County, New York.

## STATEMENT OF FACTS

### Defendants' Recruitment of Plaintiff and Trafficking to the United States

17.     Mr. Rana was born in Comilla, Bangladesh.

18.     Mr. Rana first met Defendant Monirul Islam through Mr. Rana's stepfather, who knew Defendant Islam because they had grown up together.  Mr. Rana's stepfather learned that Defendant Islam was looking for domestic worker to help the Islam family when they moved to the United States to take up a post at the Consulate General in New York.  Mr. Rana's stepfather introduced Mr. Rana to Defendant Islam.  Mr. Rana was interested in the opportunity to earn money and work in the United States.

19.     In or around June 2012, Mr. Rana provided Defendant Islam with copies of his birth certificate and school records.

20.     Approximately one week later, on or about June 17, 2012, Mr. Rana met with Defendant Islam at his office in the Bangladesh Ministry of Foreign Affairs in Dhaka.  At this meeting, Defendant Islam explained that Mr. Rana would need a passport to travel and arranged to have an employee from his office accompany Mr. Rana to obtain a passport.  Defendant Islam explained that he would be leaving for Brazil shortly, and would travel from there to the United States.  Defendant Islam had Mr. Rana sign some documents in English, which Mr. Rana could not read or understand.  Defendant Islam did not explain what the documents were and because he was a powerful and important person in Bangladesh, Mr. Rana could not question him about it.

21.     Over the next several weeks, with Defendant Islam having already left Bangladesh, Mr. Rana met with Defendant Islam's wife, Defendant Prova, several times to finalize the visa and travel arrangements.

4

22.     Over the course of several meetings, Defendant Prova informed Mr. Rana that he would be going to Brazil first, and would need a Brazilian visa; he would then travel with Defendant Islam from Brazil to the United States.

23.     Defendant Prova had Mr. Rana sign several documents in English, of which Mr. Rana had very limited understanding. Defendant Prova did not provide Mr. Rana with time to read any of the documents, nor did she provide a copy of the documents to Mr. Rana. Rather, she simply told Mr. Rana that these were the documents needed to get him a visa and demanded that he sign the documents.

24.     Defendant Prova then took Mr. Rana to the Brazilian Embassy in Dhaka to get a visa. Mr. Rana was not questioned at the Brazilian Embassy and was only asked to sign a document.

25.     Several days later, Defendant Prova took Mr. Rana back to the Brazilian Embassy to pick up his visa.

26.     Approximately two to three weeks later, Defendant Prova informed Mr. Rana that he would not be going to Brazil to work for Defendant Islam, but would instead go directly to the United States.

27.     Defendant Prova explained that Mr. Rana would need to obtain a visa at the American Embassy in Dhaka and had him sign more documents in English. Again, Defendant Prova did not explain to him what the documents said; she only said that the documents were required to obtain the visa.

28.     Defendant Prova provided Mr. Rana with additional details regarding the terms of his employment over this series of meetings. Defendant Prova explained that Mr. Rana would enjoy all of the rights and privileges of Americans in the United States. She promised to renew Mr. Rana's visa in the United States, and explained that Mr. Rana would be with them for as long as they stayed in New York. Defendant Prova further promised that Mr. Rana would have some free time to himself every day when he completed his job duties.

5

29. Defendant Prova told Mr. Rana that officials at the Embassy would ask him questions about why he was coming to the United States. She instructed Mr. Rana not to answer any questions if they were asked in English, even if Mr. Rana understood. Defendant Prova told Mr. Rana that she would answer all questions that were posed in English and that Mr. Rana was only to answer questions if the official spoke to him in Bengali.

30. Defendant Prova instructed Mr. Rana on how to answer certain questions if asked. For example, Defendant Prova told Mr. Rana that if the official asked whether he would have days off in the United States, he must answer that he would have days off. Defendant Prova told Mr. Rana that he must lie about his education; if the official asked about how long Mr. Rana had been in school, he must say that he only went to school until the fifth grade, even though Mr. Rana had completed high school and had some university-level education. Defendant Prova informed Mr. Rana that if asked, Mr. Rana must say that he had been working for Defendants as a domestic servant for two years in Bangladesh, even though he had not.

31. In or around July 2012, Defendant Prova took Mr. Rana to the American Embassy in Dhaka. Defendant Prova was unable to obtain a visa for Mr. Rana during that visit. Defendant Prova maintained control over Mr. Rana's passport during this process.

32. Approximately ten to fifteen days later, Defendant Prova brought Mr. Rana back to the American Embassy in Dhaka. Defendant Prova spoke in English to an Embassy official. Mr. Rana did not understand much of what was being said, but he did overhear Defendant Prova telling the official that Mr. Rana would be paid "$3,000 per month."

33. The Embassy official only asked Mr. Rana one question directly about the work he would be doing in the United States. Mr. Rana explained that he would be cooking for the family.

34. On the way home from the American Embassy, Defendant Prova informed Mr. Rana directly that she and Defendant Islam would pay him $3,000 per month. She also expressed her displeasure with his answer to the one question he was asked. She told Mr. Rana that he should have stated that he had been cooking for the family for two years.

6

35.     Mr. Rana accepted the terms of employment represented by Defendants to him, including time off each day, some days off, a $3,000 per month salary, and the promise that they would renew his visa before it expired.

36.     Approximately two to three weeks after the second visit to the American Embassy, Defendant Prova informed Mr. Rana that his visa was ready.  Defendant Prova took Mr. Rana back to the American Embassy to retrieve the passport and visa.  Defendant Prova retained possession of Mr. Rana's passport and visa.

37.     Mr. Rana had never been on a plane before, nor had he left Bangladesh prior to this trip.

38.     On or about September 11, 2012, Mr. Rana flew to the United States with Defendant Prova and her son.  Defendant Prova continued to maintain possession of Mr. Rana's passport and presented it to airport security and immigration officials on Mr. Rana's behalf.

**Forced Labor, Abuse, and Isolation in the United States**

39.     Defendants intentionally obtained Mr. Rana's forced labor and involuntary services through fraud and deception, and maintained and benefited from Mr. Rana's labor and services through a pattern of abusive and coercive behavior that included physical threats, coercion, isolation, physical restraint, physical force, threats to Mr. Rana's life, and by confining Mr. Rana to Defendants' apartment, by maintaining control over Mr. Rana's passport and visa, and by causing Mr. Rana to fear that he would be arrested, detained, or killed by law enforcement authorities if he escaped.  Defendants' actions were willfully and knowingly intended to cause Mr. Rana to reasonably believe he had no other choice but to continue working for Defendants.

40.     Immediately after arriving in New York, Mr. Rana began working in Defendants' home, which was in an apartment building in Manhattan.  Mr. Rana would start working at approximately 6:30 am, when he would prepare breakfast for the family.  Mr. Rana was required to cook all meals from scratch, iron clothes, wash clothes by hand, watch Defendants' eleven-year-old son, and clean the entire apartment daily.

41.     Mr. Rana would complete his daily tasks by approximately 11:00 pm each night. However, if Defendants were attending an event outside of the house, Mr. Rana was required to wait for them to return to let them in and prepare a late meal for them. On these occasions, Mr. Rana did not finish his work until approximately 1:00 am. Several times per month, Defendants hosted parties and gatherings in their home, for which Mr. Rana was required to cook for all for the guests, serve, and clean up after the guests left. On these occasions, Mr. Rana did not finish his work until as late as 3:00 am.

42.     Defendants also required that Mr. Rana cook food for events at the Bangladesh Consulate and required that he work as a busboy and server at monthly community events at the Bangladesh Consulate.

43.     Defendants relocated to a different apartment in Manhattan in or around late December 2012 or early January 2013.

44.     In Defendants' first apartment, Mr. Rana was required to sleep on a mattress on the floor in the kitchen despite the fact that there was a spare bedroom that was unoccupied unless guests were visiting. In Defendants' second apartment, Mr. Rana slept in a room that was primarily used for extra storage space. Mr. Rana was not given any place to keep his personal belongings and stored them in a plastic bag near his bed.

45.     Approximately one or two weeks after arriving in the United States, Defendant Islam told Mr. Rana that he would beat him if he did not listen to and follow his instructions. This was the beginning of constant threats by Defendant Islam of physical harm.

46.     Approximately one week after arriving in the United States, Mr. Rana asked Defendant Prova if he could leave the apartment to get some fresh air. Defendant Prova told him that he was not permitted to leave the apartment building and could only go as far as the building lobby.

47.     Defendants maintained possession of Mr. Rana's passport and immigration-related documents during the entire approximately eighteen-month period.

48.     Defendant Islam regularly told Mr. Rana that if he left the apartment, the police would find him and kill him because Mr. Rana did not have his passport. Defendant Islam further warned Mr. Rana that if he was arrested, Defendant Islam would not seek to have him released from jail. Defendant Islam also threatened to kill Mr. Rana himself if he left the apartment. Mr. Rana believed Defendant Islam's threats and felt he could not leave the apartment for fear of the police and Defendant Islam.

49.     With the exception of approximately five or six short trips to a convenience store across the street from Defendants' apartment at Defendants' instruction, Mr. Rana was only permitted to leave the residence with Defendants approximately once per month to work at the Bangladesh Consulate. Until his escape, Mr. Rana did not leave Defendants' apartment building on his own volition for over eighteen months.

50.     Defendants maintained Mr. Rana in a state of near complete isolation and dependence on them.

51.     Defendants never gave Mr. Rana a key to either apartment.

52.     Mr. Rana never had a day off during the approximately eighteen months he worked for Defendants.

53.     Defendants never paid Mr. Rana a single dollar of the promised wages of $3,000 per month.

54.     On one occasion, Defendant Prova gave Mr. Rana $20 as a "gift" during a holiday. Mr. Rana also earned some tips from attendees of the parties at which he was forced to work at the Consulate General of Bangladesh.

55.     Defendants regularly and repeatedly called Mr. Rana "illiterate," "stupid," and "lazy," and told him he was "nothing," in an effort to demean, intimidate, and abuse Mr. Rana.

9

56.     Defendants never allowed Mr. Rana to eat their food or to eat anywhere but alone in the kitchen.  Mr. Rana was only allowed to eat expired or leftover food that was deemed not suitable for Defendants to eat.

57.     Defendants told Mr. Rana that he was not allowed to talk to anyone outside of the house.

58.     Mr. Rana's activities and movements were closely monitored.  Defendant Prova constantly watched Mr. Rana while he did his work during the day.  Defendants listened in to Mr. Rana's telephone conversations with his family – from a telephone in another room – when they would occasionally call Defendants' residence.  When Mr. Rana was required to go to the convenience store, Defendant Prova told Mr. Rana that she watched him from the apartment window.

59.     Mr. Rana was not permitted to make phone calls.  When Defendants were not at home, Mr. Rana would occasionally attempt to use the phone, but he could not.  The phone would always say "line in use."

60.     Neither Defendants nor anyone else oriented Mr. Rana to New York, or explained how to use taxis, buses, or the subway.  He had no sense of where Defendants' home was located in the city or on a map.

61.     In or around June 2013, Defendants informed Mr. Rana that his visa had expired. Defendant Islam used this information as an opportunity to repeat his threats regarding what would happen if Mr. Rana escaped.  Defendant Islam again warned that if Mr. Rana went outside, the police would catch him and kill him, and especially because his visa was now expired. The Defendants further threatened that if the police caught him, Defendant Islam would not seek to have him released.   Defendant Islam also told Mr. Rana that if Defendant Islam killed him, Defendant Islam would not have to answer to anyone.

62.     Defendants' failure to renew Mr. Rana's visa increased Mr. Rana's vulnerability and isolation, which Defendants exploited to their benefit.

63.     Defendant Islam was physically violent towards Mr. Rana on approximately two occasions. On the first occasion, approximately three or four months after Mr. Rana arrived in the United States, Mr. Rana inquired about his pay because he had not received any compensation. Defendant Islam responded by hitting Mr. Rana on back of the head, and told him, "I brought you to America, that is enough."

64.     On the second occasion, on or about February 21, 2014, Defendant Islam told Mr. Rana that he was going to Morocco, and that Mr. Rana must come with him. He then presented Mr. Rana with a document in English and told him to sign it. Mr. Rana understood that this document would require him to work for Defendant Islam in Morocco, something he did not want to do, and Mr. Rana refused to sign the document. Defendant Islam hit Mr. Rana in the head and pushed him into the kitchen from the dining room. Mr. Rana's head hit the kitchen counter and Mr. Rana held onto the counter to brace himself. Defendant Islam slammed the doors to the kitchen shut and left Mr. Rana in the kitchen. Mr. Rana felt dizzy from the blow to his head and needed to remain in that spot for nearly ten minutes until he had his bearings.

65.     Eventually, Mr. Rana left the kitchen and went to his room. There, Mr. Rana overheard Defendants speaking to each other while he remained in the kitchen. Mr. Rana overheard Defendant Islam say to Defendant Prova that they could not leave him in the United States and they could not send him back to Bangladesh because Mr. Rana could report Defendant Islam to the authorities, which could create a problem for his job and harm his reputation. Defendant Islam said they had no other option but to bring Mr. Rana with them to Morocco.

66.     Two or three hours later, Defendant Islam informed Mr. Rana that he must come with him to Morocco, or Defendant Islam would kill him.

11

**Escape**

67.     In or around the end of February 2014, Mr. Rana's relative called Defendants' home and spoke with Mr. Rana. She provided Mr. Rana with the name and phone number of a person in New York City whom Mr. Rana should contact. Mr. Rana wrote the name and phone number down.

68.     Because Mr. Rana knew that Defendants were listening to the conversation, Mr. Rana presented the name and phone number to Defendant Islam and asked Defendant Islam if he could call him. Defendant Islam took the phone number.

69.     A few days later, on or around March 2, 2014, Mr. Rana asked Defendant Islam if he called his relative's contact in New York on his behalf, and he said that he did not and threw the paper with the contact information away while Mr. Rana stood in front of him. Mr. Rana picked up the piece of paper and kept it.

70.     Later that day, when Defendants were not home, Mr. Rana went to the lobby of the apartment building and used a phone at the reception desk to call his relative's contact. The contact gave him an address in New York City where he should go to meet him. Mr. Rana left several hours later with the clothes on his back and a few personal effects. Mr. Rana could not take passport or visa because it had been confiscated by Defendants.

**Violations of the Employment Laws and Breach of Contract**

71.     At all relevant times to this action, Defendant Islam had the power to hire and fire Mr. Rana, and both Defendants had the power to terminate Mr. Rana's employment.

72.     At all relevant times to this action, Defendants had the power to set Mr. Rana's schedule.

73.     At all relevant times to this action, Defendants supervised Mr. Rana.

74.     At all relevant times to this action, Defendants controlled Mr. Rana's work conditions.

75.     At all relevant times to this action, Defendants were employers of Mr. Rana as defined under the employment laws.  29 U.S.C. § 203(g); N.Y. Lab. L. § 190.

76.     Defendants did not pay Mr. Rana any wages at all for the thousands of hours he worked.

77.     Defendants did not pay Mr. Rana the statutory federal or state minimum wage rate.

78.     Defendants did not pay Mr. Rana the required overtime pay over forty-four hours of work per week as required by the New York state law.

79.     Defendants did not inform Mr. Rana about the minimum wage or overtime pay requirements.

80.     Defendants did not pay Mr. Rana spread of hours pay as required under New York state law: an additional hour of pay for those days in which the interval between the time Mr. Rana started and ended was more than ten hours.

81.     Upon information and belief, Defendants did not maintain proper records for Mr. Rana's work schedules and pay.  Defendants did not provide him with wage statements as required by both federal and state law.

82.     At all relevant times to this action, Defendants did not post any information indicating the laws regarding the minimum wage and overtime pay, or otherwise provide Mr. Rana any information about his rights under federal or state employment laws.

83.     Defendants' failure to inform Mr. Rana of his rights was willful and/or intentional.

13

84.     Defendants did not pay Mr. Rana the salary as agreed in the Parties' oral contract and, upon information and belief, as referenced in the written documents the Parties signed.

85.     Pursuant to the Foreign Affairs Manual, 9 FAM 41.22, foreign consular officers posted in the United States may obtain A-3 visas for their personal employees, domestic workers, and servants, if they submit, among other requirements, "an employment contract signed by both the employer and the employee which must include each of the following items:"

     i. "Description of Duties.  The contract must describe the work to be performed, e.g., housekeeping gardening, child care, and also must include a statement that the domestic employee shall work only for the employer who signed the contract."

     ii. "Hours of Work.  The contract must state the time of the normal working hours and the number of hours per week.  It is generally expected that domestic workers will be required to work 35-40 hours per week.  It also must state that the domestic employee will be provided a minimum of one full day off each week. The contract must indicate the number of paid holidays, sick days, and vacation days the domestic employee will be provided."

     iii. "Minimum Wage.  The contract must state the hourly wage to be paid to the domestic employee.  The rate must be the greater of the minimum wage under U.S. Federal and state law, or the prevailing wage for all working hours…"

     iv. "The contract must state that wages will be paid to the domestic employee either weekly or biweekly…"

     v. "Overtime Work.  The contract must state that any hours worked in excess of the normal number of hours worked per week are considered overtime hours, and that hours in which the employee is 'on call' count as work

14

hours.  It also must state that such work must be paid as required by U.S. local laws."

vi.  "Payment.  The contract must state that after the first 90 days of employment, all wage payments must be made by check or by electronic transfer to the domestic worker's bank account.  Neither Mission members nor their family member should have access to domestic workers' bank accounts…"

vii.  "Other Required Terms of Employment. The contract must state that the employer agrees to abide by all Federal, State, and local laws in the United States.  The contract also must include a statement that the domestic worker's passport and visa will be in the sole possession of the domestic worker…."

86.     Upon information and belief, Defendants presented a contract with the required terms pursuant to 9 FAM 41.22 to the American Embassy in Dhaka, Bangladesh in order to obtain an A-3 visa for Mr. Rana.

**FIRST CLAIM FOR RELIEF**

**Trafficking Victims Protection Reauthorization Act ("TVPRA")**
**Forced Labor: 18 U.S.C. §§ 1589, 1595**

87.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

88.     As set forth in 18 U.S.C. § 1595, Plaintiff may bring a civil action against the perpetrators of violations of the TVPRA.

89.     Defendants are perpetrators of the violations of 18 U.S.C. § 1589.

90.     The forced labor provision of the TVPRA, 18 U.S.C. § 1589, establishes: "(a) Whoever knowingly provides or obtains the labor or services of a person by any one of, or by

15

any combination of, the following means (1) by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another person; (2) by means of serious harm or threats of serious harm to that person or another person; (3) by means of the abuse or threatened abuse of law or legal process; or (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint, shall be punished as provided under subsection (d)."

91.     Defendants knowingly obtained Mr. Rana's labor and services through physical threats, coercion, isolation, physical restraint, intimidation, threats against Mr. Rana's life, physical force, by confining Mr. Rana to Defendants' apartment, by maintaining control over Mr. Rana's passport and visa, and by causing Mr. Rana to fear that he would be arrested, detained, or killed by law enforcement authorities if he escaped.

92.     Defendants developed and participated in a scheme, which included, but was not limited to, confiscating and keeping Mr. Rana's passport and visa, and intending to cause Mr. Rana to believe that if he did not perform the labor or services, he would suffer serious harm.

93.     Defendants used threats and intimidation to hold Mr. Rana in captivity and force him to work without paying him the compensation required by law.

94.     As a result of Defendants' conduct, Mr. Rana has suffered damages in an amount to be determined at trial.

95.     Pursuant to 18 U.S.C. Section 1595(a), Mr. Rana is entitled to recover compensatory and punitive damages and reasonable attorneys' fees for Defendants' wrongful conduct.

## SECOND CLAIM FOR RELIEF

### Trafficking Victims Protection Reauthorization Act

### Trafficking With Respect to Peonage, Slavery, Involuntary Servitude, or Forced Labor:

### 18 U.S.C. §§ 1590, 1595

96.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

97.     As set forth in 18 U.S.C. § 1595, Plaintiff may bring a civil action against the perpetrators of violations of the TVPRA.

98.     Defendants are perpetrators of the violations of 18 U.S.C. § 1590.

99.     The trafficking into peonage, slavery, involuntary servitude, or forced labor provision of the TVPRA, 18 U.S.C. § 1590, provides: "recruiting, harboring, transporting, providing, or obtaining by any means any person for labor or services in violation of laws prohibiting peonage, slavery, involuntary servitude, or forced labor shall subject defendant to fines."

100.    Involuntary servitude is defined as "a condition of servitude induced by means of any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such condition, that person or another person would suffer serious harm or physical restraint; or the abuse or threatened abuse of legal process." 8 C.F.R. § 214.11(a).

101.    As set forth herein, Defendants knowingly recruited, harbored, transported, provided, and obtained Mr. Rana to provide labor and services to Defendants in violation of laws prohibiting slavery, involuntary servitude, and forced labor.

102.    Defendants knowingly induced a system of servitude by means of physical threats, coercion, isolation, physical restraint, intimidation, threats against Mr. Rana's life, physical force, by confining Mr. Rana to Defendants' apartment, by maintaining control over

17

Mr. Rana's passport and visa, and by causing Mr. Rana to fear that he would be arrested,

detained, or killed by law enforcement authorities if he escaped.

103.    As a result of Defendants' conduct, Mr. Rana has suffered damages in an amount

to be determined at trial.

104.    Pursuant to 18 U.S.C. Section 1595(a), Mr. Rana is entitled to recover

compensatory and punitive damages and reasonable attorneys' fees for Defendants' wrongful

conduct.

### THIRD CLAIM FOR RELIEF

**Trafficking Victims Protection Reauthorization Act**

**Unlawful Conduct With Respect To Documents In Furtherance Of Trafficking, Peonage, Slavery, Involuntary Servitude, Or Forced Labor**

**18 U.S.C. §§ 1595, 1592**

105.    Plaintiff realleges and incorporates, as though fully set forth herein, each and

every allegation contained in the above paragraphs.

106.    As set forth in 18 U.S.C. § 1595, Plaintiff may bring a civil action against the

perpetrators of violations of the TVPRA.

107.    Defendants are perpetrators of the violations of 18 U.S.C. § 1592.

108.    18 U.S.C. § 1592 makes it unlawful to "knowingly destroy[], conceal[], remove[],

confiscate[], or possess[] any actual or purported passport or other immigration document, or any

other actual or purported government identification document, of another person— (1) in the

course of a violation of section[s] . . . 1589, 1590 . . . (2) with intent to violate section[s] . . .

1589, 1590; or (3) to prevent or restrict or to attempt to prevent or restrict, without lawful

authority, the person's liberty to move or travel, in order to maintain the labor or services of that

person, when the person is or has been a victim of a severe form of trafficking in persons . . . ."

18

109.     Defendants knowingly concealed, removed, confiscated, and/or possessed Plaintiff's passport and other immigration-related documents to prevent or restrict or to attempt to prevent or restrict, without legal authority, Plaintiff's liberty to move or to travel, in order to maintain Plaintiff's labor or services.  Plaintiff is a victim of a severe form of trafficking as defined by the Trafficking Victims Protection Act of 2003, 22 U.S.C. § 7102(9).  Therefore, Defendants' acts violated 18 U.S.C. § 1592.

110.     As a result of Defendants conduct, Mr. Rana has suffered damages in an amount to be determined at trial.

111.     Pursuant to 18 U.S.C. Section 1595(a), Mr. Rana is entitled to recover compensatory and punitive damages and reasonable attorneys' fees for Defendants' wrongful conduct.

**FOURTH CLAIM FOR RELIEF**

**Fair Labor Standards Act ("FLSA") Minimum Wage**

**29 U.S.C § 201 *et seq.***

112.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

113.     Because Plaintiff was employed as a domestic worker in a household at times relevant to this action, Plaintiff was engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 202(a).

114.     Section 6(a) of the FLSA, 29 U.S.C. § 206(a), provides that any employee engaged in commerce shall be paid wages at a specific rate during the period of Plaintiff's employment.

115.    In all periods of Plaintiff's employment, Defendants knowingly failed to pay Plaintiff an hourly rate of at least the federal minimum wage, in violation of 29 U.S.C. §§ 206 and 216.

116.    Defendants failed to display, in a place accessible to Plaintiff and in a visually conspicuous manner, the notices of employee rights to receive wages and overtime pay as required under the FLSA.  29 C.F.R. § 516.4.

117.    Defendants' willful and intentional failure to pay Plaintiff the minimum wage violates 29 U.S.C. § 201, *et seq.*, and U.S. Department of Labor regulations.

118.    Defendants did not act in good faith when they failed to comply with the federal minimum wage law and paid Mr. Rana nothing.

119.    Plaintiff is entitled to an award of damages for unpaid minimum wages in amounts equal to the proper federal minimum wage he should have been paid, plus liquidated damages, attorneys' fees, and costs.

**FIFTH CLAIM FOR RELIEF**

**New York State Minimum Wage Law**

**N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.***

120.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

121.    At all relevant times to this action, Plaintiff was employed by Defendants within the meaning of New York Labor Law §§ 2 and 651.

122.    At all relevant times to this action, Defendants were employers within the meaning of the New York Labor Law.

123.    In all periods of Plaintiff's employment, Defendants failed to pay Plaintiff the proper minimum wage, as required by New York Labor Law.  N.Y. Lab. L. § 650 *et seq.*

124.     Defendants failed to display, in a place accessible to employees and in a visually conspicuous manner, the notices of employee rights and to receive wages and overtime pay as is required under the New York Labor Law.  N.Y. Lab. L. § 680(3); 12 N.Y.C.R.R. § 137-2.3.

125.     Defendants knowingly, willfully, and intentionally failed to maintain accurate records and failed to account for all hours Plaintiff regularly worked, as they were required to do by law.  N.Y. Lab. L. § 195.

126.     Defendants' failure to pay Plaintiff the minimum wage was willful and/or not in good faith.

127.     Plaintiff is entitled to an award of damages for unpaid minimum wages in an amount equal to the proper state minimum wage he should have been paid, plus liquidated damages, attorneys' fees, and costs.

### SIXTH CLAIM FOR RELIEF

#### New York State Overtime Law

#### N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.*; 12 N.Y.C.R.R. § 142-2.2

128.     Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

129.     Defendants failed to pay Plaintiff overtime premiums for his work in excess of forty-four (44) hours per week, as required for a residential employee in violation of New York Labor Law §§ 190 *et seq.* and 650 *et seq.* and New York Department of Labor regulations, 12 N.Y.C.R.R. § 142-2.2.

130.     Defendants' failure to pay Plaintiff overtime pay was willful and/or not in good faith.

21

131.    Plaintiff is entitled to an award of damages for overtime pay for work over forty-four (44) hours per week in an amount equal to the proper overtime premiums he should have been paid, plus liquidated damages, attorneys' fees, and costs.

## SEVENTH CLAIM FOR RELIEF
### New York Labor Law, Spread of Hours Pay
### N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.*; 12 N.Y.C.R.R. § 142-2.4

132.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

133.    Defendants failed to pay Mr. Rana one extra hour's pay for every day in which the interval between the beginning and end of Mr. Rana's work day exceeded ten hours, in violation of 12 N.Y.C.R.R. § 142-2.4 and N.Y. Lab. L. §§ 190 *et seq.* and 650 *et seq.*

134.    Defendants' failure to pay Plaintiff spread of hours pay was willful and/or not in good faith.

135.    Plaintiff is entitled to an award of an extra hour's pay for every day that Plaintiff worked in excess of ten hours, liquidated damages, attorneys' fees, and costs.

## EIGHTH CLAIM FOR RELIEF
### New York Labor Law, Frequency of Payments
### N.Y. Lab. L. § 191(1)(a)(i)

136.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

137.    New York Labor Law requires employers to pay manual laborers each week, and to pay promised wages for every hour worked. N.Y. Lab. L. §§ 190, 191, *et seq.*

138.    Mr. Rana did not receive payment of wages for hours worked within seven calendar days after the end of the week in which the wages were earned, in violation of N.Y. Lab. L. § 191(1)(a)(i).

139.    Defendants' failure to pay Plaintiff the promised wages was willful and/or not in good faith.

140.    Plaintiff is entitled to his promised wages, plus liquidated damages, attorneys' fees, and costs.

### NINTH CLAIM FOR RELIEF
**New York Labor Law**
**Notice and Record-Keeping, New York Labor Law § 195**

141.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

142.    Employers are required to provide, at the time of hire and each subsequent year of employment, notice of the employee's rights to receive minimum wage and overtime at a rate of one and one-half their regular rate.  N.Y. Lab. L. § 195.

143.    Employers are also required to obtain, yearly from employees, written acknowledgement that such notice was provided.  N.Y. Lab. L. § 195.

144.    Defendants failed to provide Mr. Rana the requisite notice of his rights to receive minimum wage and overtime pay and failed to obtain written acknowledgement from Plaintiff of such notice, thus entitling Plaintiff to damages of fifty dollars for each work week that he did not receive the notice required by N.Y. Lab. L. § 195(1)(a) and one hundred dollars for each work week that he did not receive the notice required by N.Y. Lab. L. § 195(3), together with costs and reasonable attorneys' fees.

23

## TENTH CLAIM FOR RELIEF

### Fraudulent Misrepresentation

145. Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

146. Prior to Mr. Rana's arrival in the United States, Defendants represented to him that they would pay him $3,000 per month and that he would enjoy all the rights and liberties available in the United States. They further represented that Mr. Rana would have time off and time each day to himself. Finally, they represented that they would renew Mr. Rana's visa, of which they had in their possession, when it expired.

147. Defendants never fulfilled any of their promises. Instead, Defendants forced Mr. Rana to work for more than approximately sixteen hours per day, seven days per week without pay for over eighteen months, with no freedom to leave, no identification documents, and no time to himself. Upon information and belief, despite their promises, Defendants never renewed Mr. Rana's visa.

148. From the beginning, Defendants never intended to pay Mr. Rana, never intended to give him any time off, or to renew his visa, but rather intended to subject him to trafficking, slavery, involuntary servitude, and forced labor in violation of federal, state, and common law. That intention is evident through Defendants' role in misrepresenting the terms of Mr. Rana's employment to American Embassy officials in Dhaka, Bangladesh in order to obtain a work visa for Mr. Rana.

149. Mr. Rana justifiably relied on Defendants' misrepresentations in deciding to leave his life and family in Bangladesh to work in the United States.

150. Mr. Rana's justifiable reliance on Defendants' false representations caused injuries to him, including, among others, lost wages and overtime compensation.

151.    Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively, with the wrongful intention of injuring Plaintiff, with an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights, entitling Plaintiff to recover punitive damages in an amount to be proven at trial.

## ELEVENTH CLAIM FOR RELIEF
### Breach of Contract

152.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

153.    Plaintiff and Defendants entered into an oral agreement, whereby Plaintiff agreed to work for Defendants, and Defendants agreed to pay Plaintiff $3,000 per month.

154.    Defendants breached the terms of the Parties' oral contract.

155.    Plaintiff and Defendants entered into a written contract, whereby, upon information and belief, the Parties agreed to the terms mandated by the Foreign Affairs Manual, 9 FAM 41.22, as described above.

156.    Defendants breached the terms of the Parties' written contract.

157.    Plaintiff is entitled to recover damages in amount to be proven at trial.

## TWELFTH CLAIM FOR RELIEF
### Unjust Enrichment

158.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

159.    Plaintiff rendered services as cook, housekeeper, babysitter, and on-call servant, *inter alia*, in good faith and with the expectation that he would be fairly compensated for such services.

160.    Defendants accepted those services and in turn failed to compensate Plaintiff for the reasonable and/or fair market value of his services.

161.    Defendants were unjustly enriched because Mr. Rana worked for Defendants without compensation.

162.    Defendants received the benefit of Mr. Rana's unpaid labor though fraudulent and unconscionable conduct.

163.    Equity and good conscience require that Mr. Rana receive restitution.

164.    Plaintiff is entitled to recover damages in an amount to be proven at trial.

### THIRTEENTH CLAIM FOR RELIEF

#### Quantum Meruit (In the Alternative)

165.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

166.    Plaintiff renders services as cook, housekeeper, babysitter, and on-call servant, *inter alia*, in good faith and with the expectation that he would be fairly compensated for such services.

167.    Defendants accepted those services and in turn failed to compensate Plaintiff for the reasonable and/or fair market value of his services.

168.    Defendants were unjustly enriched because Mr. Rana worked for Defendants without compensation.

169.    Defendants received the benefit of Mr. Rana's unpaid labor though fraudulent and unconscionable conduct.

170.    Equity and good conscience require that Mr. Rana receive restitution.

171.    Plaintiff is entitled to recover damages in an amount to be proven at trial.

26

## FOURTEENTH CLAIM FOR RELIEF

### Conversion

172.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

173.    Defendants wrongfully took and assumed ownership over Plaintiff's passport and immigration-related documents without his permission and to the exclusion of Plaintiff's ownership rights in the property.

174.    As a result, Plaintiff is entitled to return of the property and to compensatory and punitive damages in an amount to be proven at trial.

## FIFTEENTH CLAIM FOR RELIEF

### Trespass to Chattel (In the Alternative)

175.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

176.    At all times mentioned in the Complaint, Plaintiff had legal title to his passport and other immigration-related documents.

177.    Defendants intentionally interfered with Plaintiff's use or possession of his passport and other immigration-related documents.

178.    Defendants' trespass and interference proximately caused damage to Plaintiff, including but not limited to, damage to Plaintiff's use and enjoyment of his passport and immigration-related documents.

179.    Plaintiff is entitled to the return of property and all damages sustained as a result of such trespass, in an amount to be determined at trial.

## SIXTEENTH CLAIM FOR RELIEF

### False Imprisonment

180.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

181.    Defendants intentionally confined and restrained Plaintiff in Defendants' home against Plaintiff's will by use of threats and physical abuse.

182.    Defendants' intentional actions constitute false imprisonment.

183.    Plaintiff is entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, attorneys' fees, and costs.

## SEVENTEENTH CLAIM FOR RELIEF

### Assault and Battery

184.    Plaintiff realleges and incorporates, as though fully set forth herein, each and every allegation contained in the above paragraphs.

185.    Defendant Islam intentionally placed Plaintiff in apprehension of imminent harm and oppressive contact.

186.    Defendant Islam's intentional acts constitute assault, and Plaintiff suffered serious injury as a result.

187.    Defendant Islam intentionally made physical contact without Plaintiff's consent on at least two occasions, in or around January 2013 and on or about February 21, 2014. Plaintiff is entitled to an award of compensatory and punitive damages, in an amount to be determined at trial, attorneys' fees, and costs.

## PRAYER FOR RELIEF

WHEREFORE, based on the allegations set forth above and/or additional facts that will be revealed through discovery, Plaintiff respectfully requests that a judgment be granted as follows:

1.      Awarding Plaintiff unpaid minimum wages, plus liquidated damages, interest, and attorneys' fees and costs, pursuant to 29 U.S.C. § 201 *et seq.*;

2.      Awarding Plaintiff unpaid wages, including promised wages, minimum wages overtime pay, and spread-of-hours pay, plus liquidated damages, interest, attorneys' fees and costs, pursuant to New York Labor Law § 190, *et seq.*;

3.      Awarding Plaintiff punitive and compensatory damages, the reasonable and/or fair market value of services provided to Defendants, attorneys' fees and costs, and such other relief as the Court may deem just and proper pursuant to the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. § 1595;

4.      Awarding Plaintiff pre-judgment interest and post-judgment interest as allowed by law;

5.      Directing Defendants to turn over Plaintiff's passport and identification documents, and all other personal belongings remaining in Defendants' control; and awarding Plaintiff compensatory and punitive damages due to the conversion and/or trespass of his passport and other documents;

6.      Declaring the oral contract between the Parties a valid contract and awarding Plaintiff the value of the terms of the contract; or in the alternative, awarding Plaintiff the reasonable and/or fair market value of services provided to Defendants in good faith pursuant to Plaintiff's claims of unjust enrichment or quantum meruit;

7.      Awarding Plaintiff such other legal and equitable relief as the Court may deem just and proper.

Dated: New York, New York
       March 21, 2014

Respectfully submitted,

By: _____

Dana Sussman
Safe Horizon Anti-Trafficking Program
50 Court Street, 8th Floor
Brooklyn, New York 11201
Telephone: (718) 943-8641
Facsimile: (718) 943-8653

*Attorney for Plaintiff Mashud Parves Rana*