UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| MASHUD PARVES RANA, | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : No. 14-CV-01993  (SHS) |
| | : |
| MONIRUL ISLAM and | : ECF Case |
| | : |
| FAHIMA TASHINA PROVA, | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW
## IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Dana Sussman
Safe Horizon Anti-Trafficking Program
50 Court Street, 8th Floor
Brooklyn, New York 11201
Telephone: (718) 943-8641
Email: dana.sussman@safehorizon.org

Emily Shea (admitted *pro hac vice*)
DECHERT LLP
1900 K Street NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Email: emily.shea@dechert.com

*Attorneys for Plaintiff Mashud Parves Rana*

May 28, 2014

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................ 2

I.    DEFENDANTS LURED MR. RANA TO THE UNITED STATES AND THEN
      SUBJECTED HIM TO FORCED LABOR, ABUSE, AND ISOLATION ...................... 2

II.   DEFENDANTS WERE SERVED WITH THE SUMMONS AND COMPLAINT
      AT THEIR MANHATTAN APARTMENT BUILDING ................................... 5

ARGUMENT ................................................................................................ 7

I.    SERVICE OF PROCESS WAS SUFFICIENT ................................................ 7

      A.    Contrary to Defendants' Contention, Plaintiff Was Not Required To
            Resort To Rule 4(f) ........................................................................ 7

      B.    Defendants Have Failed To Rebut Plaintiff's Prima Facie Case That
            Service Was Sufficient .................................................................... 9

            1.    Plaintiff Has Established A Prima Facie Case That Service Was
                  Proper ................................................................................... 9

            2.    Defendants Have Neither Denied That They Received Service Nor
                  Sworn To Specific Facts Rebutting The Presumption That Service
                  Was Proper ......................................................................... 10

      C.    Defendants' Actual Notice Of The Complaint Further Bolsters Plaintiff's
            Showing That Service Was Effective ................................................ 13

      D.    For Avoidance of Any Doubt, This Court Can Order Service on
            Defendants' U.S. Lawyers ............................................................. 14

II.   DEFENDANTS ARE NOT IMMUNE FROM THIS SUIT ............................. 16

      A.    Defendants Are Not Entitled To Diplomatic Immunity Because Defendant
            Islam Was Not A Diplomat ............................................................. 16

      B.    Consular Immunity Does Not Shield Defendants From Plaintiff's Claims ........ 18

            1.    Consular Immunity Is Limited ................................................ 18

            2.    Defendant Islam Is Not Immune Because The Employment Of A
                  Personal Domestic Worker Is Not A "Consular Function." .................. 19

            3.    Defendant Islam Is Not Immune Because He Was Not Acting As
                  An "Agent" Of Bangladesh When He Contracted for Plaintiff's
                  Employment ......................................................................... 21

            4.    Defendant Prova Is Not Entitled To Any Consular Immunity ............... 22

III.  PLAINTIFF STATED A CLAIM FOR FRAUDULENT MISRPRESENTATION ...... 23

CONCLUSION ............................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*131 Main St. Assocs. v. Manko*,
  897 F. Supp. 1507 (S.D.N.Y. 1995).......................................................................10

*Ali v. Mid-Atlantic Settlement Servs., Inc.*,
  233 F.R.D. 32 (D.D.C. 2006)...............................................................10, 12, 13, 14

*Arista Records LLC v. Media Servs. LLC*,
  No. 06-15319, WL 563470 (S.D.N.Y. Feb. 25, 2008)..........................................15

*Bhardwaj v. Dayal*,
  No. 11-4170 ............................................................................................................17, 20

*Carillo v. Hagerty*,
  No. 05-1417, 2006 WL 2165679 (D. Conn. July 31, 2006) ...................................14

*Dunn v. Burns*,
  839 N.Y.S.2d 894, 895-96 (App. Div. 2007)..........................................................12

*F.I. DuPont, Glore, Forgan & Co. v. Chen*,
  364 N.E.2d 1115 (N.Y. 1977)..................................................................................10

*Fed. Home Loan Mortgage Corp. v. Venticinque*,
  658 N.Y.S.2d 689 (App. Div. 1997) .......................................................................12

*In GLG Life Tech. Corp. Securities Litig.*,
  287 F.R.D. 262, 265 (S.D.N.Y. 2012) .....................................................................15

*Hettler v. Entergy Enterprises, Inc.*,
  -- F. Supp. 2d --, 2014 WL 1508699 (S.D.N.Y. Mar. 28, 2014) ...........................16

*Jaffe and Asher v. Van Brunt*,
  158 F.R.D. 278 (S.D.N.Y. 1994) .......................................................................12, 13

*Joseph v. Office of the Consulate General of Nigeria*,
  830 F.2d 1018 (9th Cir. 1987) .................................................................................17

*Karlin v. Avis*,
  326 F. Supp. 1325 (E.D.N.Y. 1971) ........................................................................12

*Karlsson v. Rabinowitz*,
  318 F.2d 666 (4th Cir. 1963) ............................................................................12, 13

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006).....................................................................................23

*Logan v. Dupuis,*
    990 F. Supp. 26 (D.D.C. 1997) ........................................................................18

*Magnifico v. Villanueva,*
    783 F. Supp. 2d 1217 (S.D. Fla. Apr. 2011) ....................................................25

*Manlinguez v. Joseph,*
    226 F. Supp. 2d 377 (E.D.N.Y. 2002) .......................................................23, 25

*Mateo v. Perez,*
    No. 98-7426, 1999 WL 216651 (S.D.N.Y. Apr. 13, 1999) ..............................17

*Mazengo v. Mzengi,*
    542 F. Supp. 2d 96 (D.D.C. 2008) ...................................................................17

*Nat'l Dev. Co. v. Triad Holding Corp.,*
    930 F.2d 253 (2d Cir. 1991)..............................................................................11

*Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.,*
    301 F.3d 54 (2d Cir. 2002)..................................................................................9

*Park v. Shin,*
    313 F.3d 1138 (9th Cir. 2002) ...........................................................17, 19, 20, 21

*Swarna v. Al-Awadi,*
    No. 06-cv-4880, 2007 WL 2815605 (S.D.N.Y. Sept. 20, 2007) .......................15

*United States v. Chindawongse,*
    771 F.2d 840 (4th Cir. 1985) .............................................................................17

*United States v. Khobragade,*
    -- F. Supp. 2d --, 2014 WL 1621471 (S.D.N.Y. Mar. 12, 2014) ................17, 18

*United States v. Kostadinov,*
    734 F.2d 905 (2d Cir. 1984)........................................................................16, 18

*United States v. Kuznetsov,*
    442 F. Supp. 2d 102 (S.D.N.Y. 2006)...............................................................17

*United States v. Lumumba,*
    741 F.2d 12 (2d Cir. 1984)................................................................................17

*Volkswagenwerk Aktiengesellschaft v. Schlunk,*
    486 U.S. 694 (1988).............................................................................................8

STATUTES

Fed. R. Civ. P. 4 .......................................................................................... passim

Fed. R. Civ. P. 9(b) ...............................................................................................2, 23, 25

N.Y. C.P.L.R. 308(2) ...............................................................................................9, 10

N.Y. Gen. Bus. Law § 11 ...............................................................................................5


OTHER AUTHORITIES

James E. Hickey, Jr., Annette Fisch, The Case to Preserve Criminal Jurisdiction
    Immunity Accorded Foreign Diplomatic and Consular Personnel in the United States,
    41 HASTINGS L. J. 351, 372 (1990) ..........................................................................22

James M. Parkhill, Diplomacy In The Modern World: A Reconsideration of the Bases for
    Diplomatic Immunity in the Era of High-Tech Communications, 21 HASTINGS INT'L
    & COMP. L. REV. 565, 575 (1997) ..........................................................................22

Restatement (Third) of Foreign Relations Law of the United States (1987).....................17, 18, 22

Vienna Convention on Consular Relations,
    Apr. 24, 1963, 21 U.S.T. 77.................................................................................16, 18, 19, 21

Vienna Convention on Diplomatic Relations,
    Apr. 18, 1961, 23 U.S.T. 3227..........................................................................15, 16

## PRELIMINARY STATEMENT

Plaintiff Mashud Parves Rana was employed, or rather enslaved, by Defendants from September 2012 until his escape in March 2014.  During this time, Defendant Monirul Islam served as the Consul General at the Consulate General of Bangladesh in New York City.  Mr. Rana was trafficked from Bangladesh to New York by Defendants to serve as a domestic worker in their Manhattan apartment.  Defendants enticed Mr. Rana here with false promises regarding pay and working conditions.  Instead, Defendants paid Mr. Rana nothing, required him to work up to 20 hours per day 7 days per week, confined him in their apartment, and verbally and physically abused him.

Three weeks after his escape, Mr. Rana filed this suit and immediately sought to serve Defendants at their Manhattan apartment.  After attempting to personally serve Defendants three times – one time, observing that Defendants were inside their apartment but refused to answer the door – the process server left the summons and Complaint with the doorman, who confirmed that Defendants were residents of the building.  Now, Defendants claim that they left New York and moved to Morocco the very day the Complaint was left at their apartment building in Manhattan, and therefore argue that service was procedurally insufficient.  ***However, Defendants do not deny that they were actually served***.  Indeed, one day after the filing of the Complaint, Defendant Islam was speaking to the press about it in detail, and three weeks later, Defendants' attorney entered her appearance.

In addition to contesting service, Defendants try to avoid responsibility for their actions by asserting that they are entitled to diplomatic immunity.  But Defendants completely ignore the fact that ***Defendant Islam was not a diplomat***, but merely a consular officer who is entitled to immunity only for official consular acts.  And Defendants' employment of Mr. Rana to cook

1

their meals, clean their home, and care for their child is not a consular function. Thus, Defendants are not shielded from liability by diplomatic or consular immunity.

Finally, Defendants assert that Mr. Rana's fraudulent misrepresentation claim does not meet the pleading standard required by Rule 9(b), but fail to explain how Mr. Rana's factual allegations are deficient. This flimsy argument can be readily disposed of. The Complaint contains specific facts about the false promises Defendant Prova made to Mr. Rana to lure him to the United States, and how Defendants immediately reneged on those promises and forced Mr. Rana to perform nearly round-the-clock labor for them. Thus, Defendants' Motion to Dismiss the Complaint should be denied in its entirety.

## **FACTUAL BACKGROUND**

### I.     **DEFENDANTS LURED MR. RANA TO THE UNITED STATES AND THEN SUBJECTED HIM TO FORCED LABOR, ABUSE, AND ISOLATION.**

Mr. Rana's Complaint alleges that Defendants "knowingly and willfully lured Mr. Rana from Bangladesh" to the United States for the purpose of "obtaining Mr. Rana's forced labor and involuntary services" through "physical threats, coercion, isolation, physical restraint, physical force, [and] threats to Mr. Rana's life." Compl. ¶¶ 2, 39. In June and July 2012, Defendants made various promises to induce Mr. Rana to travel to the United States with them, including (1) that Defendants "would pay him $3,000 per month," (2) "Mr. Rana would have some free time to himself every day" and "some days off," and (3) Defendants "would renew his visa before it expired." *Id.* ¶¶ 28, 34-35. In reliance upon these representations, Mr. Rana accepted Defendants' offer of employment. *Id.* ¶35.

Upon Mr. Rana's arrival in the United States on or about September 11, 2012, Defendants reneged on all the promises made to him. *Id.* ¶¶ 38-39. Defendants "never paid Mr. Rana a single dollar of the promised wages of $3,000 per month." *Id.* ¶ 53. When Mr. Rana

asked why Defendants had not paid him anything, Defendant Islam struck Mr. Rana and told him, "I brought you to America, that is enough." *Id.* ¶ 63.  Defendants forced Mr. Rana to work over 16 hours each day – and sometimes up to 20 hours – and never once gave him a day off.  *Id.* ¶¶ 40-41, 52.  Mr. Rana "was required to cook all meals from scratch, iron clothes, wash clothes by hand, watch Defendants' eleven-year-old son, and clean the entire apartment daily."  *Id.* ¶ 40. When Defendants hosted parties in their home, they demanded that Mr. Rana "cook for all the guests, serve, and clean up after the guests left."  *Id.* ¶ 41.  Additionally, once a month, Defendants required Mr. Rana to "work as a busboy and server" at events at the Bangladesh Consulate.  *Id.* ¶ 42.

Defendants forced Mr. Rana to continue working "through a pattern of abusive and coercive behavior." *Id.* ¶ 39.  Defendants isolated Mr. Rana completely and did not allow him to leave their apartment.  *Id.* ¶ 46-50.  Defendant Islam "told Mr. Rana that he would beat him if he did not listen to and follow his instructions" and "threatened to kill Mr. Rana" if he left the apartment.  *Id.* ¶¶ 45, 47.  Twice, Defendant Islam was physically violent towards Mr. Rana – once, "hitting Mr. Rana on the back of the head" and once, hitting Mr. Rana in the head and pushing him into the kitchen counter.  *Id.* ¶¶ 63-64.

Defendants "maintained possession of Mr. Rana's passport and immigration-related documents" during the entire time Mr. Rana lived with Defendants.  *Id.* ¶ 47.  Defendant Islam "regularly told Mr. Rana that if he left the apartment, the police would find him and kill him because Mr. Rana did not have his passport" and that "if Mr. Rana was arrested, Defendant Islam would not seek to have him released from jail." *Id.* ¶ 48.  When Mr. Rana's visa expired around June 2013, Defendants told Mr. Rana that if he left the apartment, the police would certainly "catch him and kill him" now because his visa was expired.  *Id.* ¶ 61.  Aside from "five or six

short trips to a convenience store across the street from Defendants' apartment at Defendants' instruction" – and with Defendants watching from their apartment window – "Mr. Rana was only permitted to leave the residence with Defendants approximately once per month to work at the Bangladesh Consulate." *Id.* ¶ 49, 58.

Defendants "regularly and repeatedly called Mr. Rana 'illiterate,' 'stupid,' and 'lazy,' and told him he was 'nothing,' in an effort to demean, intimidate, and abuse Mr. Rana." *Id.* ¶ 55. Mr. Rana was "only allowed to eat expired or leftover food." *Id.* ¶ 56.  He was "not allowed to talk to anyone outside of the house" and "was not permitted to make phone calls." *Id.* ¶¶ 57, 59. Defendants "closely monitored" Mr. Rana's activities. *Id.* ¶ 58.  Defendant Prova "constantly watched Mr. Rana while he did his work during the day." *Id.*  On the rare occasions when Mr. Rana's family called Defendants' residence to talk to Mr. Rana, Defendants listened in on the calls from a telephone in another room. *Id.*

In February 2014, Defendant Islam told Mr. Rana that he was moving to Morocco and that Mr. Rana must continue work for the family in Morocco. *Id.* ¶ 64.  Mr. Rana "overheard Defendant Islam say to Defendant Prova that they could not leave [Mr. Rana] in the United States and they could not send him back to Bangladesh because Mr. Rana could report Defendant Islam to the authorities, which could create a problem for his job and harm his reputation." *Id.* ¶ 65.  Defendant Islam then "informed Mr. Rana that he must come with him to Morocco, or Defendant Islam would kill him." *Id.* ¶ 66.  On March 2, 2014 – after enduring over 18 months of slavery-like conditions and abuse – Mr. Rana escaped from the Defendants' apartment with just "the clothes on his back and a few personal effects." *Id.* ¶ 70.

## II. DEFENDANTS WERE SERVED WITH THE SUMMONS AND COMPLAINT AT THEIR MANHATTAN APARTMENT BUILDING.

The day the Complaint was filed, on March 21, 2014, Mr. Rana's process server attempted service at Defendants' apartment at 60 West 57th Street, Apartment 10B, New York, New York 10019 – the same apartment Mr. Rana had escaped from just three weeks earlier. *See* Return of Service (ECF No. 3). The server identified himself to the building concierge as a process server with documents for building residents, Mr. Monirul Islam and Ms. Fahima Tahsina Prova. Hollingsworth Decl. (Ex. 7[1]) ¶ 5. The concierge called up to Defendants' apartment, but there was no answer, and the server was not permitted to go up to the apartment. *Id*. The next day, the process server again attempted service at the same address. *Id*. ¶ 6. The server noticed that the concierge desk was vacant and proceeded up to Defendants' apartment, 10B, and knocked on the door. *Id*. He "observed voices coming from the apartment, but no one answered the door." *Id*; *see also* Return of Service.

On March 24, 2014 at 8:16 am, the process server went to Defendants' apartment again and identified himself as a process server with documents for Mr. Islam and Ms. Prova.[2] *Id*. ¶ 7; Return of Service. The concierge, Darusalam "Daryus" Raden confirmed that Defendants were residents of the building and called up to their apartment. *Id*. ¶¶ 7, 9; Raden Decl. (Ex. 8) ¶¶ 8-9. No one answered the call, and Mr. Raden did not allow the server to proceed past the concierge desk. Hollingsworth Decl. ¶ 8; Raden Decl. ¶ 10. The process server left two copies of the summons and Complaint with Mr. Raden, who said he would give them to Defendants. Hollingsworth Decl. ¶ 10; Return of Service. That same day, the server also mailed two copies

---

[1]     All numbered exhibits referenced herein are exhibits to the Declaration of Emily Shea in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss.

[2]     Service was not attempted on Sunday, March 23, 2014 because New York law prohibits service of process on Sunday in civil cases. *See* N.Y. Gen. Bus. Law § 11.

of the documents to Defendants at the same address.  *Id.* ¶ 11.  Upon receiving the summons and Complaint from the process server, Mr. Raden placed the documents in Defendants' mailbox behind the concierge desk.  Raden Decl. ¶¶ 5, 11.  Mr. Raden does not know who retrieved the documents from Defendants' mailbox, but they are no longer there.  *Id.* ¶ 12.  Sometime after March 24, in late March or early April, Mr. Raden learned that Defendants had moved out of the building, though he never observed them moving out.  *Id.* ¶ 13.  Defendants did not provide the building with a forwarding address.  *Id.* ¶ 14.

Defendants had actual notice of the Complaint by at least March 22, 2014 – the day after it was filed and the same day that occupants of Defendants' apartment declined to answer the door when the process server knocked.  On March 22, Defendant Islam spoke to the press about the Complaint in detail.  *See, e.g.*, *Consul general refutes abuse charge*, BDNNEWS24.COM, Mar. 22, 2014 (Ex. 1) ("Speaking to bdnews24.com on Saturday, Monirul Islam claimed the house staff, Masud [sic] Parves Rana, sued him and his wife…"); Sheikh Shahariar Zaman, *Bangladesh diplomat sued in New York in Devyani style*, DHAKA TRIBUNE, Mar. 23, 2014 (Ex. 2) (quoting Mr. Islam commenting on the allegations in the Complaint).  On April 16, 2014, Defendants' counsel entered her appearance in this case.  *See* Notice of Appearance (ECF No. 6).

Along with Defendants' Motion to Dismiss, Defendant Islam has submitted an affidavit, in which he states that "until March 23, 2014, I resided in New York City."  Ex. A to Decl. in Supp. of Mot. to Dismiss (ECF No. 12-1) ("Islam Aff.") ¶ 7.  Defendant Islam further asserts that he "ha[s] been residing in Morocco since 24 March 2014" and his "wife, Fahima Tahsina Prova, has been residing in Morocco since 24 March, 2014."  *Id.* ¶¶ 3-4.  According to Defendant Islam, he "ha[s] been the Ambassador of Bangladesh to Morocco since 31 March 2014."  *Id.* ¶ 2.  The Bangladeshi foreign service corps website indicates that Mr. Islam was

formally "received" as Ambassador on May 5, 2014.[3]  And Defendant Islam's name remained on the New York Consular General's website well into May.[4]

## ARGUMENT

### I.   SERVICE OF PROCESS WAS SUFFICIENT.

Defendants contend that – despite their actual knowledge of this lawsuit and a refusal to comment on whether they were actually served – this Court should adopt an incorrect reading of Rule 4 (breaking from Supreme Court precedent), credit the vague and suspicious assertion that Defendants surreptitiously skipped town *following* two attempts at service at their apartment and mere hours before service was properly effected, and make a human trafficking victim go through needless international red-tape to hold his captors accountable. This argument should be rejected.

#### A.   Contrary to Defendants' Contention, Plaintiff Was Not Required To Resort To Rule 4(f).

Rule 4 of the Federal Rules of Civil Procedure ("Rule 4") provides for numerous avenues of effective service.  In this case, Mr. Rana served Defendants in accordance with Rule 4(e), which provides that an "individual . . . may be served in a judicial district of the United States" by complying with either (i) the law of service in the forum state; or (ii) complying with one of the disjunctive provisions in Rule 4(e)(2).  By leaving the summons and Complaint with the building concierge at Defendants' Manhattan apartment (and mailing them to Defendants' last known address), Mr. Rana complied with both.

---

[3]      *See* Ex. 3 (Bangladesh Embassy in Morocco, http://bangladeshembassy-morocco.webs.com).

[4]      *See* Ex. 4 (Profile of Consul General of Bangladesh, http://www.bdcgny.org/profile/profile_monirul_islam2.htm).

Defendants now claim they relocated from New York to Morocco on the very day service was executed and argue that service was therefore insufficient.  Specifically, Defendants base their attack on service entirely on the argument that "Plaintiff failed to comply with the requirements of Fed. R. Civ. P. 4(f)(1)," which provides for service in accordance with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents (the "Hague Convention").  Mot. to Dismiss at 3-4.  It is true that Rule 4(f), which allows service on an individual "at a place not within any judicial district of the United States," is *one* means by which effective service could have been achieved (assuming Defendants were outside of a U.S. judicial district at the time of service).  But Rule 4(f) was *not* the exclusively available means of service here.  Indeed, Defendants' claim that effective service required compliance with Rule 4(f) and the Hague Convention directly conflicts with established Supreme Court precedent.  In *Volkswagenwerk Aktiengesellschaft v. Schlunk*, the Court rejected the notion that the possible applicability of the Hague Convention categorically required its use.  486 U.S. 694, 707 (1988).  The Court made clear that where domestic service can be validly achieved, the "inquiry ends and the [Hague] Convention has no further implications."  *Id.*  Here, Mr. Rana complied with Rule 4(e) – an equally effective means of service.  Accordingly, Rule 4(f) and its reference to the Hague Convention do not nullify the otherwise effective service.

Defendants stake their motion to dismiss for insufficient service of process entirely on their misguided contention that Mr. Rana was required to follow Rule 4(f), and do not contest the sufficiency of service under Rule 4(e).  Thus, Defendants' motion to dismiss can and should be easily disposed of on this basis alone.  However, to avoid any doubt that Defendants have been properly served, Plaintiff presents below the necessary argument (and evidence) proving service was sufficient under Rule 4(e).

**B.     Defendants Have Failed To Rebut Plaintiff's Prima Facie Case That Service Was Sufficient.**

A "process server's affidavit of service establishes a prima facie case of the account of the method of service." *Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002). A "defendant's sworn denial of receipt of service" rebuts this presumption of proper service and necessitates an evidentiary hearing. *Id.* However, "no hearing is required where the defendant fails to swear to specific facts to rebut the statements in the process server's affidavits." *Id.* at 58. Here, the affidavit of Mr. Rana's process server establishes sufficient service under Rule 4(e). Return of Service; *see also* Hollingsworth Decl. Defendants have not denied that they received service, much less sworn to specific facts rebutting the statements in the process server's affidavits. Accordingly, Defendants' motion to dismiss for insufficient service should be denied.[5]

1.     Plaintiff Has Established A Prima Facie Case That Service Was Proper.

Rule 4(e) provides for effective service when the summons and complaint are left at "[an] individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Fed. R. Civ. P. 4(e)(2)(B). New York's Civil Practice Law and Rules contain a nearly identical provision. N.Y. C.P.L.R. 308(2).[6] Mr. Rana's process server has submitted an affidavit describing how he served Defendants in accordance with these rules: "on the 24th day of March, 2014 at 8:16 am, I: substitute served by delivering a true copy of the subpoena in a civil action with Complaint with the date and hour of service endorsed thereon by me, to: Daryus

---

[5]     In the event the Court finds that factual issues exist with respect to whether Defendants were served, Mr. Rana requests a hearing to resolve these issues.

[6]     The CPLR also requires a copy of the summons and complaint to be mailed to the individuals "last known residence," and contains several technical requirements. The process server in this case complied with these additional requirements, *see* Return of Service, and Defendant does not argue otherwise.

"Doe" as building concierge who confirmed residency at the address of: 60 West 57th Street, New York, NY 10019, the within named person's usual place of Abode, who resides therein, who is eighteen (18) years of age or older."  Return of Service; *see also* Hollingsworth Decl. ¶¶ 7-11. [7]  Additionally, the building concierge, Daryus Raden, has submitted a declaration which confirms the process server's statements, including the fact that Defendants were residents of the building on March 24, 2014.  Raden Decl. ¶¶ 7-8.  To further buttress the presumption that Defendants were properly served, Plaintiff has also advanced evidence indicating that at the time of service, Defendants held themselves out publicly as residing in New York.[8]

> 2.    Defendants Have Neither Denied That They Received Service Nor Sworn To Specific Facts Rebutting The Presumption That Service Was Proper.

Defendants have not submitted a "sworn denial of receipt of service."  Defendant Islam's affidavit tellingly omits any denial that he received the Complaint left with his concierge (or mailed to his apartment pursuant to CPLR 308(2)).  *See Ali v. Mid-Atlantic Settlement Servs., Inc.*, 233 F.R.D. 32, 37 (D.D.C. 2006) (finding service was effective where the defendant's affidavit "does not attest that he did not receive the papers from [his apartment building concierge]"; "[n]or does [defendant] present any evidence disputing that [the concierge] received the papers").[9]  Indeed, Defendants do not – and cannot – deny that they have actual notice of this

---

[7]    It is well-established that an apartment building's concierge can satisfy the person "of suitable age and discretion" requirement, as long as the concierge does not allow the server to proceed past him, up to the apartment. *See, e.g.*, *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1525 (S.D.N.Y. 1995); *F.I. DuPont, Glore, Forgan & Co. v. Chen*, 364 N.E.2d 1115, 1117-18 (N.Y. 1977).  Here, the building concierge denied the process server's request to proceed to Defendants' tenth floor apartment, and so the server left copies of the summons and Complaint with the concierge.  Hollingsworth Decl. ¶ 8; Raden Decl. ¶ 10.  Thus, under controlling law, Mr. Rana properly left process with a person of suitable age and discretion.

[8]    *See* Ex. 4 (website of Consulate General of Bangladesh in New York listing Defendant Islam as Consul General).

[9]    *Ali* was amended on reconsideration on unrelated grounds, 235 F.R.D. 1 (D.D.C. 2006), *vacated sub nom.*, *Ali v. Tolbert*, 636 F.3d 622 (D.C. Cir. 2011) (unrelated grounds).

suit.  Moreover, Defendants have failed to "swear to specific facts to rebut the statements in the process server's affidavits."  For instance, Defendants have not denied that, up through March 23, 2014, they lived at the address where service was left (and mailed), that Daryus Raden worked as a building concierge there, or that Mr. Raden received the summons and Complaint.

The only evidence Defendants have offered in support of their motion to dismiss for insufficient service is Defendant Islam's statement that he and his wife "have been residing in Morocco since 24 March 2014."  Islam Aff. ¶¶ 3-4.[10]  Not only have Defendants failed to submit any evidence to support the assertion that they left the country hours before service was executed, this assertion is not enough to rebut the presumption that Defendants were properly served.  As an initial matter, Defendant Islam admits that "until March 23, 2014, [he] resided in New York City" and fails to address his whereabouts between this date and March 24, 2014, when he allegedly took up residence in Morocco.  *Id.* ¶¶ 7, 3.  It is not at all clear that Defendants were in Morocco at 8:16 a.m. on March 24, 2014 when service was executed.

Even if Defendants had submitted evidence establishing that they were in Morocco at the time the Complaint was left with the concierge, such evidence would not establish that Defendants' Manhattan apartment was not their "dwelling or usual place of abode" at that time, and thus, the presumption of proper service would still stand.  A person "can have two or more dwelling houses or usual places of abode."  *Nat'l Dev. Co. v. Triad Holding Corp.,* 930 F.2d 253, 257 (2d Cir. 1991) (New York apartment where foreign domiciliary and citizen of Saudi Arabia stayed only 34 days of the year qualified as his "dwelling" or "usual place of abode").  Furthermore, a "usual place of abode" may be a residence from which a defendant has been

---

[10]     Defendant Prova has not sworn to *anything*.  Thus, even if the Court finds Defendant Islam's affidavit sufficient to necessitate an evidentiary hearing as to service on him, her motion to dismiss should be denied outright.

absent at the time of service.  *See, e.g.*, *Jaffe & Asher*, 158 F.R.D. 278, 280 (S.D.N.Y. 1994) (Sotomayor, J.) (defendant's parent's house where he stayed occasionally was "dwelling" or "usual place of abode," even though he actually resided out-of-state); *Fed. Home Loan Mortgage Corp. v. Venticinque*, 658 N.Y.S.2d 689, 690 (App. Div. 1997) (defendant's "marital home" was his "usual place of abode," even when he actually resided at another location due to marital difficulties); *Karlin v. Avis*, 326 F. Supp. 1325, 1329-30 (E.D.N.Y. 1971) (finding service effective where left at a New York apartment with the adult son of Michigan resident and domiciliary who used apartment "sporadically" and "usually on the way to some other destination").  Importantly, "an intention to return to the usual place of abode is not critical to effective service when the individual has received actual notice." *Ali*, 233 F.R.D. at 37.  Thus, even if Defendants managed to flee to Morocco and take up residence there on the day service was made at their Manhattan apartment, service would still be sufficient.

For example, in *Dunn v. Burns*, the New York Appellate Division held that service was proper where the plaintiff served the defendant's "common law" wife at the defendant's former home, even though the defendant had become employed in and claimed to have permanently moved to the United Arab Emirates.  839 N.Y.S.2d 894, 895-96 (App. Div. 2007).  Compared to Defendants' (claimed) one day absence from their Manhattan apartment in this case, the defendant in *Dunn* claimed to have been living in the United Arab Emirates for 126 days before service.  *See id*.  Even so, the court concluded that the defendant "failed to establish that, at the time of service, he had permanently moved from the last known residence." *Dunn*, 839 N.Y.S.2d at 896.  Similarly, in *Karlsson v. Rabinowitz*, 318 F.2d 666 (4th Cir. 1963), the Fourth Circuit Court of Appeals held that service was sufficient where the plaintiff served the

defendant's wife at his former house in Maryland, even though the defendant had moved out of the house 20 days earlier and relocated to Arizona, intending never to return to Maryland.

Like the defendants in *Dunn* and *Karlsson*, Defendants have not established that, on March 24 at 8:16 a.m., their Manhattan apartment ceased to be the couple's "dwelling or usual place or abode." Defendants failed to submit any evidence indicating that they did not have access to the apartment at that time, that their furniture or other personal items were moved from the apartment prior to that time, or any other facts suggesting that the apartment was not their "dwelling or usual place of abode." Indeed, Defendant Islam remains part of the Bangladeshi foreign service corps to this day. Although Defendants' Motion to Dismiss makes much of the fact that their residence was officially leased to Bangladesh and used for foreign service purposes, *see* Mot. to Dismiss at 1, nothing submitted by Defendants says or even suggests that Defendants did not maintain, store belongings in, or have access to the apartment on March 24.

**C.     Defendants' Actual Notice Of The Complaint Further Bolsters Plaintiff's Showing That Service Was Effective.**

For the reasons discussed above, Defendants have failed to rebut the presumption that service was proper, and thus, their motion to dismiss for insufficient service should be denied. However, upholding service is particularly appropriate because Defendants have received actual notice of the Complaint. As then-Judge Sotomayor has recognized, a "strictly literal interpretation of the rule may thwart the purpose of Fed. R. Civ. P. 4(e) – to insure that service is reasonably calculated to provide a defendant with actual notice of the action." *Jaffe & Asher*, 158 F.R.D. at 280. Where the defendant has received actual notice of the complaint, the service rules "should be liberally construed to effectuate service and uphold the jurisdiction of the court." *Karlsson,* 318 F.2d at 668; *see also Ali*, 233 F.R.D. at 35 ("Where the defendant receives actual notice and the plaintiff makes a good faith effort to serve the defendant pursuant to the

13

federal rule, service of process has been effective").  "Service of process is not intended to be a game of hide and seek or cat and mouse."  *Carillo v. Hagerty*, No. 05-1417, 2006 WL 2165679, at *1 (D. Conn. July 31, 2006) (collecting cases).  Thus, "[g]ood faith efforts at service are effective particularly where the defendant has engaged in evasion, deception, or trickery to avoid being served."  *Ali*, 233 F.R.D. at 36.

As described above, Mr. Rana made a good faith effort to serve Defendants pursuant to the Federal Rules.  Defendants' attempts to thwart these efforts – first by refusing to open their door for the process server, *see* Hollingworth Decl. ¶ 6, and next by allegedly fleeing the country hours before service was executed – were unsuccessful, as Defendants undeniably received the Complaint by some means.  Almost immediately after the Complaint was filed, Defendant was commenting on it in great detail to the press.  *See* Exs. 1-2.  And less than three weeks after the return of service, Defendants' counsel entered her notice of appearance.  *See* Notice of Appearance (Apr. 16, 2014).

**D.  For Avoidance of Any Doubt, This Court Can Order Service on Defendants' U.S. Lawyers.**

As discussed above, Defendants' utter failure to rebut Plaintiff's showing that service was sufficient and Defendants' actual notice of the Complaint call for the denial of Defendants' motion to dismiss.  However, if the Court has any concerns about the sufficiency of service, it can order service on Defendants' U.S. lawyers pursuant to Rule 4(f)(3), which allows for service on individuals "not within any judicial district of the United States" "by other means not prohibited by international agreement, as the court orders."  Fed. R. Civ. P. 4(f).

Under the facts of this case, service under the Hague Convention pursuant to Rule 4(f)(1) would almost certainly prove futile (and would undoubtedly cause significant delay), because as Ambassador to Morocco, Defendant Islam and his wife are immune from Moroccan jurisdiction,

which would be invoked by Hague Convention service.[11]   However, "court-directed service

under Rule 4(f)(3) is as favored as under Rule 4(f)(1)."   *In GLG Life Tech. Corp. Securities

Litig.*, 287 F.R.D. 262, 265 (S.D.N.Y. 2012) (quoting *Rio Properties, Inc. v. Rio Int'l Interlink*,

284 F.3d 1007, 1015 (9th Cir. 2002)).   Litigants are not required to first exhaust the potential for

service under the Hague Convention before granting an order permitting alternative service

under Rule 4(f)(3).   *Id*.   Thus, the Court can order any means of service not prohibited by

international agreement and clearly calculated to provide Defendants with actual notice of this

action.   *See id*. at 266-67.   Service on Defendants' lawyers who are located in New York is one

such method.   *See id*. at 268. (ordering service upon defendant's U.S. lawyers under Rule

4(f)(3)); *Arista Records LLC v. Media Servs. LLC*, No. 06-15319, 2008 WL 563470, at *2

(S.D.N.Y. Feb. 25, 2008) (same); *Swarna v. Al-Awadi*, No. 06-4880, 2007 WL 2815605, at *2

(S.D.N.Y. Sept. 20, 2007) (ordering service under Rule 4(f)(3) by international courier to the

diplomat defendants' residence in Paris and upon defendants' U.S. lawyer).

---

[11]   Morocco is a signatory to the Hague Convention, which provides for a central authority in each signatory state (for Morocco, the Ministry of Justice), to arrange for service within the state at the request of the central authority of another signatory state.  *See* Hague Conference on Private International Law, Status Table, http://www.hcch.net/index_en.php?act=conventions.status&cid=17 (last visited May 28, 2014). Morocco is also a signatory to the Vienna Convention on Diplomatic Relations ("VCDR") which provides, "A diplomatic agent shall enjoy immunity from the criminal jurisdiction *of the receiving State.*  He shall also enjoy immunity from *its* civil and administrative jurisdiction," except under circumstances not relevant here. VCDR, art. 31, Apr. 18, 1961, 23 U.S.T. 3227 (emphasis added); United Nations Treaty Collection, Status of Vienna Convention on Diplomatic Relations, https://treaties.un.org/pages/ViewDetails.aspx?src=TREATY&mtdsg_no=III-3&chapter=3&lang=en (last visited May 28, 2014).

In *Swarna v. Al-Awadi*, No. 06-cv-4880, 2007 WL 2815605, at *1 (S.D.N.Y. Sept. 20, 2007), it took approximately eight months for the plaintiff to prove what was clearly foreseeable – that it was impossible to serve a  Kuwaiti diplomat in France pursuant to the Hague Convention.

## II.    DEFENDANTS ARE NOT IMMUNE FROM THIS SUIT.

Defendants argue that the Court lacks subject matter jurisdiction because "Defendants are immune from this action by virtue of their diplomatic immunity."[12]  Mot. to Dismiss Br. at 4. However, Defendant Islam was not a diplomat during the relevant time period, and thus he and his wife are not entitled to diplomatic immunity.  At most, Defendant Islam is entitled to limited consular immunity, which does not immunize Defendants from liability on Plaintiff's claims.

### A.    Defendants Are Not Entitled To Diplomatic Immunity Because Defendant Islam Was Not A Diplomat.

Defendant Islam argues that his former post as Consul General at the Consulate General of Bangladesh in New York entitles him, and his wife, Defendant Prova, to diplomatic immunity. Mot. to Dismiss at 4-5; *see also* Islam Aff. ¶ 5.  However, Defendant Islam's title of Consul General means that he was a consular officer, which is a separate and distinct title from "diplomat" and which confers a much more limited form of immunity.  The Vienna Convention on Diplomatic Relations ("VCDR"), which Defendants cite, does not apply to consular officials like Defendant Islam.  In fact, as the Court of Appeals for the Second Circuit has recognized, the delegates to the VCDR "demonstrated their clear aversion to conferring diplomatic status upon purely consular officials" and as a result, "a separate convention was prepared to regulate consular relations, the Vienna Convention on Consular Relations."  *United States v. Kostadinov*, 734 F.2d 905, 910 (2d Cir. 1984).  As a consular official, Defendant Islam is accorded only the limited consular immunity provided by this convention, the "VCCR," and not diplomatic immunity.  *See* VCCR, art. 43, Apr. 24, 1963, 21 U.S.T. 77.

---

[12]    In deciding a motion to dismiss for lack of subject matter jurisdiction, "the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor."  *Hettler v. Entergy Enterprises, Inc.*, -- F. Supp. 2d --, 2014 WL 1508699, at *2 (S.D.N.Y. Mar. 28, 2014).

Defendants do not cite a single case that supports their argument that a consul general may be entitled to diplomatic immunity.  Indeed, courts have universally held that consul generals and other consular officers are entitled to only consular immunity.  *See, e.g.*, *United States v. Khobragade*, -- F. Supp. 2d --, 2014 WL 1621471, at *1 (S.D.N.Y. Mar. 12, 2014) (consular officer accorded consular immunity pursuant to VCCR); *Mateo v. Perez*, No. 98-7426, 1999 WL 216651, at *4-5 (S.D.N.Y. Apr. 13, 1999) (same); *Park v. Shin*, 313 F.3d 1138, 1141 (9th Cir. 2002) (same); *Joseph v. Office of the Consulate General of Nigeria*, 830 F.2d 1018, 1028 (9th Cir. 1987) (same); *United States v. Chindawongse*, 771 F.2d 840, 848 (4th Cir. 1985) (same).  And in a decision from the bench, Judge Hellerstein rejected the very same argument Defendants make here – that a consul general was entitled to diplomatic immunity.  *Bhardwaj v. Dayal*, No. 11-4170, Mot. to Dismiss Hr'g Tr. Nov. 30, 2011 (Ex. 5) at 7:9-20, 12:12-13:3.

Furthermore, even if a consul general *could* be entitled to diplomatic immunity, Defendant Islam has not shown that he is entitled to such immunity.  "A foreign official cannot simply assert diplomatic immunity in order to evade civil jurisdiction or to open to judgment." *Mazengo v. Mzengi*, 542 F. Supp. 2d 96, 99-100 (D.D.C. 2008).  Rather, "recognition and certification by the State Department is necessary to establish diplomatic immunity." *United States v. Kuznetsov*, 442 F. Supp. 2d 102, 107 (S.D.N.Y. 2006); *see also United States v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984) (VCDR "premises diplomatic immunity upon recognition by the receiving state"); Restatement (Third) of Foreign Relations Law of the United States § 464 (1987) ("In the United States, a person's diplomatic status is established when it is recognized by the Department of State.").  Defendants have not provided any evidence – or even asserted – that the United States ever recognized Defendant Islam as a diplomat.

Moreover, Defendant Islam is not included on the U.S. State Department's Diplomatic List, which, according to the State Department's website, "contains a complete list of the accredited diplomatic officers of foreign embassies within the United States."[13]  Courts rely on this list as "presumptive evidence" of diplomatic or consular status.  *See* Restatement § 464, Reporters' Note 1; *United States v. Kostadinov*, 734 F.2d 905, 911-13 (2d Cir. 1984) (noting that defendant's name never appeared on the State Department's list of diplomats as probative of non-diplomatic status).  There is simply no reason to believe, despite Defendants' unsupported assertions to the contrary, that Defendant Islam is a diplomat.  Because Defendant Islam is not a diplomat, no diplomatic immunity attaches to him or Defendant Prova.

### B. Consular Immunity Does Not Shield Defendants From Plaintiff's Claims.

Defendants stake their immunity argument on their entitlement to diplomatic immunity, and do not argue that they are entitled to consular immunity.  However, even assuming that Defendant Islam is entitled to consular immunity, this limited form of immunity does not shield Defendants from Plaintiff's claims.

#### 1. Consular Immunity Is Limited.

Consular officers enjoy less immunity than diplomats.  *See Khobragade*, 2014 WL 1621471, at *2 ("Diplomatic officers enjoy a higher level of immunity than consular officers."); *Logan v. Dupuis*, 990 F. Supp. 26, 30 n. 7 (D.D.C. 1997) (VCCR "provides for a much more limited immunity than that accorded to diplomatic agents").  Specifically, the VCCR provides that "[c]onsular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving state ***in respect of acts performed in the exercise of consular functions***."  art. 43, 21 U.S.T. at 104 (emphasis added). In addition,

---

[13]     Mr. Islam is not included on the list of diplomatic officers for Bangladesh.  *See* Ex. 6 (excerpt of U.S. Department of State Diplomatic List, Feb. 4, 2014) at 12-13.

consular immunity does not apply in a civil action "arising out of a contract concluded by a consular officer or a consular employee in which he did not contract expressly or impliedly as an agent of the sending state." *Id*. [14]

The VCCR sets out 12 specific consular functions. *Id*. at art. 5. These include activities such as assisting and protecting "the interests of the sending State and its nationals," "furthering the development of commercial economic, cultural and scientific relations between the sending State and the receiving State," "issuing passports and travel documents to nationals of the sending State," "acting as notary and civil registrar," "transmitting judicial and extra-judicial documents…for courts of the sending State," and inspecting and assisting "vessels having the nationality of the sending State." *Id*. The VCCR also contains a "catch-all" provision defining consular functions to include "performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws or regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State." *Id*. at art. 5(m).

2.       Defendant Islam Is Not Immune Because The Employment Of A Personal Domestic Worker Is Not A "Consular Function."

Defendants' employment of Plaintiff Rana, their *personal* domestic servant, was not a "consular function" under the VCCR. Retaining a servant to cook and clean a consular officer's private residence and take care of his child does not fall under any of the specific consular functions set out in the VCCR, nor is it a "function entrusted to a consular post by the sending State." In the only published case to address this specific issue, the Court of Appeals for the Ninth Circuit held that the employment of a personal domestic servant was merely "incidental"

---

[14]       The analysis is the same, even though Defendant Islam is no longer a consular officer at a U.S. post. *See* art. 53(4) (providing for residual consular immunity for acts performed by a consular officer "in the exercise of his functions).

to the Deputy Consul General's official duties and therefore did not constitute a consular function. *Park*, 313 F.3d at 1143.[15]

The facts in *Park* are analogous to those present in this case.  In *Park*, the defendant, the Deputy Consul General of Korea, obtained an A-3 visa for the plaintiff that permitted her to enter the United States to work as a domestic servant for the defendant and his family.  *Id*. at 1140.  The plaintiff's work included cooking, cleaning, performing other household duties, and taking care of the defendants' children.  *Id*. at 1141.  Additionally, several times a month, the plaintiff prepared and served food for gatherings hosted by the defendants on behalf of the Korean Consulate.  *Id*. at 1141, 1143.  The plaintiff alleged that she worked 15 hours a day on weekdays and 13 hours a day on weekends.  *Id*. at 1143.

The court held that the plaintiff was hired as the Deputy Consul General's "*personal domestic servant*" and that "[a]ny labor she performed on behalf of the Consulate was incidental to her employment as a personal servant."  *Id*. at 1142 (emphasis in original).  Thus, the acts alleged by the plaintiff were not "performed in the exercise of consular functions" and the defendants were not entitled to consular immunity.  *Id*. at 1143.  The court relied primarily on two key facts, both of which are present here.  First, the defendant obtained an A-3 visa for the plaintiff, which the court recognized "are issued only for *personal* employees of consular officers."  *Id*. at 1142-43 (emphasis in original) (citing 8 U.S.C. § 1101(a)(15)(A)(iii); 8 C.F.R. § 214.(a)(2)).  Second, the Korean government did not pay for the plaintiff's services.  *Id*. at 1143.  Additionally, the court noted that because the defendants entertained visitors only "several times a month," whereas the plaintiff allegedly worked 13-15 hours a day, "the bulk" of the plaintiff's

---

[15]     Additionally, in a case with very similar facts to those present here, Judge Hellerstein ruled from the bench that the employment of the plaintiff as a domestic servant by the Consul General of India was not a "consular function" and thus the defendant was not entitled to the limited "official acts" consular immunity.  *See* Ex. 5 at 18:5-13.

time was spent caring for the defendants' children and cooking and cleaning for the defendants, rather than performing work related to official consular functions. *Id*. at 1143.

Here, just as in *Park*, Defendant Islam obtained an A-3 visa for Mr. Rana. Compl. ¶ 9. Defendant Prova told Mr. Rana that *she and Defendant Islam*, not the government of Bangladesh, would pay him $3,000 a month for his services (though Mr. Rana did not actually receive payment from any source). *Id*. ¶ 34. Further, Mr. Rana worked over 16 hours a day, cooking and cleaning for Defendants and looking after the Defendants' child. *Id*. ¶¶ 40-41. Though Mr. Rana was also required to "work as a busboy and server at monthly community events at the Bangladesh Consulate" (Compl. ¶ 42), this work was incidental to Mr. Rana's work as Defendants' personal servant. *See Park*, 313 F.3d at 1142.[16]  Accordingly, Defendant Islam's consular immunity does not protect him from Mr. Rana's claims.

### 3. Defendant Islam Is Not Immune Because He Was Not Acting As An "Agent" Of Bangladesh When He Contracted for Plaintiff's Employment.

Defendants' argument that they are immune from Plaintiff's claims fails for another, independent reason. The VCCR contains an exception to consular immunity for civil actions "arising out of a contract . . . in which [the consular officer] did not contract expressly or impliedly as an agent of the sending state." VCCR, art. 43, 21 U.S.T. at 104. For the same reasons as those set forth above – Defendants entered into an employment contract with Mr. Rana for personal domestic services for their family; Mr. Rana was promised payment from

---

[16]    Defendants imply that they are entitled to immunity because Mr. Rana performed services at the Bangladesh Consulate as well as at their private residence. Mot. to Dismiss at 5. Yet Defendants provide no authority or rationale to support this position. Although the plaintiff in *Park* prepared and served food for guests of the Consulate at the Defendants' home because the "Korean Consulate in San Francisco does not have an area which to entertain guests," the court did not reference the location of these services as a factor in its decision. 313 F.3d at 1141-43. Even if location is relevant, Mr. Rana spent the vast majority of his time working for Defendants in their home, not in the Consulate.

Defendants personally, not the government of Bangladesh; and his employment was incidental to Defendant Islam's status as a consular officer – Defendant Islam was not acting as an "agent" of Bangladesh when he entered into the employment contract.  Thus, this exception to consular immunity also applies.

4.    <u>Defendant Prova Is Not Entitled To Any Consular Immunity.</u>

Defendants contend that Defendant Prova is immune from suit because "[a]rticle 37 of the VCDR extends immunity to the family members of diplomatic agents."  Mot. to Dismiss at 4. As discussed above, Defendant Islam is not a diplomat and has no diplomatic immunity.  Thus, his wife has no diplomatic immunity either.  Further, unlike diplomatic immunity, consular immunity does not extend to family members.  Because Defendant Prova has no official consular capacity, she cannot perform "consular functions," and therefore has no consular immunity.  *See, e.g.*, Restatement § 465, Reporters' Note 9 ("[m]embers of the family of a consular officer or employee enjoy no immunities under [the VCCR]"); James M. Parkhill, *Diplomacy In The Modern World: A Reconsideration of the Bases for Diplomatic Immunity in the Era of High-Tech Communications*, 21 HASTINGS INT'L & COMP. L. REV. 565, 575 (1997) (VCCR "denies immunity to consuls' families and limits the activities under which immunity might obtain to a narrower range"); James E. Hickey, Jr., Annette Fisch, *The Case to Preserve Criminal Jurisdiction Immunity Accorded Foreign Diplomatic and Consular Personnel in the United States*, 41 HASTINGS L. J. 351, 372 (1990) ("The limited functional immunity and personal inviolability accorded to consular personnel, in contrast to diplomatic personnel, does not extent to family members.").  Further, even if consular immunity could attach to family members of consular officials, because Defendant Islam is not entitled to consular immunity, Defendant Prova is not entitled to such immunity either.  Thus, Defendant Prova's claim of consular immunity also fails.

22

### III.    PLAINTIFF STATED A CLAIM FOR FRAUDULENT MISRPRESENTATION.

Defendants assert that Plaintiff has not pled his fraudulent misrepresentation claim with sufficient specificity, but fail to point to any allegations they believe are deficient or identify any facts they believe are missing from the Complaint.  *See* Mot. to Dismiss at 5-6.  Under Federal Rule of Civil Procedure 9(b), when pleading fraud, a complaint must "(1) specify the statements the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006).  As Defendants acknowledge, allegations of knowledge and scienter "do not require great specificity because 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.'" *Manlinguez v. Joseph*, 226 F. Supp. 2d 377, 389 (E.D.N.Y. 2002) (quoting *Conn. Nat'l Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir. 1987)).  Instead, "the Second Circuit requires that the complaint 'specifically plead events which give rise to a strong inference that the defendant had an intent to defraud, knowledge of falsity, or a reckless disregard of the truth.'" *Id.*  Mr. Rana's Complaint satisfies this standard.

Mr. Rana alleges that in the weeks after June 17, 2012, in Dhaka, Bangladesh, Defendant Prova[17] made several misrepresentations about the terms of his employment: "that Mr. Rana would enjoy all of the rights and privileges of Americans in the United States"; that she would "renew Mr. Rana's visa in the United States"; "that Mr. Rana would have some free time to himself every day when he completed his job duties"; and that Mr. Rana "would have days off." Compl. ¶¶ 20-21, 28-29.  In July 2012, on the way back from obtaining a visa at the American Embassy in Dhaka, Defendant Prova "informed Mr. Rana directly that she and Defendant Islam

---

[17]    Plaintiff agrees to the dismissal of his fraudulent misrepresentation against Defendant Islam.

would pay him $3,000 per month."  Compl. ¶ 34.  These statements were fraudulent because Defendant Prova did not intend to keep her promises – immediately upon Mr. Rana's arrival in New York, Defendants forced Mr. Rana to work over 16 hours a day, 7 days a week, and did not pay him anything.  Compl. ¶¶ 40-41, 52-53.  Defendants also let Mr. Rana's passport expire and then exploited Mr. Rana's increased vulnerability to keep him under their control.  Compl. ¶ 61.  Thus, Mr. Rana has sufficiently pled the "who, what, when, where, and how" of the fraudulent statements.

In addition to alleging that "Defendants knowingly and willfully lured Mr. Rana from Bangladesh" (Compl. ¶ 2), Mr. Rana also alleged numerous specific facts that give rise to a strong inference of scienter.  At the meetings where Defendant Prova made false promises to Mr. Rana about the terms of his employment, Defendant Prova also "demanded" that Mr. Rana sign documents in English, "did not explain to him what the documents said," "did not provide Mr. Rana with time to read any of the documents," and did not "provide a copy of the documents to Mr. Rana." Compl. ¶¶ 23, 27.  When obtaining Mr. Rana's visa at the American embassy, Defendant Prova "told Mr. Rana that he must lie about his education" and "must say that he had been working for Defendants as a domestic servant for two years in Bangladesh, even though he had not."  Compl. ¶ 30.  Further, "Defendant Prova maintained control over Mr. Rana's passport" during the process of obtaining Mr. Rana's visa and "continued to maintain possession of Mr. Rana's passport" during the trip from Bangladesh to the United States.  Compl. ¶ 36.  Moreover, immediately upon Mr. Rana's arrival in New York, Defendants obtained his force labor through threats, coercion, isolation, and verbal and physical abuse.  Compl. ¶¶ 39-66.

These allegations of Defendants' misconduct raise a strong inference that Defendant Prova intended to defraud Mr. Rana by luring him to the United States with false promises of

good wages and working conditions.  *See Manlinguez*, 226 F. Supp. 2d at 389-90 (allegations that defendants lured plaintiff to the United States with false promises about the terms and conditions of employment, then forced plaintiff to work over 16 hours every day, did not pay her, and isolated and abused her, "give rise to a strong inference that Defendants either intended to defraud Plaintiff, knew their statements were false, or recklessly disregarded the truth of their statements"); *Magnifico v. Villanueva*, 783 F. Supp. 2d 1217 (S.D. Fla. Apr. 2011) (allegations that defendants recruited workers to come to the United States using misrepresentations about the terms and conditions of employment, then forced the workers to live in severely crowded housing and to work long hours, and threatened workers with arrest, were sufficient under Rule 9(b)).  Thus, Plaintiff has sufficiently pled his fraudulent misrepresentation claim against Defendant Prova.

## CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Court deny Defendants' Motion to Dismiss in its entirety.

May 28, 2014

*/s/ Emily Shea*_____
Emily Shea (admitted *pro hac vice*)
DECHERT LLP
1900 K Street NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Email: emily.shea@dechert.com

Dana Sussman
Safe Horizon Anti-Trafficking Program
50 Court Street, 8th Floor
Brooklyn, New York 11201
Telephone: (718) 943-8641
Email: dana.sussman@safehorizon.org

*Attorneys for Plaintiff Mashud Parves Rana*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 28, 2014, true and correct copies of the foregoing **Plaintiff's**

**Memorandum Of Law In Opposition To Defendants' Motion To Dismiss** and **Declaration**

**Of Emily Shea In Support Of Plaintiff's Opposition To Defendants' Motion To Dismiss**

were electronically filed with the clerk of the court using the CM/ECF System, which will send

notice of such filing to the following counsel of record:


**Ellen M. Nichols**
ellen.m.nichols@gmail.com



Dated: May 28, 2014                                    */s/ Emily Shea*_____
                                                                         Emily Shea