USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  01/06/2015

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

MASHUD PARVES RANA,

                                        Plaintiff,

                    -against-

MONIRUL ISLAM and FAHIMA
TAHSINA PROVA,

                                        Defendants.

14-Cv-1993 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Mashud Parves Rana brings this action against his former employers, Monirul Islam and Fahima Tahsina Prova, alleging violations of the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589 *et seq.*, the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, and the New York State Labor Law, N.Y. Labor Law § 190 *et seq*. Rana also asserts New York state law claims for breach of contract, fraudulent misrepresentation, unjust enrichment, quantum meruit, conversion, trespass to chattels, false imprisonment, and assault and battery.

Defendants have moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Rana's fraudulent misrepresentation claim for failure to state a claim upon which relief can be granted. They also move to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), contending that both defendants are immune from this action by virtue of consular immunity. Finally, defendants also move to dismiss the complaint for insufficient service of process. *See* Fed. R. Civ. P. 12(b)(5).

The Court finds (1) that Rana has pled his fraudulent misrepresentation claim with sufficient specificity; (2) that defendants are not immune from this suit because their employment and supervision of Rana were not consular functions; and (3) that even if defendants' attempts at service were insufficient, the Court need not dismiss the suit

because proper service may still be obtained. Accordingly, defendants' motion to dismiss the complaint is denied.

Finally, the Court orders service pursuant to Fed. R. Civ. P. 4(f)(3) upon the attorneys who represent defendants in this litigation.

## I. BACKGROUND

For purposes of this motion, the Court assumes as true all facts alleged in the complaint.

Rana is a citizen of Bangladesh. (Compl. ¶ 8.) He was admitted to the United States pursuant to an A-3 Visa (*id.* ¶ 9) and served as a domestic worker in defendants' household in New York City for almost nineteen months (*id.* ¶¶ 1, 10, 43).[1]

Defendant Islam served as Consul General of the Consulate General of Bangladesh in New York City from September 5, 2012 to March 23, 2014. (Aff. of Monirul Islam dated May 14, 2014 ("Islam Aff.") ¶ 5.) Since March 24, 2014, he and his wife, defendant Prova, have resided in Morocco (*id.* ¶¶ 3–4), where defendant Islam began serving as Ambassador of Bangladesh to Morocco on March 31, 2014 (*id.* ¶ 2).

Rana alleges that, in the summer of 2012, defendants "knowingly and willfully lured [him] from Bangladesh" to the United States with various promises, including that (1) defendants "would pay him $3,000 per month," (2) Rana "would have some free time to himself every day" and "some days off," and (3) defendants "would renew his visa before it expired." (Compl. ¶¶ 2, 28, 34–35.) Rana accepted these terms (*id.* ¶ 35), and "[o]n or about September 11, 2012, [he] flew to the United States with defendant Prova and her son" (*id.* ¶ 38).

---

[1] A-3 visas are issued to employees, personal attendants, and servants of foreign officials, including diplomatic and consular officers. *See* Visas for Diplomats and Foreign Government Officials, http://travel.state.gov/content/visas/english/other/diplomat-foreign-government-official.html (last visited January 5, 2015).

Rana alleges that upon his arrival in the United States, defendants "obtained [his] forced labor and involuntary services" through "physical threats, coercion, isolation, physical restraint, physical force, [and] threats to [his] life." (*Id.* ¶ 39.) He alleges that "[d]efendants maintained possession of [his] passport and immigration-related documents" throughout the period of his employment. (*Id.* ¶ 47.) According to Rana, Islam warned Rana "that if he left the apartment, the police would find him and kill him because Mr. Rana did not have a passport." (*Id.* ¶ 48.) Rana alleges that "[d]efendants informed [him] that his visa had expired" in or about June 2013, and "Islam used this information as an opportunity to repeat" his warnings about "what would happen if Mr. Rana escaped." (*Id.* ¶ 61.) Islam also allegedly threatened to "beat him" and "kill [] Rana himself" if Rana left the apartment (*id.* ¶¶ 45, 48) and on two occasions was "physically violent" toward Rana (*id.* ¶¶ 63–64). Rana further alleges that he was "not allowed to talk to anyone outside the house" or to "make phone calls." (*Id.* ¶¶ 57, 59.)

According to Rana, defendants "never paid [him] a single dollar of the promised wages of $3,000 per month." (*Id.* ¶ 53.) When Rana asked defendants why they failed to pay him, Islam allegedly struck Rana "on [the] back of the head" and told him, "'I brought you to America, that is enough.'" (*Id.* ¶ 63.) Rana alleges that defendants forced him to work from sixteen to twenty hours a day (*see id.* ¶¶ 40–41) and that he "never had a day off" during the almost nineteen months he worked for Islam and Prova (*id.* ¶ 52). His duties included "cook[ing] all meals from scratch, iron[ing] clothes, wash[ing] clothes by hand, watch[ing] Defendants' eleven-year-old son, and clean[ing] the entire apartment daily." (*Id.* ¶ 40.) Additionally, when defendants hosted parties in their home, Rana had to "cook for all the guests, serve, and clean up after the guests left." (*Id.* ¶ 41.) Defendants also demanded that Rana "cook food for events at the Bangladesh Consulate and required that he work as a busboy and server at monthly community events at the Bangladesh Consulate." (*Id.* ¶ 42.)

According to Rana, in February 2014, Islam told him he must move to Morocco with the family and continue to work there in defendants' new

household. (*Id.* ¶ 64.) Rana alleges that he "overheard Defendant Islam say to Defendant Prova that they could not leave [Rana] in the United States . . . [or] send him back to Bangladesh because Mr. Rana could report Defendant Islam to the authorities, which could create a problem for [defendant Islam's] job and harm his reputation." (*Id.* ¶ 65.) Islam then allegedly told Rana "that he must come with [the family] to Morocco, or Defendant Islam would kill him." (*Id.* ¶ 66.) On or about March 2, 2014, after Islam allegedly refused to allow Rana to contact a relative's acquaintance in New York (*id.* ¶¶ 67–69), Rana fled defendants' apartment "with the clothes on his back and a few personal effects" (*id.* ¶ 70).

Rana commenced this litigation on March 21, 2014. (Dkt. No. 2.) The same day, his process server attempted to serve Islam and Prova with the summons and complaint at their apartment at 60 West 57th Street in Manhattan. (Decl. of Raymond Hollingsworth dated May 20, 2014 ("Hollingsworth Decl.") ¶ 3; Return of Service, Dkt. Nos. 3–4.) The process server identified himself to the building concierge, who called up to defendants' apartment. (Hollingsworth Decl. ¶ 5.) There was no answer, and the concierge did not allow the process server to go up to the apartment. (*Id.*)

The process server returned the next day—March 22—in order to effectuate personal service of process. (*Id.* at ¶ 6.) Because the concierge desk was unoccupied when he arrived, he proceeded to defendants' apartment and knocked on the door. (*Id.*) Even though "voices [were] coming from the apartment," no one answered. (*Id.*)

On Monday, March 24, one day after defendants claim in their answering declarations that they had left the country, the process server returned to the 57th Street building and identified himself to the concierge, Darusalam Raden, as a process server with documents for defendants. (*Id.* ¶ 7.) Raden confirmed that defendants were residents of the building and called up to their apartment. (*Id.* ¶¶ 7, 9; Decl. of Darusalam Raden dated May 22, 2014 ("Raden Decl.") ¶¶ 8–9.) There was no answer, and Raden did not allow the process server to proceed to defendants' apartment.

(Hollingsworth Decl. ¶ 8; Raden Decl. ¶ 10.) The process server left two copies of the summons and complaint with Raden, who said he would give them to defendants. (Hollingsworth Decl. ¶ 10.) Raden placed the documents in defendants' mailbox, and they were eventually removed. (Raden Decl. ¶¶ 11–12.) The process server also mailed two copies of the summons and complaint to the apartment. (Hollingsworth Decl. ¶ 11.) Sometime after March 24—in late March or early April—Raden learned that defendants had moved out of the building. (Raden Decl. ¶ 13.)

## II. DISCUSSION

### A. Motion to Dismiss the Fraudulent Misrepresentation Claim for Failure to State a Claim for Relief

Defendants move pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss Rana's fraudulent misrepresentation claim on the grounds that Rana has not pled that claim with sufficient particularity. *See* Fed. R. Civ. P. 9(b). Rana has agreed to dismissal of his fraudulent misrepresentation claim against defendant Islam. (Pl.'s Mem. in Opposition to Mot. to Dismiss ("Pl.'s Opp'n") at 23 n.17, Dkt. No. 17.) Therefore, the Court evaluates Rana's pleadings only insofar as they relate to his fraudulent misrepresentation claim against defendant Prova.

#### 1. Legal Standard

In evaluating a motion to dismiss pursuant to Rule 12(b)(6), the court accepts the truth of the facts alleged in the complaint and draws all reasonable inferences in the plaintiff's favor. *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 128 (2d Cir. 2011) (internal citation omitted). A complaint will survive a motion to dismiss only if the plaintiff has pled "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. V. Twombly*, 550 U.S. 544, 570 (2007). For a claim to be plausible, the plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* at 555.

To state a claim for fraudulent misrepresentation pursuant to New York law, "a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 186-87 (2d Cir. 2004) (internal citation and quotation marks omitted). Courts must evaluate fraud claims in light of Rule 9(b), which requires that the complaint "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The allegations of fraud must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal citation and quotation marks omitted).

## 2. Rana Has Sufficiently Pled His Fraudulent Misrepresentation Claim

Rana alleges that in the weeks after June 17, 2012, in Dhaka, Bangladesh, defendant Prova told him "that [he] would enjoy all of the rights and privileges of Americans in the United States"; that she would "renew Mr. Rana's visa in the United States"; and that "Rana would have some free time to himself every day when he completed his job duties." (Compl. ¶¶ 20, 21, 28; *see also id.* ¶¶ 31–32, 34.) These allegations comport with Rule 9(b), specifying the time, place, and nature of the alleged misrepresentations that form the basis of Rana's fraudulent misrepresentation claim.

Defendant Prova asserts that Rana "generally alleges vague time periods during which Defendant Prova allegedly made false promises to him." (Defs.' Reply Mem. in Supp. of Mot. to Dismiss ("Defs.' Reply") at 8, Dkt. No. 19.) However, "a complaint need only apprise a defendant of the 'general time period' of any alleged misstatements to meet the requirements of Rule 9(b)." *Harris v. Wells*, 757 F. Supp. 171, 173 (D. Conn.

1991) (quoting *Int'l Paper Co. v. James*, 1989 WL 240079, at \*10 (S.D.N.Y. Oct. 12, 1989)). Accordingly, courts have found sufficient specificity when plaintiffs alleged misrepresentations during a two-month period, *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC*, 223 F. Supp. 2d 474, 481 (S.D.N.Y. 2002), and a three and one-half month period, *Jubran v. Musikahn Corp.*, 673 F. Supp. 108, 112 (E.D.N.Y. 1987). Rana alleges that defendant Prova's misrepresentations were made in Dhaka in the weeks after June 17, 2012. *(*Compl. ¶¶ 20–28.) Since Rana and Prova moved to the United States on or about September 11, 2012 (*id.* ¶ 38), the Court can infer that the statements were made within the three-month period from mid-June to mid-September. Furthermore, Rana alleges that after visiting the American Embassy in Dhaka in or around July 2012 to obtain a visa, Prova "informed Mr. Rana directly that she and Defendant Islam would pay him $3,000 per month." (Compl. ¶¶ 31–32, 34.) These allegations are sufficiently specific to enable defendants to submit an answer and prepare for trial. *See Manavazian v. Atec Group, Inc.*, 160 F. Supp. 2d 468, 477–78 (E.D.N.Y. 2001), (quoting *In re Revlon, Inc. Secs. Litig.*, No. 99 Civ. 10192, 2001 WL 293820, at \*8 (S.D.N.Y. Mar. 27, 2001) ("To satisfy Rule 9(b) . . . a plaintiff need not plead dates, times, and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based.") (internal quotation marks and citation omitted).

Rana has also pled sufficient facts to give rise to the required intent to defraud. Rana alleges that Prova lured him to the United States with promises that (1) Islam and Prova "would pay him $3,000 per month," (2) Rana "would have some free time to himself every day" and "some days off," and (3) defendants "would renew his visa before it expired." (Compl. ¶¶ 2, 28, 34–35.) Rana further alleges that Prova demanded that he sign documents without explaining their contents or giving him time to read them. (Compl. ¶¶ 23, 27.)  Finally, Rana alleges that after Islam and Prova brought him to the United States,

> [d]efendants maintained him here in forced labor in slavery-like
> conditions, forbidding him from leaving their residence under his

own volition, threatening to beat him or kill him, threatening that the police will arrest and kill him if he left their residence, physically assaulting him on at least two occasions, maintaining possession over Mr. Rana's passport and visa, and withholding all compensation from Mr. Rana for a period of over eighteen months. (Compl. ¶ 2.)

Taken together and assumed for purposes of this motion to be true, these allegations support the requisite inference that Prova intended to defraud Rana. *See, e.g., Malinguez v. Joseph*, 226 F. Supp. 2d 377, 379–82, 389–90 (E.D.N.Y. 2002) (viewed in their totality, allegations that the plaintiffs failed to pay their domestic servant the agreed-upon wage, retained her passport, verbally abused her, required her to work long hours under poor conditions, and kept her in isolation "give rise to a strong inference that Defendants either intended to defraud Plaintiff, knew their statements were false, or recklessly disregarded the truth of their statements").

Because Rana's allegations satisfy Rule 9(b)'s specificity requirements, defendants' motion to dismiss plaintiff's claim against Prova for fraudulent misrepresentation is denied.

B.   <u>Motion to Dismiss the Complaint for Lack of Subject Matter Jurisdiction</u>

Defendants also move pursuant to Fed. R. Civ. P. 12(b)(1) to dismiss the complaint for lack of subject matter jurisdiction because they are immune from this action by virtue of consular immunity.

1.   <u>Legal Standard</u>

On a motion to dismiss for lack of subject matter jurisdiction, "'the party invoking federal jurisdiction bears the burden of establishing that jurisdiction exists.'" *Sharkey v. Quarantillo*, 541 F.3d 75, 82 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The court must accept as true all material facts alleged in the complaint. *Merritt v. Shuttle, Inc.*, 245 F.3d 182, 186 (2d. Cir. 2001). However, in resolving a challenge to subject matter jurisdiction, the court may look beyond the

pleadings in order to determine whether it has authority to hear the action. *See Filetech S.A. v. Fr. Telecom S.A.*, 157 F.3d 922, 932 (2d Cir. 1998); *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 327 n.1 (S.D.N.Y. 2008).

### 2.   The Court Has Subject Matter Jurisdiction Over this Action

Rana contends that the Court has federal question jurisdiction over his federal claims pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 201 *et seq.*, and 18 U.S.C. § 1595(a) (Compl. ¶ 5), and supplemental jurisdiction over his state law claims pursuant to 28 U.S.C. § 1367(a) (Compl. ¶ 6).

Islam and Prova do not dispute that certain of Rana's claims "arise under" federal law for the purposes of federal question jurisdiction or that Rana's state and federal law claims arise "from a common nucleus of operative facts" for the purposes of supplemental jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966); *see also* 28 U.S.C. § 1367(a). Rather, defendants contend that this Court lacks subject matter jurisdiction because they are shielded by consular immunity.[2] (Defs.' Mem. in Supp. of Mot. to Dismiss ("Defs.' Mem.") at 4–5, Dkt. No. 14; Defs.' Reply at 7–8.)

#### a.   *Defendant Islam is Entitled to Consular Immunity*

The Vienna Convention on Consular Relations ("VCCR") governs consular immunity. *United States v. Kostadinov*, 734 F.2d 905, 910 (2d Cir.

---

[2] Defendants initially based their motion on the contention that they "are immune from this action by virtue of their diplomatic immunity." (Defs.' Mem. at 4.) In their reply brief, however, they apparently concede that the question is one of consular—rather than diplomatic—immunity. (Defs.' Reply at 7–8.) In any event, diplomatic status is conditioned on recognition by the receiving state (in this case, the United States). *See U.S. v. Lumumba*, 741 F.2d 12, 15 (2d Cir. 1984) (citing applicable law); *United States v. Khobragade*, 15 F. Supp. 3d 383, 385 (S.D.N.Y. 2014); *U.S. v. Kuznetsov*, 442 F. Supp. 2d 102, 106–07 (S.D.N.Y. 2006); Restatement (Third) of The Foreign Relations Law of the United States § 464 (1987). Here, defendants' names do not appear on the State Department's February 4, 2014 "Diplomatic List" of those who have been recognized as diplomats (Ex. 7 to Decl. of Emily Shea dated May 28, 2014), and defendants have proffered no evidence to the contrary.

1984). The degree of immunity that consular officers receive is more restricted than that enjoyed by diplomats. *See United States v. Khobragade*, 15 F. Supp. 3d 383, 385 (S.D.N.Y. 2014). Specifically, whereas diplomatic officers have almost complete immunity from a receiving state's civil and criminal jurisdiction, consular officers and employees are only entitled to immunity "in respect of acts performed in the exercise of consular functions." *Compare* Vienna Convention on Diplomatic Relations [hereinafter "VCDR"] art. 31, Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95, *with* Vienna Convention on Consular Relations [hereinafter "VCCR"] art. 43(1), Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

When he was Consul General of the Consulate General of Bangladesh in New York, Defendant Islam was unquestionably a "consular officer" within the meaning of Article 43 of the VCCR. *See Park v. Shin*, 313 F.3d 1138, 1141 (9th Cir. 2002). Consequently, Islam is entitled to consular immunity for acts he "performed in the exercise of consular functions." VCCR art. 43(1).

> b. *Consular Immunity Does Not Shield Defendant Islam from this Action Because Employing a Domestic Worker Is Not a Consular Function*

Determining whether consular immunity applies "involves a two-part inquiry." *Ford v. Clement*, 834 F. Supp. 72, 75 (S.D.N.Y. 1993) (citing *Gerritsen v. Consulado General de Mexico*, 989 F.2d 340, 346 (9th Cir. 1993)). First, the court must determine whether the official's actions "implicated some consular function." *Id.* Second, the "acts for which the consular officials seek immunity must be 'performed in the exercise of the consular functions' in question." *Id.*

The VCCR sets forth twelve specific consular functions, including protecting "the interests of the sending State and its nationals" and "issuing passports and travel documents to nationals of the sending State." VCCR art. 5. In addition, the VCCR contains a catchall provision defining consular functions as "any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of

the receiving State or . . . which are referred to in the international agreements in force between the sending State and the receiving State." VCCR art. 5(m).

The Court finds that defendants' employment of Rana was not a consular function within the meaning of the VCCR. Hiring a domestic worker to cook, clean, and provide childcare in a consular official's household falls neither within any of the specific functions set forth in the VCCR nor within the scope of Article 5(m)'s catchall provision.

This Court's determination accords with the decisions of at least two Courts of Appeal. In *Park v. Shin*, the U.S. Court of Appeals for the Ninth Circuit held that a consular official's employment of a "*personal* domestic servant" is not a consular function. 313 F.3d at 1142 (emphasis in original). Similarly, in *Swarna v. Al-Awadi*, 622 F.3d 123, 137-140 (2d Cir. 2010), the U.S. Court of Appeals for the Second Circuit rejected the notion that "residual" diplomatic immunity—that is, immunity for past acts performed in the receiving state that the diplomat continues to enjoy even after he has left that country—shields a diplomat from causes of action arising out of the employment of a domestic worker. The standard for residual diplomatic immunity is virtually identical to that for consular immunity. Specifically, Article 39(2) of the VCDR provides that former diplomats are entitled to immunity for "acts performed by such a person in the exercise of his functions as a member of the mission," while Article 43(1) of the VCCR art. 43(1) grants immunity to consular officers "in respect of acts performed in the exercise of consular functions." Because the residual immunity enjoyed by diplomats is essentially the same as that accorded consular officers, *Swarna* thus teaches that consular immunity cannot shield a consular officer from claims arising out of his or her employment of a personal domestic worker.

Both the Second Circuit decision—*Swarna*—and the Ninth Circuit decision—*Park*—emphasized three facts in reaching their conclusions, all of which are present in this case. First, the plaintiffs in both cases were issued visas specifically intended for personal employees of diplomats or

consular officers. *Swarna*, 622 F.3d at 138; *Park*, 313 F.3d at 1142–43. Here, Rana held an A-3 visa (Compl. ¶ 9), the same visa issued to the plaintiff in *Park*, 313 F.3d at 1142–43. Second, the defendants in *Park* and *Swarna* paid for the domestic workers' services out of their own personal funds. *Swarna*, 622 F.3d at 138; *Park*, 313 F.3d at 1143. Similarly, Prova allegedly promised to pay Rana $3,000 per month for his services (Compl. ¶ 34), and there is nothing in the record to suggest that the Bangladesh Consulate agreed to pay Rana or that it maintained a practice of compensating the personal employees of its consular officers. Third, in both *Park* and *Swarna*, the plaintiffs spent "the bulk" of their time cooking and cleaning for the defendants and caring for their children. *Swarna*, 622 F.3d at 138; *Park*, 313 F.3d at 1143. Here, Rana allegedly worked over 16 hours per day in defendants' household, cooking, cleaning, and looking after their child. (Compl. ¶¶ 40–41.)

Defendants contend that they are entitled to immunity because their employment of Rana was "incidental" to Islam's post as Consul General of Bangladesh. (Defs.' Mem. at 5.) They point to two facts in support of this argument: (1) Rana "was retained to perform domestic services for [defendants] while Defendant Islam was posted as Consul General"; and (2) Rana was required to perform services not only at defendants' apartment, but also at the Bangladesh Consulate. (*Id.*)

These exact arguments, however, were rejected in *Park*. There, the defendants, a consular officer and his wife, argued that the officer "could not fulfill his other functions as a consular officer as effectively if he were required to cook, clean, take care of his children, and perform the other services that Plaintiff provided for" his family. 313 F.3d at 1142. Although the Ninth Circuit panel recognized that that contention might indeed be true, it nonetheless concluded that "this fact alone is insufficient to make hiring and supervising [a domestic worker] a consular function." *Id.* ("A direct, not an indirect, benefit to consular functions is required.").

The defendants in *Park* also argued that their employment of the plaintiff constituted a consular function because her duties included

preparing and serving food when the defendants entertained official guests of the consulate in their home. *Park*, F.3d at 1142. However, the court held that because the plaintiff spent "the bulk" of her time attending to the defendants' household, the "[p]laintiff's work for the Consulate was merely incidental to her regular employment as the [defendants'] personal domestic servant and, accordingly, Mr. Shin's hiring and supervision of her was not a consular function." *Id.* at 1143.

Here, too, the fact that Rana worked for defendant Islam while he was a consular officer does not mean that defendants' employment of Rana was a consular function. The record on this motion shows that Rana was employed to meet defendants' private needs and not the official needs of the Consulate General of Bangladesh. *See Swarna*, 622 F.3d at 138 (the plaintiff's work in the home of defendant, a diplomat, was not "part of any mission-related functions"). Defendants have not alleged that their employment of Rana required consular authorization or approval. Furthermore, nothing in the record suggests that Rana's occasional work in the Bangladesh Consulate was anything more than incidental to his regular employment in defendants' household. As noted above, defendants have provided no evidence that the Consulate hired or paid Rana and the facts alleged are that Rana devoted substantially all of his time attending to defendants' household. (Compl. ¶¶ 40–42.) The fact that Rana occasionally "cook[ed] food for events at the Bangladesh Consulate" and provided services at "monthly community events" there (Compl. ¶ 42) is not sufficient to render his employment a consular function. *See Swarna*, 622 F.3d at 128, 138 (defendants' employment of a domestic servant was not an official diplomatic function, even though the plaintiff "cooked for an official event held at the Kuwait Mission on 'at least one occasion.'"); *Park*, 313 F.3d at 1143.

Defendant Prova's claim to immunity rests on the same grounds as her husband's; therefore, she also is not entitled to consular immunity.[3]

---

[3] The plain language of the VCCR also suggests that the general consular immunity provided by Article 43 does not extend to any member of the consular officer's family

> ### c. Consular Immunity Does Not Shield Islam from this Action Because He Was Not Acting as an "Agent" of Bangladesh When He Contracted for Rana's Employment

Even if Article 43(1) of the VCCR provided a basis for consular immunity here, the Court would still find subject matter jurisdiction to exist because the alleged circumstances of Rana's employment would trigger an exception to the immunity provision of the VCCR. Specifically, the VCCR provides that immunity from jurisdiction in a civil action does not apply when the action "aris[es] out of a contract concluded by a consular officer or a consular employee in which he did not contract expressly or impliedly as an agent of the sending State." Art. 43(2)(b).

First, there is little doubt that Rana's claims for relief arise out of his employment contract with defendants. As an initial matter, Rana's breach of contract, unjust enrichment, and quantum meruit claims arise directly out of the contract. Defendants' alleged fraudulent misrepresentations also arise out of the contract insofar as they occurred in the course of the parties' negotiation over the terms of Rana's employment. (Compl. ¶¶ 2, 28, 34–35.) Finally, the alleged acts giving rise to the remaining claims— conversion, trespass to chattels, assault and battery, and false imprisonment—all occurred during the course of Rana's employment.

Second, the alleged facts also clearly show that Islam was not acting as an agent of the state of Bangladesh when he contracted to employ Rana.

---

who is not himself or herself a consular officer or employee. Whereas the VCCR expressly exempts family members from requirements to pay various taxes and obtain certain permits, the VCCR's general immunity provision does not refer to family members. *Compare, e.g.,* art. 48(1) ("[M]embers of the consular post with respect to services rendered by them for the sending State, and members of their families forming part of their households, shall be exempt from social security provisions which may be in force in the receiving State."), *with* art. 43(1) ("Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State in respect of acts performed in the exercise of consular functions."). Prova has not alleged that she was a consular officer or employee.

Here, too, the pertinent facts are that Rana was issued an A-3 visa, that defendants were responsible for paying him, and that Rana spent the bulk of his time serving defendants' household. Indeed, insofar as these facts establish that defendants' employment and supervision of Rana do not qualify as consular functions, they also demonstrate that Islam was not acting as Bangladesh's agent when he contracted for Rana's labor.

For all of these reasons, defendants are not immune from this action. Consequently, to the extent their motion to dismiss is premised on a lack of subject matter jurisdiction, it is denied.

### C.   Motion to Dismiss for Insufficient Service of Process

Defendants move pursuant to Fed. R. Civ. P. 12(b)(5) to dismiss this action for insufficient service of process.

#### 1.   Legal Standard

In resolving a motion to dismiss a litigation for insufficient service of process, "a court must look to matters outside the complaint to determine whether it has jurisdiction." *Darden v. DaimlerChrysler N. Am. Holding Corp.*, 191 F. Supp. 2d 382, 387 (S.D.N.Y. 2002). "[W]hen a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service." *Burda Media, Inc. v. Viertel*, 417 F.3d 292, 298 (2d Cir. 2005) (parentheses omitted).

Pursuant to Fed. R. Civ. P. 4(e)(2)(b), service may be accomplished by "leaving a copy of [the summons and complaint] at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Service may also be made by "following state law for serving a summons . . . where the district court is located or where service is made." Fed. R. Civ. P. 4(e)(1). The relevant New York

Civil Practice Law and Rules ("C.P.L.R.") provision is nearly identical to Rule 4(e)(2)(b). *See* N.Y. C.P.L.R. § 308(2).[4]

A process server's affidavit of service constitutes prima facie evidence of proper service pursuant to Rule 4(e) and section 308(2) of the C.P.L.R. *Old Republic Ins. Co. v. Pac. Fin. Servs. Of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002); *Bankers Trust Co. of California, N.A. v. Tsoukas*, 303 A.D.2d 343, 344, (2d Dep't 2003). "A defendant's sworn denial of receipt of service . . . rebuts the presumption . . . and necessitates an evidentiary hearing." *Old Republic*, 203 F.3d at 54. However, "no hearing is required where the defendant fails to swear to specific facts to rebut the statements in the process server's affidavits." *Id.* (internal citation and quotation marks omitted).

> 2.   <u>There Is an Issue of Fact as to Whether the 57th Street Apartment Was Defendants' "Dwelling or Usual Place of Abode" on March 24, 2014</u>

Defendants contend that service was improper because Raden, the concierge at the 57th Street apartment, does not reside in the building. Alternatively, defendants argue that service was improper because the apartment was not their "dwelling or usual place of abode" on the morning of March 24, 2014.[5]

---

[4] Rana's process server also complied with N.Y. C.P.L.R. section 308(2)'s additional requirement—not found in Fed. R. Civ. P. 4—that the summons be mailed to the defendant's last known address. (Hollingsworth Decl. ¶ 11.)

[5] Defendants initially based their motion to dismiss on their argument that, pursuant to Fed. R. Civ. P. 4(f)(1), Rana must effect service in accordance with the Hague Convention. (Defs.' Mem. at 3–4.) However, the Convention "appl[ies] only when the internal law of the forum requires service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 700 (1988). The Federal Rules of Civil Procedure allow service on an individual outside the United States by, for example, any "means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3). Thus, service in accordance with the Hague Convention is one, but not the only, means by which Rana may serve defendants.

It is well-established that an apartment building's concierge can satisfy the person "of suitable age and discretion" requirement, and it is irrelevant whether or not the concierge lives in the building. *See, e.g.*, *131 Main St. Assocs. v. Manko*, 897 F. Supp. 1507, 1525 (S.D.N.Y. 1995). Thus, the propriety of service here turns on whether the 57th Street apartment was defendants' "dwelling or usual place of abode" for the purposes of Rule 4(e) on the morning of March 24.

Rana's process server has provided a declaration stating, under penalty of perjury, that on March 24, 2014, he delivered two copies of the summons and complaint to the concierge at the 57th Street apartment house. (Hollingsworth Decl. ¶¶ 10–11; *see also* Return of Service, Dkt. Nos. 3–4.) While this constitutes prima facie evidence of proper service, defendants have raised an issue of fact by contending that the apartment building was not their "dwelling or usual place of abode" on that date. *See CSC Holdings, Inc. v. Fung*, 349 F. Supp. 2d 613, 618 (E.D.N.Y. 2004).

Although the terms "dwelling" and "usual place of abode" "have eluded any hard and fast definition," the Second Circuit has recognized that "a person can have two or more dwelling houses or usual places of abode, provided each contains sufficient indicia of permanence." *Nat'l Dev. Co. v. Triad Holding Corp.*, 930 F.2d 253, 257 (2d Cir. 1991). Courts have identified such indicia as including belongings kept at the address, mail received at the address, ownership of the property, and frequent use of the property. *F.D.I.C. v. Scotto*, No. 97–CV–1631, 1998 WL 357324, at *3 (S.D.N.Y. June 29, 1998); *Jaffe & Asher v. Van Brunt*, 158 F.R.D. 278 (S.D.N.Y. 1994).

Rana contends that the evidence before this Court is sufficient to establish the 57th Street apartment as defendants' "dwelling or usual place of abode" on March 24. However, Rana has submitted no evidence that defendants kept belongings in the apartment or received mail at the address *on that date*. Nor has he provided evidence that defendants owned or rented the apartment. Moreover, defendants have submitted affidavits stating that they "traveled from New York to Morocco on March 23, 2014

by Royal Maroc Airlines flight No. AT201." (Reply Aff. of Monirul Islam dated June 4, 2014 ("Islam Reply Aff.") ¶ 7; *see also* Reply Aff. of Fahima Tahsina Prova dated June 4, 2014 ("Prova Reply Aff.") ¶ 10.) They "landed in Morocco on March 24, 2014 and moved into the home in which [they] currently reside, leased and furnished already by the government of Bangladesh." (Islam Reply Aff. ¶ 8; *see also* Prova Reply Aff. ¶ 11.) Defendant Islam also asserts that "[t]he movers first came to my New York residence in the first week of March, 2014." (Islam Reply Aff. ¶ 6.) Islam asked the moving company "to make the shipment after [the family's] arrival in Rabat," and "[t]hey did accordingly." (*Id.*) Finally, Islam asserts that the current Consul General of the Consulate General of Bangladesh now lives in the same 57th Street apartment that he and Prova occupied prior to March 24, 2014. (*Id.* ¶ 19.) These statements are sufficient to raise an issue of fact as to whether the 57th Street apartment was defendants' "dwelling or usual place of abode" when Rana's process server left the summons and complaint with the building concierge on March 24.

In addition to indicia of permanence, courts in analogous cases "have considered the presence or absence of an intent to return to the place of service to determine whether it can be characterized as the defendant's dwelling house or usual place of abode." 4 A.C. Wright & A. Miller, Federal Practice and Procedure § 1096 (3d ed.) (citing cases). Rana has failed to provide any evidence that defendants intend to return to the United States or continue to make use of the 57th Street apartment. Indeed, it appears that the Consulate General of Bangladesh, not defendants, leased the 57th Street apartment. (Islam Aff. ¶ 7.) Furthermore, Islam has stated that the current Consul General of the Consulate General of Bangladesh has taken up residence in the apartment. (Islam Reply Aff. ¶ 19.) These facts strongly suggest that defendants had no intention of returning to the 57th Street apartment when they left the country on March 23, 2014.

Rana argues that because defendants have received actual notice of this lawsuit, the Court should construe the service rules liberally in order to find service proper. (Pl.'s Opp'n at 13; Pl.'s Surreply in Opp'n to Mot. to

Dismiss ("Pl.'s Surreply") at 1–4, Dkt. No. 22.) Rana draws an analogy between this case and "those cases in which service was properly made at the defendant's former residence, to which he still had access." (Pl.'s Surreply at 3.) For example, Rana cites *Dunn v. Burns*, 42 A.D.3d 884, 885–86 (4th Dep't 2007), in support of his position. In that case, the Appellate Division found service proper when the plaintiff served the defendant's common law wife at the defendant's former home, even though the defendant had taken a job in the United Arab Emirates and claimed to have moved there permanently. Rana also compares this case to *Karlsson v. Rabinowitz*, 318 F.2d 666 (4th Cir. 1963), in which the U.S. Court of Appeals for the Fourth Circuit upheld service where the plaintiff served the defendant's wife at his former house, even though the defendant had permanently relocated to another state. 318 F.2d at 668-69.

The facts of *Dunn* and *Karlsson* are distinguishable from this case. In *Dunn*, the defendant "continued to own and maintain the New York residence, never changed his address with the post office and continued to refer to the New York residence as his home." *Dunn*, 839 N.Y.S.2d at 896. And in *Karlsson*, the defendant's wife, children, and maid continued to reside in the original residence, which the defendant still owned. *Karlsson*, 318 F.2d at 667. These indicia of permanence made it reasonably likely that service at the former address would result in the defendant receiving notice of the pending action.

Here, defendants left the country together on March 23, having arranged for their belongings to be shipped to them at some time after their arrival in Morocco. (Islam Reply Aff. ¶¶ 6–8; Prova Reply Aff. ¶¶ 9–11.) In contrast with *Dunn* and *Karlsson*, there is no evidence that any family member continued to reside in the 57th Street apartment after March 23. Furthermore, defendants never owned or leased the apartment. (Islam Aff. ¶ 7.) The fact that the Consulate informed defendants of the summons and complaint after they left New York shows only that defendants had notice of this litigation; it does not make the apartment their "dwelling or usual place of abode" at the time of service. In sum, there is no evidence that Islam or Prova maintained a connection to the

57th Street apartment after they flew to Morocco on March 23. Thus, even if the Court construes the service rules liberally, the evidence currently before it is insufficient to support a finding that plaintiff accomplished proper service on March 24.

For all of these reasons, the Court cannot determine, on this record, that service was proper pursuant to Rule 4(e) or New York law.

### 3.   The Court Need Not Dismiss this Action

While a hearing would be necessary to determine the sufficiency of Rana's attempted service on March 24, the Court need not follow that path because a finding of defective service is not fatal to this action. As the Second Circuit observed in *Romandette v. Weetabix Co., Inc.*, 807 F.2d 309, 311 (1986), "Rule 4 of the Federal Rules is to be construed liberally 'to further the purpose of finding personal jurisdiction in cases in which the party has received actual notice.'" Furthermore, "[i]ncomplete or improper service will lead the court to dismiss the action *unless it appears that proper service may still be obtained*." *Id.* (emphasis in original) (internal citation and quotation marks omitted).

Islam and Prova have, in fact, already received actual notice of this lawsuit. Islam admits in his affidavit that "[i]n early April 2014, the Consulate in New York informed me that a Complaint against me had been picked up from my old apartment still hired by the Consulate." (Islam Reply Aff. ¶ 11; *see also* Prova Reply Aff. ¶ 12 ("My husband told me in early April 2014 that the Consulate had picked up a court summons in our names.").) And as early as March 22—the day that Rana's process server made his second attempt at service—Islam had spoken to the press and responded to several of the specific charges in the complaint, demonstrating that he had notice of its substance and had apparently begun to formulate a response for publication by that date. (*See* Exs. 1–2 to Decl. of Emily Shea dated May 28, 2014.)

Furthermore, proper service may still be obtained. Pursuant to Fed. R. Civ. P. 4(f)(1), Rana may effect service "by any internationally agreed

means of service that is reasonably calculated to give notice, such as those authorized by" the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents [hereinafter "Hague Convention"], November 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163. Alternatively, service may be achieved "by other means not prohibited by international agreement, as the court orders." Fed. R. Civ. P. 4(f)(3). Significantly, the Federal Rules of Civil Procedure impose no time limit for service in a foreign country. Fed. R. Civ. P. 4(m).

For the foregoing reasons, the Court need not dismiss this action. *Romandette*, 807 F.2d at 311. Accordingly, defendants' motion to dismiss for insufficient service of process is denied.

### 4.   The Court Orders Service on Defendants' Attorneys Pursuant to Rule (4)(f)(3)

Rana proposes that the Court order service on the attorneys who represent defendants in this action. This method is permissible pursuant to Rule 4(f)(3) because it is "not prohibited by international agreement." *See In re GLG Life Tech Corp. Sec. Litig.*, 287 F.R.D. 262, 267–68 (S.D.N.Y. 2012); *RSM Prod. Corp. v. Fridman*, No. 06 Civ. 11512, 2007 WL 1515068, at *3 (S.D.N.Y. May 24, 2007) ("The Hague Service Convention does not prohibit an order pursuant to Rule 4(f)(3) permitting service through American counsel."). Federal courts have consistently recognized that "there is no hierarchy among the subsections in Rule 4(f)." *GLG Life Tech Corp.*, 287 F.R.D. at 265 (internal quotation marks and citation omitted). Accordingly, "court-directed service under Rule 4(f)(3) is as favored as under Rule 4(f)(1)." *Id.* (quoting *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002)). Furthermore, service on a party's attorney is "reasonably calculated . . . to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *See id.* at 267–68 (quoting *Mullane v. Cent. Hanover Bank & Trust*, 339 U.S. 306, 314 (1950)); *see also Swarna v. Al-Awadi*, No. 06-cv-4880, 2007 WL 2815605, at *1 (S.D.N.Y. Sept. 20, 2007) (holding that service on a Kuwaiti diplomat's attorneys was reasonably calculated to give notice).

"The decision whether to allow alternative methods of serving process under Rule 4(f)(3) is committed to the sound discretion of the district court." *RSM*, 2007 WL 1515068, at *1. Nevertheless, some courts, before authorizing service under Rule 4(f)(3), have required "(1) a showing that the plaintiff has reasonably attempted to effectuate service on the defendant, and (2) a showing that the circumstances are such that the court's intervention is necessary." *Id.* at 265–66 (internal quotation marks and citation omitted). Thus, in cases involving service on persons residing in a country that is a signatory to the Hague Convention, some courts require plaintiffs to first attempt service pursuant to that protocol. *Id.* at 266.

In this case, however, requiring Rana to first attempt service in accordance with the Hague Convention would likely be futile. Defendant Islam currently serves as Ambassador to Morocco, which is a signatory to the Hague Convention.[6] Therefore, Islam and Prova are immune from Moroccan jurisdiction, which service pursuant to the Hague Convention would require. *See* Hague Convention art. 2 (directing signatory states to designate a central authority to arrange for service on individuals within their borders at the request of other signatory states); VCDR art. 31 (A diplomatic agent shall "enjoy immunity from [a receiving state's] civil and administrative jurisdiction."); *Swarna*, WL 2815605, at *1 ("In response to an attempt to serve [a diplomat to the Embassy of Kuwait in France and his wife] via the Hague Service Convention, French authorities have declined because of the individuals' diplomatic immunity."). Thus, in this case, court-directed service on defendants' attorneys pursuant to Rule 4(f)(3), without first requiring Rana to attempt service in Morocco, is appropriate.

---

[6] *See* Hague Conference on Private International Law, Status Table, http://www.hcch.net/index_en.php?act=conventions.status&cid=17 (last visited January 5, 2015).

### III. CONCLUSION

Because (1) Rana has pled his fraud claim with sufficient specificity, (2) defendants are not immune from this suit, and (3) proper service may still be obtained, defendants' motion to dismiss is denied in its entirety. The Court orders plaintiff to serve a copy of the summons and complaint on defendants' attorneys by January 12, 2015. This method of service is both permissible under Rule 4(f)(3) the Federal Rules of Civil Procedure and appropriate given the circumstances of this case. Rana made three good-faith attempts at service on March 21 and 22 while Islam and Prova still resided in the 57th Street apartment, and on March 24, one day after they flew to Morocco. Furthermore, service on defendants' attorneys is fair in light of defendants' actual notice of the substance of plaintiff's claims and the difficulties of serving a diplomat and his wife in Morocco pursuant to the requirements of the Hague Convention.

Dated: New York, New York
    January 6, 2015

SO ORDERED:

Sidney H. Stein, U.S.D.J.