## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

MASHUD PARVES RANA,

                          Plaintiff,

                  -against-

MONIRUL ISLAM and

FAHIMA TAHSINA PROVA,

                       Defendants.

No. 14-CV-01993  (SHS)

ECF Case

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## HIS MOTION TO STRIKE DEFENDANTS' ANSWER
## AND ENTER A DEFAULT JUDGMENT AGAINST DEFENDANTS

Pursuant to Rule 37(b) the Federal Rules of Civil Procedure, Plaintiff Mashud Parves Rana respectfully submits this Memorandum in support of his motion to enter a default judgment against defendants Monirul Islam and Fahima Tahsina Prova based on their persistent failure to comply with this Court's orders to produce documents, schedule and appear for depositions, and provide information.  Plaintiff also respectfully requests a hearing on the amount of damages he is owed.

## CERTIFICATE OF COMPLIANCE WITH RULE 37(d)(1)(B)

Counsel for Plaintiff has attempted to confer with counsel for Defendants (before their withdrawal from this case) and with Defendants (after defense counsel's withdrawal) in a good faith effort to resolve this dispute but has been unable to do so.

## INTRODUCTION

Defendants lured Mr. Rana from his home in Bangladesh to the United States to work as their live-in domestic employee while Defendant Islam served as the Consul General of

Bangladesh in New York.  As soon as Mr. Rana arrived on U.S. soil, Defendants confiscated his passport, imprisoned him in their apartment, and forced him to work 16 to 20 hours every day without pay.  During the 18 months that Mr. Rana was enslaved – from September 2012 until his escape in March 2014 – Defendants regularly berated, demeaned, and threatened him, and twice Defendant Islam physically attacked him.

Mr. Rana brought this lawsuit to recover unpaid wages, as well as other compensatory and punitive damages.  But Defendants have continued to try to evade their obligations to Mr. Rana.  After an unsuccessful motion to dismiss, Defendants delayed this litigation for an entire year – first by answering the Complaint three months late, then by repeatedly ignoring discovery deadlines and Court orders.  With less than two weeks before trial, Defendants have produced just 28 pages of documents (half of which were attachments to their motion to dismiss) and have completely failed to produce various categories of documents ordered by the Court, to provide any response to Mr. Rana's Requests for Admission, or to appear for their depositions. Defendants have also ignored basic requests for information from the Court, such as whether they intend to participate in discovery.  After their lawyers withdrew because Defendants failed to pay or cooperate with them, Defendants failed to retain new counsel or elect to proceed pro se. Defendants' repeated violations of their discovery obligations and Court orders – amounting to a nearly total lack of participation in this litigation – clearly warrants entry of a default judgment.

## FACTUAL BACKGROUND

Mr. Rana's Complaint alleges that Defendants "knowingly and willfully lured Mr. Rana from Bangladesh" to the United States for the purpose of "obtain[ing] Mr. Rana's forced labor and involuntary services" through "physical threats, coercion, isolation, physical restraint, physical force, [and] threats to Mr. Rana's life."  Compl. ¶¶ 2, 39 (ECF No. 2).  In June and July

2

2012, Defendants made various promises to induce Mr. Rana to travel to the United States with them, including (1) that Defendants "would pay him $3,000 per month," (2) "Mr. Rana would have some free time to himself every day" and "some days off," and (3) Defendants "would renew his visa before it expired." *Id*. ¶¶ 28, 34-35.  In reliance upon these representations, Mr. Rana accepted Defendants' offer of employment. *Id*. ¶ 35.

Upon Mr. Rana's arrival in the United States on September 11, 2012, Defendants reneged on all their promises. *Id*. ¶¶ 38-39.  Defendants "never paid Mr. Rana a single dollar of the promised wages of $3,000 per month." *Id*. ¶ 53.  When Mr. Rana asked why Defendants had not paid him, Defendant Islam struck Mr. Rana and told him, "I brought you to America, that is enough." *Id*. ¶ 63.  Defendants forced Mr. Rana to work over 16 hours each day – and sometimes up to 20 hours – and never once gave him a day off. *Id*. ¶¶ 40-41, 52.  Mr. Rana "was required to cook all meals from scratch, iron clothes, wash clothes by hand, watch Defendants' eleven-year-old son, and clean the entire apartment daily." *Id*. ¶ 40.  When Defendants hosted parties in their home, they demanded that Mr. Rana "cook for all the guests, serve, and clean up after the guests left." *Id*. ¶ 41.  Additionally, once a month, Defendants required Mr. Rana to "work as a busboy and server" at events at the Bangladesh Consulate. *Id*. ¶ 42.

Defendants forced Mr. Rana to continue working "through a pattern of abusive and coercive behavior." *Id*. ¶ 39.  Defendants isolated Mr. Rana completely and did not allow him to leave their apartment. *Id*. ¶¶ 46-50.  Defendant Islam "told Mr. Rana that he would beat him if he did not listen to and follow his instructions" and "threatened to kill Mr. Rana" if he left the apartment. *Id*. ¶¶ 45, 48.  Twice, Defendant Islam was physically violent – once, "hitting Mr. Rana on the back of the head" and another time, hitting Mr. Rana in the head and pushing him into the kitchen counter. *Id*. ¶¶ 63-64.

3

Defendants "maintained possession of Mr. Rana's passport and immigration-related documents" during the entire time Mr. Rana lived with Defendants. *Id*. ¶ 47. Defendant Islam "regularly told Mr. Rana that if he left the apartment, the police would find him and kill him because Mr. Rana did not have his passport" and that "if [Mr. Rana] was arrested, Defendant Islam would not seek to have him released from jail." *Id*. ¶ 48. When Mr. Rana's visa expired around June 2013, Defendants told Mr. Rana that if he left the apartment, the police would certainly "catch him and kill him" now because his visa was expired. *Id*. ¶ 61. Aside from "five or six short trips to a convenience store across the street from Defendants' apartment at Defendants' instruction" – with Defendants watching from their apartment window – "Mr. Rana was only permitted to leave the residence with Defendants approximately once per month to work at the Bangladesh Consulate." *Id*. ¶¶ 49, 58.

Defendants "regularly and repeatedly called Mr. Rana 'illiterate,' 'stupid,' and 'lazy,' and told him he was 'nothing,' in an effort to demean, intimidate, and abuse Mr. Rana." *Id*. ¶ 55. Mr. Rana was "only allowed to eat expired or leftover food." *Id*. ¶ 56. He was "not allowed to talk to anyone outside of the house" and "was not permitted to make phone calls." *Id*. ¶¶ 57, 59. Defendants "closely monitored" Mr. Rana's activities. *Id*. ¶ 58. Defendant Prova "constantly watched Mr. Rana while he did his work during the day." *Id*. On the rare occasions when Mr. Rana's family called Defendants' residence to talk to Mr. Rana, Defendants listened in on the calls from a telephone in another room. *Id*. ¶ 58.

In February 2014, Defendant Islam told Mr. Rana that he was moving to Morocco and that Mr. Rana must continue work for the family in Morocco. *Id*. ¶ 64. Mr. Rana "overheard Defendant Islam say to Defendant Prova that they could not leave [Mr. Rana] in the United States and they could not send him back to Bangladesh because Mr. Rana could report Defendant

Islam to the authorities, which could create a problem for his job and harm his reputation." *Id.* ¶ 65. Defendant Islam then "informed Mr. Rana that he must come with him to Morocco, or Defendant Islam would kill him." *Id.* ¶ 66. On March 2, 2014 – after enduring over 18 months of slavery-like conditions and abuse – Mr. Rana escaped from the Defendants' apartment with just "the clothes on his back and a few personal effects." *Id.* ¶ 70.

## PROCEDURAL HISTORY

## I. DEFENDANTS ANSWERED THE COMPLAINT OVER THREE MONTHS LATE.

Plaintiff filed this action against Defendants on March 21, 2014, seeking damages pursuant to, *inter alia*, the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPA") and federal and New York labor laws. After the Court denied Defendants' motion to dismiss in its entirety, *see* Op. & Order at 23 (ECF No. 35), Defendants were obligated to answer the Complaint by January 28, 2015. Fed. R. Civ. P. 12(a)(1)(A). After waiting nearly three months past this deadline – and hearing nothing from Defendants' counsel – Plaintiff filed his Application for Clerk's Entry of Default on April 24, 2015 (ECF No. 41). *See* Declaration of Emily Shea ¶ 3 [hereinafter Shea Decl.]; Ex. A.[1] Only then did Defendants' counsel contact Plaintiff's counsel, representing that the default was due to an unspecified medical condition and requesting that Plaintiff withdraw his Application. Shea Decl. ¶ 4. Based on assurances from Defendants' counsel that Defendants would participate in this litigation in good faith, Plaintiff withdrew the Application. *See id*; Notice of Withdrawal of Pl.'s Appl. for Clerk's Entry of

---

[1]     All exhibits referenced herein are exhibits to the Declaration of Emily Shea dated April 15, 2016.

Default Against Defs. (ECF No. 44).  Defendants ultimately filed their Answer on May 15, 2015

– three and a half months after it was due.  Answer (ECF No. 45).

## II.     DEFENDANTS REPEATEDLY REFUSED TO COMPLY WITH THIS COURT'S ORDERS AND THEIR DISCOVERY OBLIGATIONS.

### A.     After Filing Their Delinquent Answer, Defendants Refused To Provide Any Discovery By The Court-Ordered Fact Discovery Deadline.

After filing their three-month late Answer, Defendants failed to provide their initial

disclosures, which were due February 11, 2015.  *See* Shea Decl. ¶ 6; Joint Rule 26(f) Report &

Joint Disc. Plan Order (ECF No. 40) [hereinafter Joint Disc. Plan Order].  Defendants also failed

to respond to Plaintiff's document requests, which were served on May 26, 2015 and due June

25, 2015.  Shea Decl. ¶¶ 5, 7; Ex. B.   As the initial Court-ordered fact discovery deadline of July

15, 2015 approached, *see* Joint Disc. Plan Order (ECF No. 40), Plaintiff was forced to notice

Defendants' depositions for July 14 and 15, 2015 without the benefit of any document discovery.

Shea Decl. ¶ 13; Exs. L, M.

After a July 8, 2015 discovery conference (which Defendants' counsel failed to attend),

the Court extended the fact discovery deadline to September 15, 2015 and ordered Defendants

to: (1) provide complete initial disclosures by July 31, 2015; (2) respond to Plaintiff's discovery

requests by July 31, 2015; and (3) sit for depositions by September 10, 2015.  Order (ECF No.

47).  The Court explicitly warned Defendants that "Plaintiff may move for sanctions . . . if

defendants fail to meet any discovery deadline without securing an extension from this Court."

*Id.*  The Court confirmed these deadlines – and reiterated its warning – at a conference attended

by both parties' counsel on July 14, 2015.  Order (ECF No. 48).

**B.      Defendants Failed To Produce Specifically Identified Documents Despite Multiple Court Orders.**

Defendants finally responded to Plaintiff's document requests by the Court-ordered deadline of July 31, 2015. Shea Decl. ¶ 7; Ex. C.[2] However, their response was woefully inadequate and revealed their failure to conduct any good faith search for the requested documents. Defendants did not indicate that they were withholding any documents based on privilege or any other objection, yet their production contained just five pages not already filed with the Court. It did not include a single e-mail and was also missing certain documents expected to be in Defendants' possession, such as the employment contract Defendants provided to the U.S. State Department in order to obtain Plaintiff's A-3 visa. Shea Decl. ¶ 7.

Plaintiff attempted to address these deficiencies by meeting and conferring with Defendants' counsel. *Id.* ¶ 10. When that failed, Plaintiff served a second set of narrow and specific document requests, as well as a set of requests for admissions, with responses due September 24, 2015. *Id.* ¶ 8; Exs. D-F. Defendants responded to the document requests on November 19, 2015 – two months late and with no attempt to explain their noncompliance. Shea Decl. ¶ 9; Ex. G. Defendants' second document production was just as inadequate as their first. Not only did Defendants again fail to produce documents known to be in their possession, they also indicated that they were withholding other documents on the basis of an unspecified "diplomatic privilege," but did not provide a privilege log or any substantiation for this privilege assertion. Shea Decl. ¶ 9; Ex. G at Response No. 3. Further discussions between the parties' counsel about these continued deficiencies did not convince Defendants to remedy their

---

[2]      Defendants also served their initial disclosures by this deadline. Shea Decl. ¶ 6.

discovery violations.  Shea Decl. ¶ 10; Exs. H-J.  In addition, despite Plaintiff's counsel's repeated reminders and entreaties, Defendants never responded to Plaintiff's requests for admission in any way.[3]  Shea Decl. ¶ 12; Exs. H-K.

On December 29, 2015, Plaintiff moved to compel production of the employment agreement between Plaintiff and Defendants, emails regarding Plaintiff, and correspondence between Defendants and the U.S. State Department regarding Plaintiff.  Pl.'s Mot. to Compel Defs. to Produc. Docs. *et seq.* (ECF Nos. 68-71).  Following a status conference on January 14, 2016, the Court ordered Defendants to produce the documents Plaintiff requested by January 29, 2016 or to set forth why they did not have the documents and what steps they had taken to locate them.  Order (ECF No. 93).  The Court also notified Defendants that failure to comply could result in sanctions.  *Id.*  Defendants have completely ignored the Court's order and have not produced any of the required documents.  Shea Decl. ¶ 11.

**C.    Defendants Have Failed To Comply With Multiple Court Orders To Schedule And Sit For Their Depositions.**

Defendants have also repeatedly delayed and refused to schedule their depositions.  In its first extension of the discovery schedule, the Court ordered Defendants to sit for depositions before September 10, 2015.  Orders (ECF Nos. 47-48).  Defendants failed to sit for – or even schedule – their depositions before this date.  Shea Decl. ¶ 14; Exs. N-R.  Based on Defendants' counsel's assurances that she was trying in good faith to ascertain her clients' availability for

---

[3]       As such, each request is deemed admitted by Defendants.  *See* Fed. R. Civ. P. 36(a)(3).

depositions, Plaintiff agreed to extend the fact discovery deadline to October 30, 2015.  Proposed Revised Scheduling Order (ECF No. 52).  The Court approved this extension but unambiguously warned that "[n]o further extensions . . . will be granted."  Revised Scheduling Order (ECF No. 53).[4]

After Plaintiff's counsel informed the Court that Defendants' counsel were not cooperating in the discovery process due to their professed intention to withdraw from the case, the Court ordered Defendants to schedule their depositions by October 14, 2015 and appear in New York or London for depositions by October 30, 2015.  Order (ECF No. 55).  Defendants ignored both of these deadlines without offering any explanation for their noncompliance.  Shea Decl. ¶ 15; Ex. S.

During an October 30, 2015 conference regarding Defendants' counsel's motion to withdraw, Defendant Islam telephoned from Morocco and stated that he was unable to attend a deposition outside Morocco, but agreed to attend a deposition in Casablanca, Morocco.[5]  Hr'g Tr. (Oct. 30, 2015) at 10:19-24 (ECF No. 72).  As such, the Court gave Defendants yet another extension, ordering that they must appear for their depositions by January 4, 2016 in Casablanca, London, or New York.  Order (ECF No. 60).  The Court again warned Defendants that

---

[4]     The Court repeated this warning in an Order on October 8, 2015 at a conference attended by both parties' counsel.  Order (ECF No. 55).

[5]     Defendant Islam stated that he was unable to attend a deposition outside Morocco unless the Bangladeshi government granted him permission to do so.  Hr'g Tr. (Oct. 30, 2015) at 8:25-9:6 (ECF No. 72).  However, Defendant Islam has never provided any evidence that his government had in fact prohibited him from leaving Morocco.  Affirm. of Ellen M. Nichols ¶ 13; Ex. 1 (ECF No. 95) [hereinafter Nichols Affirm.]; Op. & Order at 2 (ECF No. 96).

"appropriate sanctions" would result if they did not appear.  *Id.*  Defendants never provided any

dates that they were available for depositions in any of these locations.  Shea Decl. ¶ 16.

      In December 2015, Plaintiff notified the Court that the Moroccan Ministry of Justice

would not allow the depositions to take place in Morocco because Defendants have diplomatic

immunity in that country.  Pl.'s Mot. for an Order Requiring Defs. to Sit for Deps. in New York

or London *et seq.* (ECF Nos. 62-64).  Plaintiff therefore moved to compel Defendants to sit for

depositions in New York or London.  *Id.*  In response, the Court ordered Defendants to inform it

by January 12, 2016 whether they intended to participate in discovery; whether Defendant Islam

had any plans to leave Morocco in the following six months; and when Defendant Prova (who is

not a diplomat) was available to be deposed in New York or London.  Order (ECF No. 81).  The

Court also directed that if Defendant Islam consented to be deposed in Morocco, he must inquire

whether the Moroccan Ministry of Justice would allow him to do so if he waives his immunity.

*Id.*  Defendants have never responded to their attorneys' multiple inquiries seeking this

information.  Nichols Affirm. ¶ 13 (ECF No. 95).

      After the January 14, 2016 conference, the Court ordered Defendants to appear for

depositions in New York or London by March 4, 2016 and warned that noncompliance would

result in sanctions.  Order (ECF No. 93).  As directed by the Court, Defendants' counsel

informed their clients in detail of the requirements of the Court's orders as well as potential

consequences of any continuing failure to comply, including a default judgment.  Nichols

Affirm. ¶¶ 4-6, 10-12 (ECF No. 95).  Notwithstanding these warnings, over a month after the

March 4 deadline, Defendants have failed to appear for, or even schedule, their depositions.

Shea Decl. ¶ 17.

III.   **DEFENDANTS HAVE FAILED TO RETAIN NEW COUNSEL OR SUBMIT THEIR CONTACT INFORMATION TO THE PRO SE OFFICE, AND HAVE FAILED TO ATTEND A PRETRAIL CONFERENCE.**

On March 1, 2016, based on Defendants' "continuing failure to respond to discovery requests and court orders, their failure to communicate with their counsel, their failure to pay their attorneys, [and] their stated desire to terminate their attorneys," the Court granted defense counsel's renewed motion to withdraw.  Op. & Order at 4 (ECF No. 96).  The Court directed that "[i]f defendants retain new counsel, that counsel must file a notice of appearance on or before March 29" and that if "defendants elect to proceed pro se, they must by the same date submit the mailing addresses, email addresses, and telephone number at which they may be reached to the Court's Pro Se Office." *Id*. at 4-5.  Defendants have failed to retain new counsel or submit their contact information by the March 29 deadline.  Shea Decl. ¶ 18.  Additionally, Defendants did not appear at a March 31, 2016 pretrial conference.  Order (ECF No. 99).

## <u>ARGUMENT</u>

I.   **THE COURT SHOULD ENTER A DEFAULT JUDGMENT TO SANCTION DEFENDANTS FOR THEIR CONTINUED FAILURE TO COMPLY WITH THEIR DISCOVERY OBLIGATIONS AND THE COURT'S ORDERS.**

### A.   **A Default Judgment Is Appropriate Where Defendants Ignore Court Orders To Respond To Document Requests Or Sit For Depositions.**

"The court where the action is pending may, on motion, order sanctions if . . . a party . . . fails, after being served with proper notice, to appear for that person's deposition [or if] . . . a party, after being properly served with . . . a request for inspection under Rule 34, fails to serve its answers, objections, or written response."  Fed. R. Civ. P. 37(d)(1)(A).  Sanctions may include "rendering a default judgment against the disobedient party."  Fed. R. Civ. P. 37(b)(2)(vi); 37(d)(3); 16(f)(1)(A).

11

The Court of Appeals has indicated that several factors may be useful in evaluating the appropriateness of sanctions for discovery abuse: "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance[;] and (4) whether the non-compliant party had been warned of the consequences of noncompliance." *S. New England Tel. Co. v. Global NAPs, Inc.*, 624 F.3d 123, 144 (2d Cir. 2010). District courts "ha[ve] wide discretion in imposing sanctions under Rule 37," however, and these factors "need not each be resolved against the [sanctioned] party." *Id.* (citation and internal quotation marks omitted). A default judgment is an "appropriate" sanction "both as a penalty and as a deterrent." *See Mason Tenders Dist. Council Welfare Fund v. Precise Brick, Inc.*, No. 08 Civ. 8373, 2009 WL 1675399, at *1 (S.D.N.Y. June 15, 2009) (citing *Nat'l Hockey League v. Metro. Hockey Club*, 427 U.S. 639, 643 (1976)).

Courts in this Circuit have not hesitated to enter defaults against defendants who refuse to provide discovery necessary for plaintiffs to prosecute their federal labor law claims.[6] Courts across the country have similarly entered default judgments when defendants in TVPA cases refuse to participate in the litigation. *See, e.g.*, *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 13-15 (D.D.C. 2013); *Doe v. Howard*, No. 11-cv-1105, 2012 WL 3834930, at *1-2 (E.D. Va. Aug. 7, 2012), *adopted in full*, 2012 WL 3834929 (E.D. Va. Sept. 4, 2012).

---

[6]     *See, e.g.*, *Guallpa v. N.Y. Pro Signs, Inc.*, No. 11 Civ. 3133, 2013 WL 2149569, at *2-3 (S.D.N.Y. May 17, 2013); *Wilson v. Pasquale's DaMarino's, Inc.*, No. 10 Civ. 2709, 2013 WL 1195603, at *7-8 (S.D.N.Y. Mar. 25, 2013); *Smith v. Saki Rest. Corp.*, No. 10 Civ. 8237, 2011 WL 7102293, at *1-2 (S.D.N.Y. Aug. 3, 2011), *adopted in full*, 2012 WL 251980 (S.D.N.Y. Jan. 25, 2012); *Granados v. Gold Coast Tennis, Inc.*, No. 12-cv-4016, 2013 WL 3766582, at *1-2 (E.D.N.Y. July 16, 2013); *Teri v. Oxford Mgmt. Servs.*, No. CV 05-2777, 2008 U.S. Dist. LEXIS 117446, at *25-29 (E.D.N.Y. Sept. 30, 2008), *adopted in full*, 2009 U.S. Dist. LEXIS 107807 (E.D.N.Y. Nov. 18, 2009).

**B.    A Default Judgment Is Warranted Given Defendants' Continued Intransigence And Willful Delays.**

1.    Defendants' Refusal To Participate In Discovery Is Willful.

Defendants have failed to comply with several Court orders, including orders to provide information to the Court, to produce documents, and *five* orders to appear for depositions. *See* Joint Disc. Plan Order (ECF No. 40); Orders (ECF Nos. 47-48, 55, 60, 93-94).  Defendants were either informed directly or through their counsel about these orders, but chose not to comply. Nichols Affirm. ¶¶ 4-5, 10-12 (ECF No. 95); Hr'g Tr. (Oct. 30, 2015) at 12:22-13:4 (ECF No. 72).  Defendants have never even attempted to explain their noncompliance with the orders to provide information and produce documents.  Although Defendant Islam has asserted that he cannot leave Morocco for his deposition, he provided no evidence to support this representation. Nichols Affirm. ¶ 13; Ex. 1 (ECF No. 95); Op. & Order at 2 (ECF No. 96).  Defendants' discovery violations are, therefore, unquestionably willful.  *See, e.g.*, *S.E.C. v. Razmilovic*, 738 F.3d 14, 26-27 (2d Cir. 2013) (affirming default judgment where defendant intentionally "disobeyed only [a] single court order" by not attending his deposition); *De Vos & Co. v. Profilati Italia, S.r.l.*, No. 96 Civ. 3557, 1997 WL 109474, at *5 (S.D.N.Y. Mar. 11, 1997) (ordering default judgment where defendant refused to obey two orders to appear for his deposition); *Teri*, 2008 U.S. Dist. LEXIS 117446, at *18-21 (finding willful misconduct where defendants "continuously failed to produce materials" until ordered by the court and where such post-order document productions were clearly insufficient).

Additionally, Defendants' failure to communicate with their prior counsel, as well as their failure to retain new counsel or submit their contact information to the pro se office, further indicates their willful refusal to participate in this litigation.  *See S.E.C. v. Alexander*, No. 00 Civ.

7290, 2004 WL 1468528, at *6,8 (S.D.N.Y. June 28, 2004) (finding willful misconduct and entering default judgment where one defendant failed to communicate with his counsel and another ignored a court order to either hire new counsel or "deal with the *Pro Se Office* directly if he wished to appear *pro se*").

2.    Lesser Sanctions Would Be Futile.

"[D]istrict courts are not required to exhaust possible lesser sanctions before imposing dismissal or default." *S. New England Tel. Co.*, 624 F.3d at 148.  Courts routinely enter a default judgment without first attempting lesser sanctions, especially if the defendant has ignored several court orders.  *See, e.g.*, *United States v. $9,781.41 Formerly on Deposit at Man Fin., Inc.*, No. 07 Civ. 6224, 2009 WL 1684695, at *4 (S.D.N.Y. June 16, 2009); *Carazani*, 972 F. Supp. 2d at 15. Nevertheless, the Court has given Defendants numerous extensions of time to comply with their discovery obligations, to no avail.  Defendants' repeated defiance of Court orders suggests that further orders would be unlikely to encourage their participation in this case.  *See, e.g.*, *Coach, Inc. v. O'Brien*, No. 10 Civ. 6071, 2012 WL 1255276, at *9 (S.D.N.Y. Apr. 13, 2012) ("[Defendant's] repeated noncompliance with Court orders and her failure to engage with both counsel for [plaintiff] and the Court indicates that any lesser sanction would be an exercise in futility." (citation and internal quotation marks omitted)); *Granados*, 2013 WL 3766582, at *2 ("The Court has considered the efficacy of lesser sanctions, but concludes that because defendants have repeatedly failed to comply with . . . discovery orders or to engage with both plaintiffs' counsel and the Court, any lesser sanction would be futile.").

3.    Defendants' Noncompliance Has Caused A Year-Long Delay.

Defendants' persistent noncompliance began when they filed their Answer three months' late.  Defendants then continued to refuse to produce basic documents supporting Plaintiff's

14

claims or to schedule their depositions, depriving Plaintiff of crucial evidence for nine months after the original, Court-ordered end of fact discovery.  *See* Joint Disc. Plan Order (ECF No. 40). Courts in this Circuit have awarded default judgments even when a plaintiff has suffered much shorter delays.  *See, e.g.*, *Granados*, 2013 WL 3766582, at *1-2 (entering default requested by plaintiff only one month after obtaining order to compel document production); *Coach*, 2012 WL 1255276, at *9 (entering a default judgment where "[defendant's] history of repeated failure to engage in discovery and comply with this Court's orders spans several months"); *Smith*, 2011 WL 7102293, at *2 (ordering default despite the fact that the defendant's "recent" noncompliance "militate[d] against" doing so).

    4.    Defendants Have Been Warned That Their Noncompliance Could Result In A Default Judgment.

Courts may impose a default judgment even without explicitly warning a defendant that sanctions might include default.  *See Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 452-53 (2d Cir. 2013).  Nevertheless, this Court has explicitly and repeatedly warned Defendants that it would impose a default judgment if they continued to flout discovery orders.  *See* Hr'g Tr. (Oct. 30, 2015) at 7:9-14, 12:22-13:4, 14:19-23 (ECF No. 72); Orders (ECF Nos. 93-95).  This fact weighs in favor of entering a default judgment.  *See Citigroup Global Mkts., Inc. v. Cass*, No. 11 Civ. 7142, 2012 WL 3191875, at *1 (S.D.N.Y. Aug. 2, 2012) (describing the court's "multiple warnings" that included at least two explicit warnings of a default judgment); *Smith*, 2011 WL 7102293, at *2 (defendant "was explicitly warned that failure to appear for his deposition could result in entry of a judgment against him"); *Robertson v. Doe*, No. 05 Civ. 7046, 2008 WL 2519894, at *6 (S.D.N.Y. June 19, 2008), *aff'd sub nom. Robertson v. Dowbenko*, 443 F. App'x 659 (2d Cir. 2011) ("The Court warned [defendant] on multiple

occasions that, if his non-compliance continued, default judgment would be entered against him.").

           5.     <u>Plaintiff Has Been Prejudiced By Defendants' Non-Participation.</u>

A plaintiff need not show that he has been prejudiced in order to justify a default judgment. *S. New England Tel. Co.*, 624 F.3d at 148-49. Defendants, however, have prejudiced Plaintiff by forcing him "to devote extensive time and resources to trying to obtain the most basic discovery" – including his employment contract – "that represent[s] the very heart of plaintiff['s] case." *Teri*, 2008 U.S. Dist. LEXIS 117446, at *26-27 (citation omitted) (internal quotation marks omitted); *see also Doe*, 2012 WL 3834930, at *1 (finding "prejudice[]" when the plaintiff could not "receive information necessary . . . to prosecute her case"). Discovery from Defendants is particularly crucial in this case because Defendants' enslavement and isolation of Plaintiff prevented him retaining records of his employment or corresponding with third parties about his situation. Thus, Defendants' misconduct has harmed Plaintiff's ability to prove his claims.

**C.**    **A Default Judgment Is Necessary In Light Of Defendants' Abandonment Of This Case.**

In total, Defendants' conduct demonstrates that they have abandoned any defense against Plaintiff's claims. Defendants have ignored virtually every deadline set by the Court and the Federal Rules of Civil Procedure, resulting in an entire year of delay. They have produced just a handful of pages of documents, while leaving Plaintiff's Requests for Admission unanswered and refusing to sit for depositions. Defendants have refused to pay or cooperate with their lawyers, leading to their withdrawal, and have failed to retain new lawyers or elect to proceed pro se. When ordered to inform the Court whether they intended to participate in discovery, *see*

Order (ECF No. 81), Defendants did not respond.  Nichols Affirm. ¶ 13 (ECF No. 95).  There is

no reason to believe Defendants would appear at trial to defend against Plaintiff's claims.  If they

did appear, that would be extremely unfair to Plaintiff, who has been denied discovery from

Defendants.  The unavoidable and necessary result is entry of a default.

## II.     PLAINTIFF IS ENTITLED TO A DEFAULT JUDGMENT FOR VIOLATIONS OF THE LABOR LAWS AND TVPA AND A HEARING ON THE AMOUNTS OWED TO HIM.[7]

Pursuant to Federal Rule of Civil Procedure 55(b)(2), a default by Defendants "is deemed

to constitute a concession of all well pleaded allegations of liability."  *Greyhound Exhibitgroup,*

*Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992).  A factual allegation will be

deemed not well-pleaded only in "very narrow, exceptional circumstances."  *Trans World*

*Airlines, Inc. v. Hughes*, 308 F. Supp. 679, 683 (S.D.N.Y. 1969), *modified on other grounds,* 449

F.2d 51 (2d Cir. 1971), *rev'd on other grounds,* 409 U.S. 363 (1973).  A defendant's default,

however, "is not considered an admission of damages."  *Cement & Concrete Workers Dist.*

*Council v. Metro Found. Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012) (citation omitted).

"There must be an evidentiary basis for the damages sought by plaintiff, and a district court may

determine there is sufficient evidence either based upon evidence presented at a hearing or upon

a review of detailed affidavits and documentary evidence."  *Id.*

---

[7]     In addition to his NYLL, FLSA, and TVPA claims, Mr. Rana has also established Defendants' liability for his common law claims: fraudulent misrepresentation; breach of contract, or in the alternative unjust enrichment or quantum meruit; false imprisonment; conversion, or in the alternative, trespass to chattels; and assault and battery.  *See* Compl. ¶¶ 145-87 (ECF No. 2). However, Mr. Rana does not seek damages for these claims, as they would be duplicative of the damages for his statutory claims.

As discussed below, Plaintiff's Complaint establishes his entitlement to a default judgment on claims for violations of New York and federal labor laws and the TVPA, and the law provides the framework for the damages he can recover.  Plaintiff respectfully requests a hearing to demonstrate the amount of damages owed to him.

    **A.**    **Defendants Violated New York And Federal Labor Laws, Entitling Plaintiff To Unpaid Wages, Liquidated Damages, and Other Statutory Penalties.**

        1.    <u>Defendants Violated Minimum Wage, Overtime, And Spread Of Hours Requirements.</u>

The New York Labor Law ("NYLL") and the Fair Labor Standards Act ("FLSA") each require that employees be paid a specified minimum wage and provide a private right of action for employees to collect unpaid wages.  N.Y. Lab. Law §§ 652, 663; 29 U.S.C. §§ 206(a), 216(b).  The NYLL also requires that employees be paid an overtime premium of one and one-half times the minimum wage for work in excess of 44 hours per week.  *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; *Gurung v. Malhotra*, 851 F. Supp. 2d 583, 591 (S.D.N.Y. 2012) (awarding domestic worker overtime wages).  In addition, New York's spread of hours provision requires an employer to pay an employee who works more than 10 hours in one day an additional hour at the minimum wage.  *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4; *Gurung*, 851 F. Supp. 2d at 591 (awarding domestic worker spread of hours damages).

Defendants employed Mr. Rana as a domestic worker in their household in New York, and therefore Mr. Rana is protected by New York and federal labor laws.[8]  Mr. Rana worked for Defendants from September 11, 2012 to March 2, 2014, approximately 16-20 hours each day,

---

[8]    Mr. Rana was employed by Defendants within the meaning of NYLL §§ 2 and 651, and was engaged in commerce within the meaning of the FLSA, 29 U.S.C. § 202(a).

and never received a single day off.  Defendants did not pay Mr. Rana anything for this work, and thus violated the minimum wage provisions of the NYLL and FLSA, as well as the overtimes and spread of hours requirements of the NYLL.  As such, Mr. Rana may recover these unpaid wages.[9]

### 2.   Liquidated Damages Are Available Under the NYLL and FLSA.

The NYLL and FLSA provide for the recovery of liquidated damages in addition to unpaid wages.  Under both statutes, liquidated damages in an amount equal to the underpayment are mandatory unless the employer demonstrates that it acted in good faith.  N.Y. Lab. Law § 663(1); 29 U.S.C. §§ 216(b), 260.  A plaintiff can recover liquidated damages under both the FLSA and NYLL because the damages under those statutes serve different purposes.  *See Gurung*, 851 F. Supp. 2d at 593-94 (holding that the plaintiff "should be permitted to recover liquidated damages under both the FLSA and the NYLL").

Here, Defendants have refused to produce documents, sit for their depositions, or provide any other evidence that their failure to pay Mr. Rana was in good faith.  Indeed, when Mr. Rana inquired about his lack of compensation, Defendant Islam hit Mr. Rana on the back of the head and said, "I brought you to America, that is enough."  Compl. ¶ 63 (ECF No. 2).  Accordingly,

---

[9]    From the day Mr. Rana began working for Defendants through December 31, 2013, the New York and federal wage was $7.25.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.1(a)(2); 29 U.S.C. § 206(a)(1).  From December 31, 2013 through March 2, 2014, when Mr. Rana escaped Defendants' employ, the New York minimum wage was $8.00 and the federal minimum wage was $7.25.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.1(a)(3); 29 U.S.C. § 206(a)(1).

Mr. Rana is entitled to the greater of the New York or federal minimum wage for the hours he worked for Defendants.  *See* N.Y. Lab. Law § 663(1); 29 U.S.C. § 218(a); *see also Estanislau v. Manchester Developers, LLC*, 316 F. Supp. 2d 104, 112 n.2 (D. Conn. 2004) ("To the extent that state law provides a greater remedy than the FLSA, Plaintiff would not be precluded from recovering under it.").

Mr. Rana may recover liquidated damages.  *See Gurung*, 851 F. Supp. 2d at 592 (after entry of default judgment, awarding liquidated damages to domestic worker who alleged that the defendant employers acted willfully by, among other things, ignoring her requests to be paid).

        3.      Defendants Violated The Notice And Recordkeeping Provisions Of The NYLL.

Under the NYLL, employers are required to provide employees a copy of a written notice containing, *inter alia*, information about their pay rate within 10 days of their first day of employment.  N.Y. Lab. Law § 198(1-b) (employees who do not receive notice may recover $50 per work week up to $2,500 statutory maximum).  Additionally, employers must provide employees with a written statement each payday of days worked and wages.  N.Y. Lab. Law 198(1-d) (employees who do not receive statement may recover $100 per work week, up to $2,500 statutory maximum).  Mr. Rana never received the required notice or wage statement during the 76.7 weeks he worked for Defendants.  Thus, he may recover the statutory penalties for these notice and recordkeeping violations.

**B.     Defendants Violated The TVPA, Entitling Plaintiff to Compensatory and Punitive Damages.**

        1.      Defendants Violated The Forced Labor Provision Of The TVPA.

To establish liability for forced labor under the TVPA, the plaintiff must show that the defendant knowingly obtained the labor or services of the plaintiff by, *inter alia*, serious harm or threats of serious harm.[10]  18 U.S.C. § 1589(a); *see also Shukla v. Sharma*, No. 07-cv-2972, 2012

---

[10]      "Serious harm" means "any harm, whether physical or non-physical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding

WL 481796, at *2 (E.D.N.Y. Feb. 14, 2012).  A worker's employment and living conditions may support a finding that a defendant's threats plausibly compelled the plaintiff's labor.  *Shukla*, 2012 WL 481796, at *2.

Here, Defendants knowingly obtained Mr. Rana's labor through serious harm and threats of serious harm.  Compl. ¶ 39 (ECF No. 2).  Defendants enticed Mr. Rana to the United States with false promises regarding his employment, *id.* ¶¶ 28, 34-35, and then required him to work long hours under miserable conditions without pay.  *Id.* ¶¶ 39-42, 44, 52-53, 56.  Defendants compelled Mr. Rana to work for them by threatening to beat him and kill him if he did not follow their orders, *id.* ¶¶ 45, 48, 61, 66; confiscating his passport and visa, refusing to renew his visa, and telling him that without these documents, he would be captured and killed by the police if he left Defendants' apartment, *id.* ¶¶ 36, 38-39, 47-48, 61-62; isolating him from the outside world, *id.* ¶¶ 46, 49-50, 57, 59-60, 62; and monitoring his every move.  *Id.* ¶ 58.  In fact, when Mr. Rana refused to continue working for Defendants, Defendant Islam hit Mr. Rana, pushed him into a kitchen counter, and then threatened to kill him if he did not comply.  *Id.* ¶ 64.

Mr. Rana reasonably feared that if he left Defendants' employ, Defendants would beat or kill him or he would be captured by the American police, who would kill him or throw him in jail.  *See id.* ¶¶ 48, 61.  Accordingly, Mr. Rana has established that Defendants are liable for forced labor under the TVPA.  *See, e.g., Gurung*, 851 F. Supp. 2d at 594 (plaintiff "unquestionably established that the [defendants] induced her to work without pay [in violation

---

circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2) (emphasis added).

of § 1589] by seizing her passport and visa, restricting her ability to leave their apartment, and constantly warning her that if she traveled on her own without their permission, she would be arrested, beaten, raped, and sent back to India as 'cargo'"); *Shukla*, 2012 WL 481796, at *3-5 (evidence that defendants threatened to call the police and have the plaintiff "sent away" if he was uncooperative constituted threat of serious harm under § 1589 of the TVPA); *Howard*, 2012 WL 3834867, at *1 (defendants "used nonphysical force, such as isolation and threats of deportation, to coerce [the plaintiff] into servitude" in violation of § 1589).

        2.     <u>Defendants Violated The Trafficking Provision Of The TVPA.</u>

    A person has committed trafficking under the TVPA where he "knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services" for the purpose of forced labor or involuntary servitude.  18 U.S.C. § 1590; *Shukla*, 2012 WL 481796, at *5.  In this case, Defendants lured Mr. Rana to the United States with false promises of good wages and working conditions, Compl. ¶¶ 28, 34-35 (ECF No. 2); transported him from Bangladesh to New York, *id.* ¶¶ 37-38; and then harbored him in their Manhattan apartment, forcing him to perform nearly round-the-clock labor without pay.  *Id.* ¶¶ 39-42, 46, 52-53.  Thus, the uncontradicted facts satisfy the elements of trafficking under the TVPA.

        3.     <u>Defendants Violated The TVPA By Confiscating Mr. Rana's Passport And Visa.</u>

    It is unlawful to knowingly destroy, conceal, remove, confiscate, or possess another person's passport or other immigration or government identification document in the course of a violation, or with the intent to violate, the forced labor or trafficking sections of the TVPA.  18 U.S.C. § 1592.  Defendants did just that when they confiscated and maintained possession of Mr. Rana's passport and visa and then threatened that if Mr. Rana left the apartment where he was

enslaved, the police would kill or imprison him because he did not have immigration papers. Compl. ¶¶ 36, 38-39, 47-48, 61-62 (ECF No. 2).  Accordingly, Defendants are liable under § 1592 of the TVPA as well.

        4.    <u>Emotional Distress Damages And Punitive Damages Are Available Under The TVPA.</u>

Under the TVPA, defendants are liable for "the full amount of the victim's losses,"18 U.S.C. § 1593(b)(3), which includes damages for emotional distress as well as unpaid wages. *See, e.g.*, *Gurung*, 851 F. Supp. 2d at 594-95; *Shukla*, 2012 WL 481796, at *13-15; *Carazani*, 972 F. Supp. 2d at 24; *Howard*, 2012 WL 3834867, at *3.  In recent cases, courts have awarded emotional distress damages relating to forced domestic labor of trafficking victims ranging from $400 to $500 for each day of forced labor.  *See Gurung*, 851 F. Supp. 2d at 588, 595 (emotional distress damages of $500,000 for 40 months of forced labor, amounting to about $410 per day); *Carazani*, 972 F. Supp. 2d at 24-25 (emotional distress damages of $400 per day); *Doe*, 2012 WL 3834867, at *4 (emotional distress damages of $500 per day of forced labor); *Fernandes v. Hayes*, No. 11-CA-137 (W.D. Tex. Apr. 27, 2012) (emotional distress damages of $500 per day of forced labor) (Ex. T).  In *Shukla*, the court affirmed a jury award of $1,000,000 in compensatory damages under the TVPA for 42 months of forced labor, which amounts to about $780 per day of forced labor.  2012 WL 481796, at *13-14.

Punitive damages are also available under the TVPA.  *See, e.g.*, *Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011); *Francisco v. Susano*, 525 Fed. Appx. 828, 834-35 (10th Cir. 2013); *Carazani*, 972 F. Supp. 2d at 26.  Punitive damages awards should be based on the "degree of reprehensibility of the defendant's conduct" and "should reflect the enormity of [the defendant's] offense."  *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) (citation

omitted).  Other factors courts consider include whether "the harm caused was physical as opposed to economic; the tortuous conduct evinced an indifference to or a reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the result of intentional malice, trickery, or deceit, or mere accident."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  Courts also look to the amount of compensatory damages awarded.  *See Carazani*, 972 F. Supp. 2d at 27 (awarding a 1:1 ratio of compensatory to punitive damages); *Shukla*, 2012 WL 481796, at *16 (same); *Canal v. Dann*, No. 09-cv-03366, 2010 WL 3491136, at *4 (N.D. Cal. Sept. 2, 2010) (same); *Fernandes*, No. 11-CA-137 (awarding a 2:1 ratio of compensatory to punitive damages) (Ex. T).

## <u>CONCLUSION</u>

Mr. Rana respectfully requests that this Court strike Defendants' Answer and enter a default judgment against Defendants.  Mr. Rana also respectfully requests a hearing at a convenient time in May 2016[11] to determine the amounts owed to him.  Mr. Rana expects to call no more than four witnesses and submits that a half-day will be sufficient for this hearing.

April 15, 2016

*/s/ Emily Shea*
Emily Shea (admitted *pro hac vice*)
DECHERT LLP
1900 K Street, NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Email: emily.shea@dechert.com

*Attorneys for Plaintiff Mashud Parves Rana*

---

[11]     Plaintiff's expert witness is unavailable in June 2016.

24