```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 5/12/16
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------

MASHUD PARVES RANA,

                Plaintiff,

-against-

MONIRUL ISLAM and FAHIMA TASHINA PROVA,

                Defendants.

14-Cv-1993 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

Mashud Parves Rana brings this action against his former employers, Monirul Islam and Fahima Tashina Prova, alleging violations of various federal and state labor and human trafficking laws. Specifically, Rana alleges that defendants lured him to the United States to serve as their domestic servant during Islam's time as Bangladeshi Consul General in New York City. According to Rana, defendants maintained him in a state of slavery, giving him not the fair wages and conditions they had promised but rather threats and physical coercion. This action represents Rana's attempt to redress injuries stemming from his alleged bondage.

Because defendants have failed repeatedly to comply with numerous discovery orders in this action, Rana now asks the Court to strike defendants' answer and enter judgment by default against them as a sanction pursuant to Fed. R. Civ. P. 37. Rana's motion is granted.

## I. BACKGROUND

Rana served defendants Islam and Prova as a domestic worker for nearly nineteen months. (Compl. ¶ 1.) Islam is a Bangladeshi diplomat who was serving as the Consul General of Bangladesh in New York City. (Compl. ¶ 14.) Prova is Islam's wife. (Compl. ¶ 16.) Subsequent to the commencement of this action, Islam was relocated to Morocco in order to serve as the Bangladeshi Ambassador there. (Ex. 3 to Decl. of Emily Shea dated May 28, 2014 at 2, Dkt. No. 18.)

The complaint alleges that Islam and Prova hired Rana in Bangladesh to serve as their domestic worker during the time Islam served as the Bangladeshi Consul General in New York City. (Compl. ¶ 18.) Defendants helped Rana procure a visa and "lured" him to the United States with promises of fair wages and good working conditions. (Compl. ¶¶ 2, 27-31.) According to Rana, the conditions were anything but good: Rana often worked seventeen hours per day, seven days per week, and was never paid his promised wages. (Compl. ¶¶ 2-3.)

Defendants allegedly kept Rana in "slavery-like conditions." (Compl. ¶ 2.) He was forbidden to leave the defendants' New York City apartment. (Compl. ¶ 50.) They kept his passport and visa in their possession and threatened that if he left the apartment without those documents, the police would arrest or kill him because he would not be carrying proper documentation. (Compl. ¶¶ 2, 47-48.) These tactics allegedly kept Rana "in a state of near complete isolation and dependence." (Compl. ¶ 46, 50.)

The complaint further alleges that Islam physically assaulted Rana on two occasions. (Compl. ¶¶ 2, 61-64.) One of these assaults arose when Rana asked Islam for owed compensation. (Compl. ¶ 63.) Islam refused, struck Rana on the back of the head, and told Rana "I brought you to America, that is enough." (Compl. ¶ 63.) Ultimately, Rana contacted a relative's friend in New York City and was able to escape defendants' apartment. (Compl. ¶¶ 67-70.)

Rana's complaint sets forth seventeen causes of action. He brings several claims pursuant to the Trafficking Victims Protection Reauthorization Act, 18 U.S.C. § 1589, *et seq.*, seeking to hold defendants liable for forced labor and trafficking with respect to peonage, slavery, and involuntary servitude. (Compl. ¶¶ 87-111.) He also brings a variety of federal and New York labor law and common law tort claims. (Compl. ¶¶ 112-187.)

Islam and Prova have filed an answer in which they deny the substantive allegations in the complaint and state that "Plaintiff never wanted to leave the United States and is using this suit as a means of fraudulently obtaining legal immigration status." (Answer, Sixth Defense.) According to a letter that Islam sent to the Court, the only trouble in his employment relationship with Rana occurred when the Bangladeshi

government transferred Islam from New York City to Morocco. (Letter from Monirul Islam dated Feb. 3, 2016, Dkt. No. 98.) Rana, writes Islam, was "adamant to stay in the USA permanently by any means." (Islam Letter dated Feb. 3, Dkt. No. 98.) Defendants thus contend that Rana's lawsuit is a scurrilous ruse designed to ensure that he acquire "quick legal status in the USA" and be able to remain here. (*Id.*)

This Court has already recounted this action's somewhat convoluted history in its March 1, 2016 order granting defendants' attorneys leave to withdraw in large part because "defendants' continuing failure to cooperate in this litigation has rendered it unreasonably difficult for [counsel] to continue the representation." *Rana v. Islam*, No. 14-cv-1993, 2016 WL 859859 at *1 (S.D.N.Y. March 1, 2016). The Court recounts that history here and notes that essentially nothing has changed in the two months since the March 1 order: defendants have continued to fail to participate in this litigation.

Shortly after Rana filed this action, defendants moved to dismiss the complaint claiming among other things that their consular immunity barred suit. (Mem. of Law in Supp. of Defs.' Mot. to Dismiss, Dkt. No. 14.) That motion was denied in January 2015, *Rana v. Islam*, 305 F.R.D. 53 (S.D.N.Y. 2015), and the parties commenced discovery. (Order Endorsing Joint Discovery Plan dated Feb. 2, 2015, Dkt. No. 40.) Or so the Court thought.

In late April 2015 Rana moved for a clerk's entry of default on the ground that defendants' answer was three months overdue. (Pl.'s Appl. for Clerk's Entry of Default, Dkt. No. 41.) He withdrew that request in mid-May after defendants explained that the tardy answer was due to "an unexpected and extenuating circumstance" and wrote that they "intend to participate in this litigation in good faith." (Notice of Withdrawal of Pl.'s Appl. For Clerk's Entry of Default, Dkt. No. 44.) Defendants subsequently filed their answer.

By July 2015, defendants' participation had still not materialized despite a clear and specific scheduling order. (Discovery Plan Order dated Feb. 2, 2015, Dkt. No. 40.) They had failed to provide any initial disclosures; to respond to interrogatories; or to produce any requested documents. (Letter from Emily Shea dated July 2, 2015 at 2, Dkt. No. 46.) After plaintiff informed the Court of defendants' delinquencies—by that time the initial disclosures were nearly five months late, (Discovery Plan Order dated Feb.

3

2, 2015 at 2, Dkt. No. 40) — the Court issued an order compelling defendants to provide their initial disclosures by mid-July; to respond to document requests by late July; and to sit for depositions by mid-September. (Order dated July 8, 2015, Dkt. No. 47). The Court subsequently extended the deposition deadline to October 30, 2015. (Revised Scheduling Order dated Sept. 16, 2015, Dkt. No. 53; Letter from Emily Shea dated Sept. 15, 2015, Dkt. No. 52.) Defendants met none of those deadlines.

Instead, in October, defendants' attorneys filed their first motion to withdraw. According to counsel, Islam and Prova were not cooperating with them in defending this litigation or paying attorneys' fees. (Trans. of Pretrial Conference, Oct. 30, 2015 at 6:12-14, Dkt. No. 72.) Plaintiff opposed that motion, fearing that defense counsel's withdrawal would further delay this already stalled action.

During a pretrial conference held on October 30, 2015, defendant Islam unexpectedly telephoned the Court from Morocco, where he was by then serving as the Ambassador of Bangladesh to Morocco. He stated on the record that he intended to pay his attorneys and would sit for the required depositions. (Oct. 30 Trans. at 5:18-24, 10:24, 11:4-14, Dkt. No. 72; Affirmation of H. Bruce Fischer dated Jan. 4, 2016 ¶ 4, Dkt. No. 82.) On the basis of that representation, as well as Islam's representation to the Court that he intended to defend this action, the Court denied without prejudice counsel's motion to withdraw and directed those attorneys to continue to represent Islam and Prova. (Oct. 30 Trans. at 14:4 to 15:5, Dkt. No. 72; Order dated Oct. 30, 2015, Dkt. No. 60.)

At that same pretrial conference, Islam also stated that he was unable to attend a deposition outside Morocco unless the Bangladeshi government granted him permission to do so. (Oct. 30 Trans. at 8:25 to 9:6, Dkt. No. 72.) Islam, however, never provided any evidence whatsoever — apart from his own word on that telephone call — that his government in fact had prohibited him from leaving Morocco. Nor did he state that he would or did attempt to obtain his government's permission or that any such effort would be futile. Several weeks later, at the Court's direction, defense counsel Ellen M. Nichols wrote Islam, asking him to provide written proof of these facts, (Ex. 1 to Affirmation of Ellen M. Nichols dated Feb. 8, 2016 at 3-4, Dkt. No. 95), but Islam never responded to her. (Nichols Affirmation ¶ 13, Dkt. No.

4

95.) As a result of the representations Islam made at the October 30 court conference, the Court ordered that the depositions of Islam and Prova take place at the United States consulate in Casablanca, Morocco, by January 4, 2016. (Order dated Oct. 30, 2015, Dkt. No. 60.)

Subsequent to that October 30 order, plaintiff's attorney submitted evidence that depositions may only be taken in Morocco with the permission of the Moroccan Ministry of Justice. (Decl. of Emily Shea dated Dec. 21, 2015 ¶¶ 9-13, Dkt. No. 64.) Plaintiff's counsel also conferred with two Moroccan attorneys who informed her that the Ministry of Justice would "certainly" deny any request to depose defendants in Morocco because they have diplomatic immunity in Morocco. (Id. ¶¶ 12-13.) Upon learning this new information, Rana moved to compel defendants to sit for their depositions in New York or London rather than Morocco. (Mot. for an Order Requiring Defs. to Sit for Deps. in New York or London, Dkt. No. 62.)

Following plaintiff's motion to compel the depositions, the Court issued an order in January of this year seeking more information. (Order dated Jan. 6, 2016, Dkt. No. 81.) Specifically, the Court ordered defendants to state by January 12 whether they intended to participate in discovery; whether Islam had any plans to leave Morocco in the following six months; and when Prova—who is not a diplomat and presumably would be free to leave Morocco—was available to be deposed in New York or London. (Id. ¶ 5.) The Court also directed that if Islam consented to being deposed in Morocco as he had represented in the October 30 court conference, he must inquire whether the Moroccan Ministry of Justice would allow him to do so if he waives his immunity. (Id. ¶ 6.) Ultimately, defendants did not respond to multiple written inquiries by their attorneys seeking that information. (Nichols Affirmation ¶ 13, Dkt. No. 95.)

By the time the Court issued its January 2016 order, Rana had filed yet another motion to compel—this time he sought the production of various documents to which defendants had either not objected previously or had objected allegedly without any basis. (Pl.'s Mot. to Compel Defs. to Produce Docs., Dkt. No. 68.) After a January 14 pretrial conference at which counsel for all parties were present, the Court granted plaintiff's motion to compel document production and his motion to compel defendants to sit for depositions. (Order dated Jan. 15, 2016 ¶¶ 1-2, Dkt. No. 93.) Defendants

were directed to produce the required documents by January 29 or to set forth why they did not have the documents and what steps they had taken to locate them. (*Id.* ¶ 1.) Defendants were also directed to sit for depositions in London or New York by March 4, 2016. (*Id.* ¶ 2.)

As in several prior orders, (Order dated July 14, 2015, Dkt. No. 48; Order dated Oct. 30, 2015, Dkt. No. 60), the Court expressly notified defendants that failure to comply with this order compelling discovery would result in appropriate sanctions. (Order dated Jan. 15, 2016, ¶¶ 1(c), 2(a), 3, Dkt. No. 93.)

By this time, defense counsel, frustrated by defendants' complete failure to cooperate with them, had renewed their motion to withdraw. The Court deferred ruling on that motion and instead directed counsel to file an affidavit documenting their various attempts to communicate with their clients. (*Id.* ¶¶ 3-6.) In addition, the Court directed that defense counsel inform Islam and Prova about the range of sanctions that Fed. R. Civ. P. 37 authorizes if they continued to fail to comply with the Court's orders. (*Id.* ¶ 3.) The Court also explicitly directed defense counsel to instruct their clients that failure to comply with discovery orders could result in the entry of a default judgment against them. (*Id.* ¶ 3(d)-(e).) Counsel were directed to explain in detail to their clients that if a default judgment were imposed, "(1) a judgment of liability will be entered against [defendants]; (2) a subsequent proceeding will be held to determine the amount of damages; and (3) an enforceable judgment will be entered that will enable plaintiff to collect monetary damages." (*Id.* ¶ 3(e).) Finally, the Court directed defense counsel to provide their clients with a copy of Fed. R. Civ. P. 37. (*Id.* ¶ 3(b).)

Defense attorney Nichols subsequently reported that she had complied in full with the Court's order. Specifically, she had sent her clients numerous emails and letters informing them in detail of the specific requirements of the several court orders as well as the potential consequences of any continuing failure to comply. (Nichols Affirmation ¶¶ 4-6, 10-12, Dkt. No. 95.) She apprised her clients of the various sanctions that Fed. R. Civ. P. 37 provides as well as the serious consequences that stem from the imposition of a default judgment. (*Id.* ¶¶ 11 & Ex. 2.) As the Court had ordered, she also provided Islam and Prova a copy of Fed. R. Civ. P. 37. (*Id.* ¶ 11.)

Nichols' court ordered notifications and warnings have failed to produce defendants' compliance. They did not reply to any of Nichols' communications; they ignored every discovery deadline; and they have taken no steps whatsoever of which the Court is aware to schedule the depositions due by March 4, 2016, (Nichols Affirmation ¶ 13, Dkt. No. 95), more than two months ago. Defendants have been advised four times that sanctions may follow such failures, (Order dated July 8, 2015, Dkt. No. 47; Order dated July 14, 2015, Dkt. No. 48; Order dated Oct. 30, 2015, Dkt. No. 60; Order dated Jan. 15, 2016, Dkt. No. 93), and Nichols explained the nature and consequences of those sanctions. Plaintiff now asks the Court to follow through on its numerous warnings; default judgment day, Rana understandably urges, has come.

## II. DISCUSSION

Fed. R. Civ. P. 37 authorizes the Court to grant a default judgment to a plaintiff as a sanction for an adverse party failing to comply with discovery orders. Fed. R. Civ. P. 37(b)(2)(A)(vi). Although a default judgment is "the most severe sanction" that Rule 37(b) provides "because it terminates" the action, *Mason Tenders Dist. Council Welfare Fund v. Precise Brick, Inc.*, No. 08-cv-8373, 2009 WL 1675399 at *1 (S.D.N.Y. June 15, 2009), it "may be appropriate in 'extreme situations.'" *Guggenheim Capital, LLC v. Birnbaum*, 722 F.3d 444, 450-51 (2d Cir. 2013). The Court evaluates the propriety of a default judgment through the lens of four factors: (1) the willfulness of defendants' noncompliance; (2) whether lesser sanctions may be effective; (3) the duration of defendants' noncompliance; and (4) whether defendants have been warned that their failures would result in sanctions. *Id.* at 451. Here, each factor manifestly justifies the entry of a default judgment.

First, defendants' conduct was willful. *See id.* The Court has provided a truly fulsome number of opportunities for defendants to participate in this litigation. (*See, e.g.*, Order dated July 8, 2015, Dkt. No. 47; Order dated July 14, 2015, Dkt. No. 48; Order dated Oct. 30, 2015, Dkt. No. 60; Order dated Jan. 15, 2016, Dkt. No. 93; Order dated April 18, 2016, Dkt. No. 104.) Defendants have failed to comply with numerous oral and written discovery orders, and they were unquestionably on notice of each of those orders and the potential consequences of their failure to comply. (Order dated Jan. 15, 2016, Dkt. No. 93; Nichols Affirmation ¶¶ 4-5, 10-13, Dkt. No.

95.) Defendants' knowing and "sustained recalcitrance" was willful and justifies the imposition of a default judgment. *Guggenheim Capital*, 722 F.3d at 451.

Second, the Court has considered whether the other, lesser sanctions available in Fed. R. Civ. P. 37(b) might better procure defendants' compliance. *See SEC v. Razmilovic*, 738 F.3d 14, 26-27 (2d Cir. 2013). However, there is no reason to believe that any of those sanctions would lead to the desired outcome—the participation by defendants in defending this litigation. Defendants' lack of participation is not limited to individual pieces of evidence for which an order prohibiting them from supporting certain defenses or establishing various facts as true may provide a remedy for their noncompliance. *See* Fed. R. Civ. P. 37(b)(2)(A)(i)-(ii). Their complete failure to comply with numerous discovery orders has pervaded this litigation, and a default judgment is a concomitantly pervasive sanction.

Third, defendants' lack of compliance has spanned more than a year. *See Guggenheim Capital*, 722 F.3d at 451. Indeed, defendants ignored the court ordered deadline for initial disclosures more than fifteen months ago. (Discovery Plan Order dated Feb. 2, 2015, Dkt. No. 40; Shea letter dated July 2, 2015 at 2, Dkt. No. 46.) Plaintiff first notified the Court of defendant's failure to produce required documents nearly one year ago. (Shea Letter dated July 2, 2015, Dkt. No. 46.) In addition, defendants' lack of cooperation in scheduling their depositions has lasted for months. (Order dated July 14, 2015, Dkt. No. 48; Order dated Oct. 30, 2015, Dkt. No. 60; Order dated Jan. 15, 2016, Dkt. No. 93.) Islam and Prova's lengthy pattern of ignoring court orders again suggests that a default judgment is appropriate.

Fourth, defendants have received ample warnings of the possible consequences of their failures. *See Guggenheim Capital*, 722 F.3d at 452. Indeed, the Court instructed defendants' prior counsel to advise defendants in writing of the sanctions the Court may impose. (Order dated Jan. 15, 2016 ¶ 3, Dkt. No. 93.) The Court also ordered defense counsel to send by email, DHL courier service, and U.S. Postal Service a copy of Fed. R. Civ. P. 37. (*Id.*) The Court expressly ordered defense counsel both to explain that a default judgment might ensue and to illuminate defendants in detail as to the "implications" of such a judgment. (*Id.*) Counsel communicated these warnings to defendants (Nichols Affirmation ¶ 11, Dkt. No. 95), and the

8

warnings themselves were more than sufficient. *Guggenheim*, 722 F.3d at 452. Defendants had ample notice that plaintiff could move for, and this Court had the power to grant, suitably sweeping sanctions.

### III. CONCLUSION

A default judgment is harsh and is not imposed by this Court without hesitation. The Court has waited fifteen months for defendants to participate in this litigation and has given them numerous opportunities to alter course. Islam and Prova have utterly failed to participate in discovery in this action. A default judgment is appropriate.

It is HEREBY ORDERED that: (1) defendants' answer is stricken pursuant to Fed. R. Civ. P. 37(b)(2)(A)(iii); and (2) the Clerk of Court shall enter judgment by default in plaintiff's favor pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi).

Dated: New York, New York
May 12, 2016

SO ORDERED:

*[signature]*

Sidney H. Stein, U.S.D.J.

9