

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                                  :

MASHUD PARVES RANA,                :

                                     Plaintiff,     :

                                                :    No. 14-CV-01993 (SHS)

          -against-                    :

                                                :    ECF Case

MONIRUL ISLAM and                 :

FAHIMA TAHSINA PROVA,         :

                                Defendants.  :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**PRE-HEARING BRIEF IN SUPPORT OF PLAINTIFF'S
REQUEST FOR DAMAGES AGAINST DEFENDANTS**

       Plaintiff Mashud Rana respectfully submits this pre-hearing brief in support of his request for damages against Defendants Monirul Islam and Fahima Tahsina Prova. Judgment by default has been entered in Mr. Rana's favor, Defendants' Answer has been stricken, and all of Mr. Rana's allegations are deemed true. *See* Op. & Order (ECF No. 107); Default J. (ECF No. 108). Mr. Rana seeks statutory, compensatory, and punitive damages.

**FACTUAL BACKGROUND**

       Defendants "knowingly and willfully lured Mr. Rana from Bangladesh" to the United States for the purpose of "obtain[ing] Mr. Rana's forced labor and involuntary services" through "physical threats, coercion, isolation, physical restraint, physical force, [and] threats to Mr. Rana's life." Compl. (ECF No. 2) ¶¶ 2, 39. In June and July 2012, Defendants made various promises to induce Mr. Rana to travel to the United States with them, including that Defendants "would pay him $3,000 per month" and that "Mr. Rana would have some free time to himself every day" and "some days off." *Id.* ¶¶ 28, 34-35. In reliance upon these representations, Mr. Rana accepted Defendants' offer of employment. *Id.* ¶ 35.

Upon Mr. Rana's arrival in the United States on September 12, 2012, Defendants reneged on all their promises. *Id.* ¶¶ 38-39. Defendants "never paid Mr. Rana a single dollar of the promised wages." *Id.* ¶ 53. When Mr. Rana asked why Defendants had not paid him, Defendant Islam struck Mr. Rana and told him, "I brought you to America, that is enough." *Id.* ¶ 63. Defendants forced Mr. Rana to work over 16 hours each day — and often up to 20 hours — and never once gave him a day off. *Id.* ¶¶ 40-41, 52. Mr. Rana "was required to cook all meals from scratch, iron clothes, wash clothes by hand, watch Defendants' eleven-year-old son, and clean the entire apartment daily." *Id.* ¶ 40. When Defendants hosted parties in their home, they demanded that Mr. Rana "cook for all the guests, serve, and clean up after the guests left." *Id.* ¶ 41. Additionally, about once a month, Defendants required Mr. Rana to "work as a busboy and server" at events at the Bangladesh Consulate. *Id.* ¶ 42.

Defendants forced Mr. Rana to continue working "through a pattern of abusive and coercive behavior." *Id.* ¶ 39. Defendants isolated Mr. Rana completely and did not allow him to leave their apartment. *Id.* ¶¶ 46-50. Defendant Islam "told Mr. Rana that he would beat him if he did not listen to and follow his instructions" and "threatened to kill Mr. Rana" if he left the apartment. *Id.* ¶¶ 45, 48. Twice, Defendant Islam was physically violent — once, "hitting Mr. Rana on the back of the head" and another time, hitting Mr. Rana in the head and pushing him into the kitchen counter. *Id.* ¶¶ 63-64.

Defendants "maintained possession of Mr. Rana's passport and immigration-related documents" during the entire time Mr. Rana lived with Defendants. *Id.* ¶ 47. Defendant Islam "regularly told Mr. Rana that if he left the apartment, the police would find him and kill him because Mr. Rana did not have his passport" and that "if [Mr. Rana] was arrested, Defendant Islam would not seek to have him released from jail." *Id.* ¶ 48. Aside from "five or six short

trips to a convenience store across the street from Defendants' apartment at Defendants' instruction" — with Defendants watching from their apartment window — "Mr. Rana was only permitted to leave the residence (with Defendants) approximately once per month to work at the Bangladesh Consulate." *Id*. ¶¶ 49, 58.

Defendants "regularly and repeatedly called Mr. Rana 'illiterate,' 'stupid,' and 'lazy,' and told him he was 'nothing,' in an effort to demean, intimidate, and abuse Mr. Rana." *Id*. ¶ 55. Mr. Rana was frequently required "to eat expired or leftover food." *Id*. ¶ 56. He was "not allowed to talk to anyone outside of the house" and "was not permitted to make phone calls." *Id*. ¶¶ 57, 59. Defendants "closely monitored" Mr. Rana's activities. *Id*. ¶ 58. Defendant Prova "constantly watched Mr. Rana while he did his work during the day." *Id*. On the rare occasions when Mr. Rana's family called Defendants' residence to talk to Mr. Rana, Defendants listened in on the calls from a telephone in another room. *Id*.

In February 2014, Defendant Islam told Mr. Rana that he was moving to Morocco and that Mr. Rana must continue to work for the family in Morocco. *Id*. ¶ 64. Defendant Islam then "informed Mr. Rana that he must come with him to Morocco, or Defendant Islam would kill him." *Id*. ¶ 66. On March 2, 2014 — after enduring over 18 months of slavery-like conditions and abuse — Mr. Rana escaped from the Defendants' apartment with just "the clothes on his back and a few personal effects." *Id*. ¶ 70.

## **PROCEDURAL HISTORY**

Mr. Rana filed this action against Defendants on March 21, 2014, seeking damages pursuant to the Trafficking Victims Protection Reauthorization Act ("TVPA"), the Fair Labor Standards Act ("FLSA"), the New York Labor Law ("NYLL"), and New York common law. *Id.* ¶¶ 87-187. After the Court denied Defendants' motion to dismiss in its entirety, *see* Op. & Order

at 23 (ECF No. 35), Defendants wholly abandoned any intent to continue participating in this litigation. *See* Op. & Order at 3-7 (ECF No. 107); Pl.'s Mem. of Law in Support of Mot. to Strike Defs.' Answer and Enter a Default J. Against Defs. at 5-11 (ECF No. 101) [hereinafter Pl.'s Mem. ISO Default J.]. Defendants failed to timely answer Mr. Rana's Complaint and ignored Court orders to provide initial disclosures, respond to Mr. Rana's document requests, attend their depositions, appear at pretrial conferences, and file contact information with the Court. *See* Pl.'s Mem. ISO Default J. at 6-11; Op. & Order at 3-7 (ECF No. 107).

Defendants' refusal to comply with their discovery obligations and Court orders eventually led to their counsel's withdrawal, *see* Op. & Order at 5 (ECF No. 96), and ultimately to the Court's Order to enter judgment by default in favor of Mr. Rana. *See* Op. & Order at 9 (ECF No. 107); Default Judgment (ECF No. 108). As a result of this default judgment, Defendants' Answer is stricken, and the well-pleaded facts in Mr. Rana's Complaint are deemed true. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). In connection with his motion for a default judgment, Mr. Rana explained how the well-pleaded facts in his Complaint satisfy each element of his claims for relief. *See* Pl.'s Mem ISO Default J. at 17-24.

## ARGUMENT

This Court ordered an inquest to be held on September 7, 2016 to establish Mr. Rana's entitlement to damages. *See* Order (ECF No. 109). Mr. Rana plans to present evidence at the inquest to support his claim for damages. He respectfully submits this pre-hearing brief to provide an overview of the amount of damages he is seeking, the legal and factual basis for such damages, and an explanation of how such damages are calculated.

## I.    MR. RANA IS ENTITLED TO DAMAGES FOR DEFENDANTS' VIOLATIONS OF NEW YORK AND FEDERAL WAGE AND HOUR LAWS.

### A.    Unpaid Minimum and Overtime Wages

Mr. Rana pled and demonstrated that he is entitled to unpaid minimum wages under the NYLL and FLSA and unpaid overtime wages under the NYLL.  *See* Compl. ¶¶ 112-31; Pl.'s Mem. ISO Default J. at 18-19.  Defendants employed Mr. Rana in New York, and therefore Mr. Rana is protected by New York and federal labor laws.  Under the NYLL and the FLSA, Mr. Rana is entitled to the greater of the New York or federal minimum wage for the hours he worked for Defendants.  *See* N.Y. Lab. Law § 663(1); 29 U.S.C. § 218(a); *see also Estanislau v. Manchester Developers, LLC*, 316 F. Supp. 2d 104, 112 (D. Conn. 2004) ("To the extent that state law provides a greater remedy than the FLSA, Plaintiff would not be precluded from recovering under it.").  Under the NYLL, Mr. Rana is further entitled to overtime pay of one and one-half times his "normal wage rate," i.e. his contractual rate, for his work in excess of 44 hours per week.  *See* N.Y. Lab. Law § 170; N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2; *Gurung v. Malhotra*, 851 F. Supp. 2d 538, 591 (S.D.N.Y. 2012) (awarding domestic worker overtime wages pursuant to the NYLL).

Mr. Rana worked for Defendants from September 12, 2012 to March 2, 2014 — a total of 536 days.[1]  Compl. ¶¶ 38, 40, 52, 69-70.  He worked approximately 17 hours each day[2] and

---

[1]    This figure includes the day that Mr. Rana arrived in New York, *see* Compl. ¶ 38, 40, as he was put to work immediately upon his arrival, and to be conservative, excludes the day of Mr. Rana's escape even though Mr. Rana worked for part of that day.

[2]    17 hours per day is a conservative estimate for two reasons.  First, while Mr. Rana worked 16 ½ hours most days, he often worked 18 ½ to 20 ½ hours.  *See* Compl. ¶¶ 40-41.  Second, because Mr. Rana was required to remain in Defendants' apartment and follow their orders at all times, there is support for Mr. Rana's entitlement to payment for *24 hours* each day.  *See* 29 C.F.R. § 785.17 ("[a]n employee who is required to remain on call on the employer's premises or so close thereto that he cannot use the time effectively for his own purposes is working while 'on call'"); *Jiao v. Shi Ya Chen*, No. 03 Civ. 0165, 2007 WL 4944767, at *11 (S.D.N.Y. Mar. 30, 2007)

never received a day off.[3]  Compl. ¶¶ 40-42, 52.

From the day Mr. Rana began working for Defendants through December 30, 2013, the New York and federal minimum hourly wages were each $7.25.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.1(a)(2); 29 U.S.C. § 206(a)(1)(C).  From December 31, 2013 through March 2, 2014, when Mr. Rana escaped Defendants' employ, the New York minimum hourly wage was $8.00, and the federal minimum hourly wage was $7.25.  N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.1(a)(3); 29 U.S.C. § 206(a)(1)(C).  For purposes of calculating unpaid overtime wages under the NYLL, Mr. Rana's contractual rate applies.  *See* N.Y. Lab. Law § 170.  Mr. Rana was contractually entitled to "the greater of the minimum wage under U.S. Federal and state law, or the prevailing wage for all working hours."[4]  *See* Compl. ¶ 85(iii) (citing 9 Foreign Affairs

---

("Time spent waiting for work is compensable if the waiting time is spent primarily for the benefit of the employer and his business." (quotation marks and citation omitted)).

Furthermore, Mr. Rana's recollection of the hours he worked is legally sufficient, as Defendants have refused to answer the Complaint and produce employment records to the contrary.  "Where an employer fails to maintain adequate records of his employees' compensable time as required by the FLSA, a plaintiff employee must produce only sufficient evidence" — including "his own recollection" — to show the amount and extent of that work as a matter of just and reasonable inference." *Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 331-32 (S.D.N.Y. 2009); *see also Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 552 (S.D.N.Y. 2011).

[3] Defendants returned to Bangladesh for about a month in the fall of 2012; Mr. Rana remained in the United States.  During this time, Defendants assigned Mr. Rana fewer tasks, but they forbade him to leave the apartment.  As Mr. Rana will explain at the inquest, Defendants' restrictions on his ability to leave the apartment, their failure to provide him with basic necessities before their departure, and their telephone calls to ensure that he was alert to their needs prevented him from "us[ing] the time effectively for his own purposes." *See* 29 C.F.R. § 785.16(a).  Accordingly, this month was not a period of "complete freedom from all duties when [Mr. Rana] [could] leave the premises for purposes of his own." *See* 29 C.F.R. § 785.23.  Instead, Mr. Rana was working while "on call." *See* 29 C.F.R. § 785.17; *see also Jiao*, 2007 WL 4944767, at *12-13 (plaintiff required to spend his idle time at employer's hotel entitled to damages for 24 hours of work per day).

[4] In order to bring Mr. Rana to the United States, Defendants obtained an A-3 visa for him.  Compl. ¶¶ 27-36; 85.  Such visas are available to foreign consular officers posted in the United States for their domestic workers if they submit, among other requirements, an "employment contract . . . that has been signed by both the applicant [i.e., the employee] and the employer," stating that the

6

Manual § 41.22 N4.4(b)(3) (Dep't of State 2011)) (included as Ex. 6).[5] From the time Mr. Rana began working for Defendants through June 2013, the prevailing wage for housekeepers in New York City was $9.74 per hour; from July 2013 until Mr. Rana's escape, the prevailing wage was $10.32 per hour. *See* Exs. 2, 3.

Accordingly, Mr. Rana is entitled to a total of $110,745.89 in unpaid wages: $24,834.50 for the hours he worked up to 44 hours each week and an additional $85,911.39 for the overtime hours he worked.[6] *See* Shea Decl. ¶¶ 18-19 & Ex. 1 (explaining calculation of NYLL damages in detail).

### B. Unpaid Spread of Hours Wages

Mr. Rana has also asserted and demonstrated that he is entitled to recover unpaid spread of hours wages under the NYLL. S*ee* Compl. ¶¶ 132-35; Pl.'s Mem. ISO Default J. at 18-19. New York's spread of hours provision requires an employer to pay an employee who works more than 10 hours in one day an additional hour at the minimum wage. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.4; *Gurung*, 851 F. Supp. 2d at 591 (awarding domestic worker spread of hours damages). Because Mr. Rana worked more than 10 hours every day that he was employed by Defendants, *see* Compl. ¶¶ 40-41, he is owed an additional hour's pay for each of these days — a total of $3,931.75. *See* Shea Decl. ¶¶ 20-21 & Ex. 1.

---

employee is entitled to "the greater of the minimum wage under U.S. Federal and state law, or the prevailing wage for all working hours." Ex. 6.

[5] All exhibits referenced in this brief are exhibits to the Decl. of Emily Shea in Support of Plaintiff's Request for Damages Against Defendants [hereinafter Shea Decl.].

[6] Mr. Rana's unpaid overtime damages would be $63,033.22 if calculated using the minimum wage rather than his contractual wage. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2.

7

### C. Liquidated Damages

Mr. Rana has further pled and demonstrated his right to liquidated damages under the NYLL and the FLSA. *See* Compl. ¶¶ 119, 127, 131, 135; Pl.'s Mem. ISO Default J. at 19-20. Both the NYLL and FLSA provide for the recovery of liquidated, in addition to compensatory, damages. Under the NYLL, liquidated damages are available in an amount equal to the employer's underpayment "unless the employer proves a good faith basis to believe that its underpayment of wages was in compliance with the law." N.Y. Lab. Law § 663(1). Similarly, under the FLSA, liquidated damages in an amount equal to the underpayment are mandatory unless the employer demonstrates that it acted in good faith. 29 U.S.C. §§ 216(b), 260.

Defendants have not introduced any evidence to support a hypothetical argument that their underpayment of wages was based on a good faith belief that they were complying with the FLSA, the NYLL, or any other law. Furthermore, there is uncontradicted evidence that Defendants acted willfully and in bad faith. Indeed, when Mr. Rana inquired about his lack of compensation, Defendant Islam hit Mr. Rana on the back of the head and said, "I brought you to America; that is enough." Compl. ¶ 63. Accordingly, Mr. Rana is entitled to liquidated damages. *See Gurung*, 851 F. Supp. 2d at 592 (after entry of default judgment, awarding liquidated damages to domestic worker who alleged that the defendant employers acted willfully by, among other things, ignoring her requests to be paid).

Under the NYLL, Mr. Rana is entitled to $114,677.64 in liquidated damages (100% of the minimum wage, overtime, and spread of hours underpayment, as calculated above). *See* Shea Decl. ¶ 22 & Ex. 1. Additionally, under the FSLA, Mr. Rana is entitled to $66,062.00 in liquidated damages (100% of the underpayment, as calculated under the *federal* minimum wage requirements). *See id.* ¶ 27 & Ex. 4 (explaining calculation of FLSA damages in detail). Mr. Rana can recover these amounts simultaneously because liquidated damages under the FLSA and

8

the NYLL serve different purposes. *See Gurung*, 851 F. Supp. 2d at 594 (holding that the plaintiff "should be permitted to recover liquidated damages under both the FLSA and the NYLL"); *see also Almanzar v. C & I Assocs., Inc.*, No. 14-Cv-1810, 2016 WL 1268271, at *7 (S.D.N.Y. Mar. 31, 2016) (noting that "a majority of courts in this Circuit have concluded that an employee may recover liquidated damages pursuant to *both* the FLSA and NYLL"). Liquidated damages under the FLSA "are considered compensatory, essentially serving as a form of prejudgment interest" whereas "liquidated damages under the NYLL are punitive." *Gurung*, 851 F. Supp. 2d at 593. Consequently, Defendants must pay Mr. Rana a total amount of $180,739.64 in liquidated damages pursuant to both the FLSA and the NYLL. *See* Shea Decl. ¶¶ 22, 27 & Exs. 1, 4.

      D.     **Notice and Recordkeeping Violations**

Mr. Rana has also pled and proven Defendants' failure to obey the NYLL's notice and recordkeeping requirements. *See* Compl. ¶¶ 141-44; Pl.'s Mem. ISO Default J. at 20. The NYLL requires an employer to provide each employee with notice of and statements showing the employee's pay rate and wages. N.Y. Lab. Law §§ 195(1)(a); 195(3). At the time of Mr. Rana's captivity, an employee who did not receive a copy of a written notice containing, *inter alia*, information about his or her pay rate within 10 days of his or her first day of employment could recover $50 in damages for each work week that the violation occurred, up to a statutory maximum of $2,500. N.Y. Lab. Law § 198(1-b). Additionally, employees who did not receive a written statement each payday of days worked and wages earned could recover $100 in damages for each work week that the violations occurred, up to a statutory maximum of $2,500. N.Y. Lab. Law 198(1-d). Mr. Rana never received the required notice or wage statements during the 76-plus weeks that he worked for Defendants. Compl. ¶ 80. Accordingly, he is entitled to recover the statutory maximum for each these violations, for a total of $5,000.00.

9

### E. Total Wage and Hour Damages

Mr. Rana is entitled to recover a total of $300,417.28 for his wage and hour claims as summarized below. *See* Shea Decl. ¶¶ 23, 27 & Exs. 1, 4.

| Minimum Wage Underpayment | Overtime Underpayment | Spread of Hours Underpayment | Liquidated Damages | Notice & Recordkeeping Damages | **Total Wage and Hour Damages** |
|---|---|---|---|---|---|
| $24,834.50 | $85,911.39 | $3,931.75 | $180,739.64 | $5,000.00 | **$300,417.28** |

### II. MR. RANA IS ENTITLED TO BREACH OF CONTRACT DAMAGES.

Mr. Rana may also "recover additional damages for breach of contract to the extent []he is contractually entitled to more than the amount awarded under the FLSA [and NYLL]." *Lagasan v. Al-Ghasel*, 92 F. Supp. 3d 445, 459 (E.D. Va. 2015) (awarding domestic worker unpaid minimum wages under the FLSA and the additional amount she was contractually owed); *Carazani v. Zegarra*, 972 F. Supp. 2d 1, 19 (D.D.C. 2013) (adjusting the plaintiff's contractual wages as the prevailing wage varied over time); *Gurung*, 851 F. Supp. 2d at 590-91 (awarding damages at the fluctuating prevailing wage based "on a contract theory"). As discussed above, Mr. Rana is contractually entitled to "***the greater of*** the minimum wage under U.S. Federal and state law, ***or the prevailing wage*** for all working hours . . . ." Compl. ¶ 85 (emphasis added). Accordingly, Mr. Rana is entitled to additional breach of contract damages to the extent the "prevailing wage" exceeds the minimum wage — $9,047.96. *See* Shea Decl. ¶ 32 & Ex. 5 (explaining breach of contract damages in detail).

### III. MR. RANA IS ENTITLED TO DAMAGES FOR DEFENDANTS' VIOLATIONS OF THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2008.

10

The TVPA provides victims of human trafficking with a civil cause of action for any "violation of this chapter." 18 U.S.C. § 1595(a). Such violations include "[f]orced labor," 18 U.S.C. § 1589; "[t]rafficking with respect to peonage, slavery, involuntary servitude, or forced labor," 18 U.S.C. § 1590; and "[u]nlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor." 18 U.S.C. § 1592. Mr. Rana has established Defendants' liability with respect to each of these provisions of the TVPA. *See* Compl. ¶¶ 87-111; Pl.'s Mem. ISO Default J. at 17-24. Mr. Rana requests that this Court award him compensatory damages for his emotional distress and punitive damages for Defendants' abhorrent mistreatment of him.

### A. Emotional Distress Damages

Under the TVPA, Defendants are liable for "the full amount of the victim's losses." 18 U.S.C. § 1593(b)(3). In addition to damages for unpaid wages, as calculated above, "the full amount of the victim's losses" includes emotional distress damages. *See, e.g.*, *Gurung*, 851 F. Supp. 2d at 594-95; *Shukla v. Sharma*, No. 07-cv-2972, 2012 WL 481796, at *13-15 (E.D.N.Y. Feb. 14, 2012); *Carazani*, 972 F. Supp. 2d at 24; *Doe v. Howard*, No. 11-cv-1105, 2012 WL 3834930, at *3 (E.D. Va. Aug. 7, 2012), *adopted in full*, 2012 WL 3834867 (E.D. Va. Sept. 4, 2012). In recent cases, courts and juries have awarded emotional distress damages to trafficking victims ranging from $400 to $780 for each day of forced labor. *See Gurung*, 851 F. Supp. 2d at 588, 595 (awarding $410 per day); *Lagasan*, 92 F. Supp. at 458 (awarding $400 per day); *Carazani*, 972 F. Supp. 2d at 24-25 (awarding $400 per day); *Doe*, 2012 WL 3834867, at *4 (awarding $500 per day); Ex. 8, *Fernandes v. Hayes*, No. 11-CA-137 (W.D. Tex. Apr. 27, 2012) (awarding $500 per day); *Shukla*, 2012 WL 481796, at *13-14 (affirming jury award of $780 per day). Attached as Exhibit 7 is a summary of emotional distress damages awards in recent human trafficking cases.

11

Like the plaintiffs in the cases noted above, Mr. Rana suffered extreme emotional distress at the hands of Defendants. Defendants subjected Mr. Rana to grueling work days with no pay (Compl. ¶¶ 40-42; 52-53); regularly insulted and demeaned him (*id*. ¶ 55); constantly monitored his activities and deprived him of all autonomy (*id*. ¶¶ 58-59); forced him to sleep on the kitchen floor and later in a storage room (*id.* ¶ 44); and only allowed him to eat old and expired food (*id.* ¶ 56). Comparatively, Mr. Rana's experience was even worse than some plaintiffs subjected to forced domestic labor in other cases, as Defendant Islam repeatedly threatened to beat and kill Mr. Rana, *id.* ¶¶ 45, 48, 61, 66; and twice physically attacked him. *Id.* ¶¶ 63-64. At the inquest, Mr. Rana will describe additional examples of the inhumane treatment he experienced, and will present evidence showing the lasting psychological damage he suffers as a result of Defendants' abuse. Accordingly, Mr. Rana seeks $241,200.00 in compensatory damages for emotional distress, which amounts to $450 per day for the 536 days he was enslaved by Defendants.

### B. Punitive Damages

In accordance with the TVPA's command that defendants be held liable for "the full amount of the victim's losses," courts have frequently awarded punitive damages to plaintiffs like Mr. Rana who have suffered particularly abhorrent mistreatment. *See, e.g.*, *Ditullio v. Boehm*, 662 F.3d 1091, 1098 (9th Cir. 2011); *Francisco v. Susano*, 525 F. App'x 828, 834-35 (10th Cir. 2013); *Carazani*, 972 F. Supp. 2d at 26. Punitive damages awards should be based on the "degree of reprehensibility of the defendant's conduct" and "should reflect the enormity of [the defendant's] offense." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996) (citation omitted). Other factors courts consider include whether "the harm caused was physical as opposed to economic; the tortuous conduct evinced an indifference to or a reckless disregard of the health and safety of others; the target of the conduct had financial vulnerability; [whether] the conduct involved repeated actions or was an isolated incident; and [whether] the harm was the

12

result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). Courts also look to the amount of compensatory damages awarded. *See, e.g.*, *Lagasan*, 92 F. Supp. 3d at 458 (awarding a 1:1 ratio of compensatory to punitive damages); *Carazani*, 972 F. Supp. 2d at 27 (same); *Shukla*, 2012 WL 481796, at *16 (same); *Canal v. Dann*, No. 09-cv-03366, 2010 WL 3491136, at *4 (N.D. Cal. Sept. 2, 2010) (same); Ex. 8, *Fernandes*, No. 11-CA-137 (awarding a 2:1 ratio of compensatory to punitive damages). Exhibit 7 includes summaries of punitive damages awards in recent human trafficking cases involving forced domestic labor.

Here, Defendants' conduct was truly reprehensible, and all the relevant factors favor a significant punitive damages award. The harm that Defendants inflicted on Mr. Rana was physical, rather than simply economic. He was worked to the bone with little time to sleep, (Compl. ¶¶ 40-42); given inadequate food (*id.* ¶ 56); physically attacked (*id.* 63-64); and regularly threatened with violence and even death. *Id.* ¶¶ 45, 48, 61, 66. Defendants' barbaric treatment of Mr. Rana was intentional and lasted for 18 months, only ending when Mr. Rana escaped. *Id.* ¶¶ 38-39, 69-70. At the inquest, Mr. Rana will testify in detail about Defendants' heinous behavior. Mr. Rana seeks $430,987.60 in punitive damages, which is equal to the total amount of compensatory damages he is owed.[7]

## IV.  DAMAGES OFFSET

At the inquest, Mr. Rana will testify that after he escaped from Defendants and filed this lawsuit, law enforcement located a U.S. bank account in Defendant Islam's and Mr. Rana's

---

[7] The compensatory damages Mr. Rana seeks include minimum wage, overtime, and spread of hours underpayment, FLSA liquidated damages, breach of contract damages, and emotional distress damages. It does not include NYLL liquidated damages, because such damages are punitive, not compensatory. *See Gurung*, 851 F. Supp. 2d at 593.

13

name. Mr. Rana did not know about the existence of this bank account. Defendants never told Mr. Rana that they had opened a joint bank account with him or gave any indication that they never intended to pay Mr. Rana any compensation for his services. Indeed, when Mr. Rana inquired about his lack of pay, Defendant Islam made clear that Defendants were not planning to pay him anything. Compl. ¶ 63. In April 2014, law enforcement agents helped Mr. Rana withdraw the funds from the bank account. Because his name was on the bank account, Mr. Rana was able to withdraw the $13,005.00 that was in the account. Mr. Rana seeks only those damages over and above the $13,005.00 he recovered from this bank account.

## V. MR. RANA IS ENTITLED TO PREJUDGEMENT INTEREST FOR HIS CLAIMS THAT ARISE OUT OF NEW YORK LAW.

Mr. Rana is also entitled to prejudgment interest on his NYLL and breach of contract claims at the rate of nine percent per annum. *See* N.Y. C.P.L.R. §§ 5001, 5004; N.Y. Lab. Law § 198(1-a); *see also Gurung*, 851 F. Supp. 2d at 594 (awarding prejudgment interest on New York labor law claims). Since Mr. Rana incurred damages over the course of the 536-day period that Defendants enslaved him, interest should be calculated from the midpoint of the period. *See* N.Y. C.P.L.R. § 5001(b). The midpoint of this period is the 268th day, June 6, 2013. Accordingly, as of the Court's scheduled hearing on September 7, 2016, Mr. Rana will be entitled to prejudgment interest on his state law claims in the amount of $74,742.22.[8]

---

[8] To be conservative, prejudgment interest is calculated *after* offsetting the total damages sought by Mr. Rana by the $13,005.00 he recovered after filing the Complaint.

14

## VI.     TOTAL DAMAGES SOUGHT

Mr. Rana seeks a total of $1,043,390.06 in compensatory and punitive damages. These damages are summarized below:

| NYLL and FLSA | Breach of Contract | Emotional Distress | Punitive | Offset | Prejudgment Interest | **Total** |
|---|---|---|---|---|---|---|
| $300,417.28 | $9,047.96 | $241,200.00 | $430,987.60 | ($13,005.00) | $74,742.22 | **$1,043,390.06** |

## CONCLUSION

For the reasons set forth above, and that will be presented at the inquest, Mr. Rana respectfully requests that this Court award him damages in the amount of $1,043,390.06.

August 29, 2016

*/s/ Emily Shea*
Emily Shea (admitted *pro hac vice*)
DECHERT LLP
1900 K Street NW
Washington, D.C. 20006
Telephone: (202) 261-3300
Email: emily.shea@dechert.com

*Attorney for Plaintiff Mashud Parves Rana*